UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x
LIBERTY CAPITAL GROUP, Individually      :    Civil Action No.
and on Behalf of All Others Similarly Situated, :
                                         :    <u>CLASS ACTION</u>
                 Plaintiff,              :
                                         :    CLASS ACTION COMPLAINT
                                         :
      vs.                                :
                                         :
                                         :
OPPENHEIMER HOLDINGS INC.,               :
OPPENHEIMER & CO. INC., and              :
OPPENHEIMER ASSET MANAGEMENT             :    <u>DEMAND FOR JURY TRIAL</u>
INC.                                     :
                                         :
                 Defendants.             :
———————————————————— x

By and through its undersigned counsel, Liberty Capital Group ("Plaintiff") brings this class action against defendant Oppenheimer Holdings Inc. ("OPY") and its wholly owned subsidiaries, defendants Oppenheimer & Co., Inc. ("Oppenheimer") and Oppenheimer Asset Management Inc. ("OAM")  (collectively, "Defendants"), upon personal knowledge as to those allegations concerning Plaintiff and, as to all other matters, upon the investigation of counsel, including, but not limited to, review and analysis of: (a) documents created and distributed by Defendants; (b) public filings made by OPY with the U.S. Securities and Exchange Commission ("SEC"); (c) press releases disseminated by Defendants and the SEC; and (d) news articles, websites, and other publicly available information concerning Defendants.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## SUMMARY OF THE ACTION

1.      Plaintiff brings this class action to recover damages arising out of Defendants' unlawful conduct related to their Advantage Bank Deposit Program ("ABD Program").  Under the ABD Program, Defendants automatically invested customer cash into interest-bearing accounts at program banks selected by Defendants.

2.      The cash sweep accounts were highly lucrative for Defendants and their program banks but paid unreasonable, below-market interest rates to Oppenheimer customers.  Defendants and their program banks capitalized on the difference (*i.e.*, "spread") between the miniscule rates paid to customers – currently as low as 0.25% – and the returns they earned from the use of this low-cost cash.

3.      Defendants' use of the ABD Program to enrich themselves by paying unreasonably low interest rates to Oppenheimer customers during sky-high interest rate environments breached their fiduciary duties and contractual obligations and otherwise violated New York law.

## JURISDICTION AND VENUE

4.     This Court has subject matter jurisdiction under the Class Action Fairness Act of 2005, 28 U.S.C. §1332(d)(2) and (6), because: (a) there are 100 or more class members; (b) there is an aggregate amount in controversy exceeding $5,000,000.00 exclusive of interest and costs; and (c) there is minimal diversity because at least one proposed class member plaintiff and one defendant are citizens of different states.

5.     This Court has personal jurisdiction over Defendants because, during the relevant time period, Defendants were headquartered in New York; Defendants had offices in New York, regularly transacted business in New York, and intentionally availed themselves of the laws and markets of New York through the promotion, sale, marketing, distribution, and operation of their products and services in New York; and many of the acts and practices complained of herein occurred in substantial part in New York.

6.     Venue is proper in this District pursuant to 28 U.S.C. §1391 because, during the relevant time period, Defendants were headquartered in this District, Defendants transacted business and had offices in this District, and many of the acts and practices complained of herein occurred in substantial part in this District.

## PARTIES

**Plaintiff**

7.     Plaintiff Liberty Capital Group is a limited liability company located in New York. During the relevant time period, Plaintiff held a standard brokerage account with Oppenheimer. As an Oppenheimer account holder, Plaintiff's cash deposits were swept into the banks that Defendants selected in their discretion at the unreasonably low interest rates alleged herein. Plaintiff's account was eligible to receive a rate of interest of 0.25% on cash swept from its accounts under the ABD Program as of year-end 2024.

**Defendants**

8.      Defendant Oppenheimer Holdings Inc. is a Delaware corporation headquartered at 85 Broad Street, New York, NY 10004.  OPY is a financial services company that conducts business throughout the United States, manages over 49.4 billion in assets, and has over 3,000 employees.  OPY is the parent company and control person of Oppenheimer and OAM. OPY participates in the operation and control of the ABD Program, including by interest rate setting and receiving compensation in connection with the ABD Program.

9.      Defendant Oppenheimer & Co. Inc. is a Delaware corporation headquartered at 85 Broad Street, New York, NY 10004.  Oppenheimer is a broker-dealer and a Registered Investment Advisor that offers brokerage and investment advisory services to its nationwide client base. Oppenheimer acts as its customers' agent for the establishment, maintenance, and operation of the ABD Program.  Oppenheimer is a wholly owned subsidiary of, and controlled by, OPY.

10.     Defendant Oppenheimer Asset Management Inc. is a Delaware corporation headquartered at 85 Broad Street, New York, NY 10004. OAM is a Registered Investment Advisor that offers investment advisory services to its nationwide client base through wrap fee programs. OAM is a majority-owned subsidiary of, and controlled by, OPY. OAM participates in the administration of the ABD Program, including by implementing cash allocation strategies and automatically investing the cash balances of customers enrolled in all advisory programs sponsored by OAM in the ABD Program.

## SUBSTANTIVE ALLEGATIONS

**Background on Defendants' ABD Program**

11.     OPY is a global financial services company.  During the relevant time period, OPY's wholly owned subsidiary, Oppenheimer, offered brokerage and investment advisory

services to customers nationwide.  These services included the ABD Program, the exclusive sweep option for cash balances in both brokerage and advisory accounts.

12.     Oppenheimer provided the ABD Program to customers enrolled in several types of brokerage accounts with Oppenheimer and incorporated the terms of the ABD Program in the agreements governing each account-type (as further described in the following section).

13.     Under the ABD Program, Oppenheimer automatically invests eligible clients' cash balances into interest bearing deposit accounts ("Deposit Accounts") at one or more program banks selected by Defendants ("Program Banks").[1]  Funds held by the Program Banks under the ABD Program are insured by the Federal Deposit Insurance Corporation ("FDIC") up to $250,000 per depositor.

14.     As detailed below, Oppenheimer exercised broad managerial discretion and agency over customer cash in the ABD Programs.  This included selecting the Program Banks, establishing Deposit Accounts at the Program Banks, moving customer cash to and from the Deposit Accounts, setting and adjusting interest rate tiers, coordinating with the Program Banks to establish the interest rates paid on customer deposits in the ABD Program, and retaining a fee from the interest accrued on the Deposit Accounts.

15.     The terms and conditions of the ABD Program are set forth in Oppenheimer's Terms and Conditions of the Advantage Bank Deposit Program ("Sweep Agreement").[2] Brokerage

---

[1]     The current list of Program Banks is published on Oppenheimer's website. *See* Oppenheimer, *Advantage Bank Deposit Program, Deposit Bank List* (May 16, 2025), https://www.oppenheimer.com/getmedia/c7258501-185b-44d1-8903-6f010e18be4d/25-FORM-34-Advantage-Bank-Deposit-Program-05-16-25_7976155-1.pdf.

[2]     Oppenheimer, *THE ADVANTAGE BANK DEPOSIT PROGRAM* (June 2021), https://www.oppenheimer.com/getmedia/e9122c95-63ea-48c1-a3e0-be96be58ce1c/21-bro-48-abd-programterms-061021_3628390-1.pdf.

accounts are further governed by Oppenheimer's Brokerage Relationship and Disclosure Guide ("Brokerage Disclosure Guide"),[3] Oppenheimer Customer Relationship Summary ("Oppenheimer CRS"),[4] Oppenheimer Form ADV Part 2A ("Brokerage Advisory Brochure"),[5] and Oppenheimer Form ADV Part 2A, Appendix 1 ("Brokerage Wrap Fee Brochure") (collectively, "Brokerage Documents").[6] In addition to the Sweep Documents, advisory accounts, managed through OAM, are subject to the Customer Relationship Summary ("OAM CRS"),[7] Oppenheimer Asset Management Form ADV Part 2A ("OAM Advisory Brochure"),[8] and Oppenheimer Asset Management Form ADV Part 2A, Appendix 1 ("OAM Wrap Fee Brochure")[9] (collectively, "OAM Documents," and together with Brokerage Documents and Sweep Documents, "Program Documents").

---

[3]    Oppenheimer, *Brokerage Relationship and Disclosure Guide For Retail Broker-Dealer Clients* (Mar. 8, 2023), https://www.oppenheimer.com/legal/brokerage-relationship-and-disclosure-guide.aspx.

[4]    Oppenheimer, *Oppenheimer & Co. Inc. Customer Relationship Summary* (Mar. 27, 2025), https://www.oppenheimer.com/legal/opco-crs.aspx.

[5]    Oppenheimer, *PART 2A OF FORM ADV: FIRM BROCHURE* (Mar. 27, 2025), https://files.adviserinfo.sec.gov/IAPD/Content/Common/crd_iapd_Brochure.aspx?BRCHR_VRSN_ID=962339.

[6]    Oppenheimer, *Part 2A Appendix 1 of Form ADV* (Mar. 27, 2025), https://files.adviserinfo.sec.gov/IAPD/Content/Common/crd_iapd_Brochure.aspx?BRCHR_VRSN_ID=962340.

[7]    Oppenheimer, *Oppenheimer Asset Management Customer Relationship Summary* (Mar. 27, 2025), https://www.oppenheimer.com/legal/oam-crs.aspx.

[8]    Oppenheimer, *PART 2A OF FORM ADV: FIRM BROCHURE* (Mar. 27, 2025), https://files.adviserinfo.sec.gov/IAPD/Content/Common/crd_iapd_Brochure.aspx?BRCHR_VRSN_ID=962318.

[9]    Oppenheimer, *Part 2A Appendix 1 of Form ADV* (Mar. 27, 2025), https://files.adviserinfo.sec.gov/IAPD/Content/Common/crd_iapd_Brochure.aspx?BRCHR_VRSN_ID=962319.

16.    The ABD Program functions and is operated in the same manner regardless of account type, and the Program Documents explain the details of the ABD Program in the same fashion within both the Brokerage Documents and Advisory Documents alike.  As the Brokerage Disclosure Guide explains:

> Cash balances in all brokerage accounts and all advisory programs sponsored by Oppenheimer are invested automatically in certain participating banks in the Advantage Bank Deposit Program (the "ABD Program").  Oppenheimer receives a fee from each deposit bank.  The amount of the fee paid to Oppenheimer will affect the interest rate paid on Deposit Accounts.  To the extent more of the fee paid is retained by Oppenheimer the interest rate paid to clients on Deposit Accounts will be less.[10]

17.    The Sweep Documents provide that interest rates under the ABD Program "will vary based upon the amount of funds [customers] maintain in the Deposit Accounts held in the ABD Program ('Interest Rate Tiers')."[11]  Currently, customer cash invested under the ABD Program earns interest according to the following rate schedule:

| Average Household ABD Balance | Interest Rate | Annual Percentage Yield |
| --- | --- | --- |
| $0.01 - $249,999.99 | 0.2500% | 0.2503% |
| $250,000.00 - $499,999.99 | 0.3000% | 0.3004% |
| $500,000.00 - $999,999.99 | 0.3500% | 0.3506% |
| $1,000,000.00 - $4,999,999.99 | 0.5000% | 0.5012% |
| $5,000,000.00 and greater | 0.6000% | 0.6018% |

---

[10]    Oppenheimer, *Brokerage Disclosure Guide*, *supra* note 3 at 5.

[11]    Oppenheimer, *Sweep Agreement*, *supra* note 2 at 6.

18.     Oppenheimer coordinates with the Program Banks to determine the interest rates paid to customers in the ABD Program.  The Program Documents state that the "interest rates on the Deposit Accounts will be determined by the amount the [Program] Banks are willing to pay on the Deposit Accounts minus the fees paid to Oppenheimer and other service providers."[12]  The Sweep Documents additionally provide that "interest rates . . . will vary based upon prevailing economic and business conditions."[13]   However, the interest rates and interest rate tiers last changed on February 16, 2023.

19.     Oppenheimer acts as the agent and custodian on behalf of customers in the ABD Program and effectively manages and controls customers' cash in the ABD Program, including by making deposits into and withdrawals out of the ABD Program and selecting the Program Banks that receive the deposits.  Indeed, the Program Documents expressly provide that Oppenheimer acts as its customers' agent in connection with the ABD Program:

- "Oppenheimer is acting as your agent in establishing the Deposit Accounts at each Deposit Bank, depositing funds into the Deposit Accounts, withdrawing funds from the Deposit Accounts and transferring funds among the Deposit Accounts. Deposit Account ownership will be evidenced by a book entry on the account records of each Deposit Bank and by records maintained by Oppenheimer as your custodian."[14]

- "Oppenheimer seeks to maintain at least 25 Deposit Banks in the ABD Program. . . . The Deposit Bank List is subject to change, and one or more of the Deposit banks included on the Deposit Bank List many be replaced with a Deposit Bank not previously included on the Deposit Bank List. Additionally, a Deposit Bank may added or removed from the Deposit Bank List."[15]

---

[12]   *Id.* at 6

[13]   *Id.* at 3.

[14]   *Id.* at 4.

[15]   *Id.* at 5-6.

- "You will not have a direct account relationship with the Deposit Banks, unless you have a separate account outside of your Oppenheimer brokerage account, and will not be able to deposit money into or withdraw money from your Deposit Account, other than through a sweep of cash in your Oppenheimer brokerage account. Oppenheimer, as your agent, will establish the Deposit Accounts for you and its other customers on an omnibus basis at each Deposit Bank and make deposits to and withdrawals from the Deposit Accounts."[16]

- "When funds are first available for deposit, Oppenheimer, as your agent, will open a Demand Deposit Account ("DDA") or a Money Market Demand Account ("MMDA") . . . on your behalf at one or more of the Deposit Banks on the then-current Deposit Bank List. . . . As necessary, Oppenheimer, as your agent, will open Deposit Accounts at other Deposit Banks on the Deposit Bank List and place your additional funds in those Deposit Banks."[17]

- "All withdrawals necessary to satisfy debits in your brokerage account will be made by Oppenheimer as your agent."[18]

20.    In addition, Oppenheimer reserves the right to unilaterally modify the rates paid under the ABD Program.  As the Program Documents state, "Oppenheimer or the Deposit Banks may, at any time, change the basis upon which interest rates and APYs are calculated, set a minimum balance for accrual of interest, or change the Interest Rate or APY Tiers"[19] and Oppenheimer "may change these terms and conditions from time to time in its discretion by providing 30 days' prior notice to you, either by mail or by posting the revised terms and conditions on our website at www.oppenheimer.com/ABD."[20]

---

[16]    *Id.* at 3.

[17]    *Id.* at 5.

[18]    *Id.*

[19]    *Id.* at 6.

[20]    *Id.* at 8.

**Defendants Reaped Significant Benefits from Their ABD Program to the Detriment of Customers, Who Were Paid Unreasonably Low Interest Rates**

21.     The ABD Program provides highly lucrative financial benefits to Defendants and the Program Banks.  Defendants admit that "[t]he ABD Program is significantly more profitable to Oppenheimer than money market fund sweep vehicles," as "[t]he fee payable to Oppenheimer *may be as high as 5%* of the household balances invested in the ABD Program."[21] Oppenheimer states that the fee it retains "will be based on a variety of factors, including, without limitation, client household balances and prevailing market rates less fees for the Deposit Bank, and other service providers."[22]

22.     In addition, Oppenheimer and OAM also "charge[] an advisory fee on those cash balances," on top of the "administrative fees paid by bank participants for administration" of the ABD Program.[23] For accounts enrolled in programs "in which OAM exercises investment discretion, OAM determines the level of cash in the account."[24] Oppenheimer admits this "creates a conflict of interest for Oppenheimer and OAM . . . [which are] paid both the advisory fee and the bank administration fee."[25]

---

[21]  Oppenheimer, *Brokerage Wrap Fee Brochure*, *supra* note 6 at 4; *see also* OAM, *OAM Wrap Fee Brochure*, *supra* note 9 at 4.

[22]  Oppenheimer, *Sweep Agreement*, *supra* note 2 at 4.

[23]  OAM, *OAM Wrap Fee Brochure*, *supra* note 9 at 4; *see also* Oppenheimer, *Brokerage Wrap Fee Brochure*, *supra* note 6 at 4.

[24]  *Id.*

[25]  *Id.*

23.     Further, Defendants admit that Oppenheimer has a financial incentive adverse to customers because the ABD Program allows it to keep greater portions of the payments from Program Banks when it pays lower interest rates to customers:

- "Oppenheimer receives a fee from each deposit bank. The amount of the fee paid to Oppenheimer will affect the interest rate paid on Deposit Accounts. *To the extent more of the fee paid is retained by Oppenheimer the interest rate paid to clients on Deposit Accounts will be less.*"[26]

- "*The compensation received by Oppenheimer* and the service provider involved in operating the ABD Program *will affect the interest rate paid by the Deposit Bank* on your Deposit Accounts."[27]

24.     OPY, as the parent company of Oppenheimer, utilized this arrangement to control the terms of the ABD Program and position both Oppenheimer and the Program Banks to benefit financially.   But OPY, for its part, also reaped substantial financial benefits from the ABD Program.   Indeed, OPY reported that, bank deposit sweep income increased by 65.3% from 2022 to 2023 from $104.5 million to $172.8 million "due to higher short-term interest rates," while holding over $3 billion in cash sweep balances over the same period.[28]

25.     In short, the greater the amount of cash balances maintained in Deposit Accounts under the ABD Program and the lower the rate of interest paid on these cash balances, the more all of the Defendants benefit.

26.     Based on these adverse incentives, Defendants limited customers to unreasonably low rates of interest under the ABD Program and retained unreasonable, unjustified, and arbitrary

---

[26]    Oppenheimer, *Brokerage Disclosure Guide*, *supra* note 3 at 5.

[27]    Oppenheimer, *Sweep Agreement*, *supra* note 2 at 4.

[28]    Oppenheimer Holdings Inc., Annual Report (Form 10-K) (Feb. 27, 2025) at 38, 40-41, https://www.oppenheimer.com/getContentAsset/222c1aea-d200-411e-9295-658d86e8abc9/7d0aa6d3-3233-4c10-bc1b-d0cbebf43deb/opy-12-31-2024-10k.pdf?language=en.

fees on customer cash invested under the ABD Program.  Nothing prevented Defendants from paying or securing reasonable rates for customer cash or otherwise retaining a reasonable, justified, and rational fee.

27.    First, Oppenheimer could have swept customer cash to government money market funds ("MMFs"). The SEC's regulatory definition of a "Sweep Program" is "a service provided by a broker or dealer where it offers to its customer the option to automatically transfer free credit balances in the securities account of the customer to either a ***money market mutual fund*** product as described in §270.2a-7 of this chapter or an account at a bank whose deposits are insured by the Federal Deposit Insurance Corporation."[29]  Consequently, sweeping customer cash to government MMFs is a common practice among other brokers like Fidelity Investments ("Fidelity") and The Vanguard Group ("Vanguard").  Government MMFs are invested almost entirely in ultra-safe government bonds and repurchase agreements, and contain the same risk profile of an FDIC-insured deposit account.  MMFs pay rates that are approximately 500 times higher than the rates offered under the ABD Program.

28.    Second, Oppenheimer simply could have continued to sweep customer cash to its Program Banks and endeavored to pay itself a reasonable, justified, and rational fee and pass long a competitive, reasonable rate of interest to customers.

29.    Oppenheimer chose neither of these two options.  Instead, Oppenheimer limited customers' sweep investment options only to low-yielding Deposit Accounts at its Program Banks

---

[29]   17 C.F.R. §240.15c3-3(a)(17); *see also* NYSE Information Memo, Number 05-11, *Customer Accounts Sweeps to Banks* (Feb. 15, 2005), https://www.nyse.com/publicdocs/nyse/markets/ nyse/rule-interpretations/2005/05-11.pdf (acknowledging MMFs are superior alternatives to sweep accounts because, unlike sweep accounts, they are generally linked to prevailing market rates).

and retained an unreasonable, unjustified, and arbitrary fee from the interest accrued on the Deposit Accounts.

**Defendants Paid Unreasonably Low Rates of Interest Under the ABD Program**

30.     A reasonable rate of interest is the rate that would result in a competitive market under fair market valuation conditions, *i.e.*, a rate parties would agree to in an arm's-length transaction where neither party was able to exert market power over the other.

31.     As defined in the Oxford English Dictionary, the term "reasonable" is synonymous with "fair" and "equitable." In the rate context, "reasonable" is synonymous with "fair market value" and can be determined using a market approach of comparable instruments.

32.     "Fair market value" ordinarily represents "[t]he price that a seller is willing to accept and a buyer is willing to pay on the open market and in an arm's-length transaction . . . ."[30] Similarly, "fair market value" is defined by the U.S. Internal Revenue Service ("IRS") as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts."[31]

33.     The Organization for Economic Co-Operation and Development ("OECD") guidance for financial transactions states that "in applying the arm's length principle to a financial transaction it is necessary to consider the conditions that independent parties would have agreed to in comparable circumstances."[32]

---

[30]   *Value, fair market value*, Black's Law Dictionary (12th ed. 2024).

[31]   26 C.F.R. §20-2031-1(b).

[32]   OECD *Transfer Pricing Guidance on Financial Transactions: Inclusive Framework on BEPS: Actions 4, 8-10* (Feb. 2020), https://perma.cc/TNY9-9GK2.

34.     Accordingly, the United States Department of Labor has defined a "reasonable" rate of interest as "a rate of interest determinable by reference to short-term rates available to other customers of the bank, those offered by other banks, those available from money market funds, those applicable to short-term instruments such as repurchase agreements, or by reference to a benchmark such as sovereign short term debt (*e.g.*, in the U.S., treasury bills), all in the jurisdiction where the rate is being evaluated."[33]

35.     Similarly, the IRS defines an "arm's length interest rate" as "a rate of interest which was charged, or would have been charged, at the time the indebtedness arose, in independent transactions with or between unrelated parties under similar circumstances."[34]  In making this determination, the IRS specifies, "[a]ll relevant factors shall be considered, including the principal amount and duration of the loan, the security involved, the credit standing of the borrower, and the interest rate prevailing at the situs of the lender or creditor for comparable loans between unrelated parties."[35]

36.     Consistent with these common-sense definitions, a reasonable sweep rate is one that takes into account market rates for products in arm's-length transactions, rates applicable to short-term instruments like repurchase agreements, and other short-term benchmark rates, including the federal funds rate and Treasury bills.

37.     By a variety of objective measures, Defendants' ABD Program paid below-market interest rates throughout the relevant time period. For example, between 2022 and 2023, rates under the ABD Program ranged from 0.01% to 0.25% on all accounts with household cash

---

[33]   Grant of Individual Exemptions; Deutsche Bank AG, 68 Fed. Reg. 34646, 34648 (June 10, 2003).

[34]   26 C.F.R. §1.482-2(a)(2).

[35]   *Id.*

balances under $250,000.00 ("Tier 1") and increased only marginally from a low of 0.04% to 0.60% for accounts with household cash balances of $5,000,000 and greater ("Tier 5"). [36] During the same period, however, market rates for similar products, rates for short-term instruments, and other short-term interest rate benchmarks skyrocketed. For one, the federal funds rate (the rate banks charge to borrow from each other overnight) rose from a low of nearly zero to a 20-year high of around 5.33%. In fact, still today, the federal funds effective rate remains around 4.33%. Meanwhile, the current ABD Program rates *have not been adjusted since February 2023* and still range from only 0.25% to 0.60% across asset tiers.

38.    The following table presents a non-exhaustive sample of the rates paid to customers in the ABD Program from at least as far back as July 2022 through April 2025:

| Deposit Balance | 2022 | 2023 | 2024 | 2025 |
|---|---|---|---|---|
| Less than $250,000.00 | 0.01% to 0.10% | 0.25% | 0.25% | 0.25% |
| $250,000.00 to $499,999.99 | 0.01% to 0.10% | 0.30% | 0.30% | 0.30% |
| $500,000.00 to $999,999.99 | 0.04% to 0.12% | 0.35% | 0.35% | 0.35% |
| $1,000,000.00 to $4,999,999.99 | 0.04% to 0.20% | 0.50% | 0.50% | 0.50% |
| $5,000,000.00 and Greater | 0.04% to 0.35% | 0.60% | 0.60% | 0.60% |

39.    As explained in further detail below, the rates paid under the ABD Program have been and remain *significantly* below several objective benchmarks of reasonableness, including, by way of example, federal benchmark rates, competitors' rates on other interest-bearing accounts, and rates paid by other sweep programs.

---

[36]  Oppenheimer, *Advantage Bank Deposit Program, Interest Rate and Yields*, *supra* note 10. For ABD Program customers with household balances of $250,000.00 to $499,999.99 ("Tier 2"), Oppenheimer's current interest rate is 0.30%; 0.35% for balances from $500,000.00 to $999,999.99 ("Tier 3"); and 0.50% for balances from $1,000,000.00 to $4,999,999.99 ("Tier 4").

### A.    Federal Benchmark Rates

40.    The rates paid under the ABD Program consistently have been and remain unreasonably low relative to federal benchmark rates.

41.    Federal benchmark interest rates, including the federal funds target rate, are an appropriate point of comparison for the reasonableness of Defendants' interest rates.  Indeed, as the Board of Governors of the Federal Reserve System ("Federal Reserve") explains on its website, "[c]hanges in the target range for the federal funds rate influence short-term interest rates for other financial instruments."[37]

42.    Defendants acknowledged the federal funds rate's influence in its most recently filed Form 10-K, stating, "[p]otential decreases to the federal funds rate may impact our interest-based revenues" by forcing it to lower the fees it retains from customer cash deposits at the Program Banks.[38]  Similarly, in Oppenheimer's customer account statements under "Sweep Investment" within the "Statement of Accounts" heading, Oppenheimer includes that "[t]he yield indicated fluctuates with short-term interest rates and should not be construed as representative of future results."

43.    Other broker-dealers have expressly acknowledged the influence of the federal funds rate on sweep rates.  For example, R.W. Baird's sweep program disclosure states that "interest rate changes will generally be made on a monthly basis and in response to changes in the

---

[37]    Board of Governors of the Federal Reserve System, *Economy at a Glance – Policy Rate* (May 7, 2025), https://www.federalreserve.gov/economy-at-a-glance-policy-rate.htm#:~:text=affect% 20the%20economy%3F-,Changes%20in%20the%20target%20range%20for%20the%20federal% 20funds%20rate,activity%2C%20employment%2C%20and%20inflation.

[38]    Oppenheimer Holdings Inc., Annual Report, *supra* note 28 at 18.

Federal Funds Target Rate."[39]  Similarly, Fidelity's sweep program disclosure states that the sweep rate "will generally be tied to the London Interbank Offered Rate (LIBOR), the Federal Funds Effective Rate (FFE), or Federal Funds Target Rate (FFT)" and "may span a spectrum of up to 0.75% above or below LIBOR, FFE, or FFT."[40]

44.    Despite precipitous increases in the target range for the federal funds rate in recent years, however, the rates paid under the ABD Program changed only marginally.  For instance, between January 2022 and February 2023, the Federal Reserve announced eight rate hikes, which increased the federal funds target range from 0.00% to 0.25% to a target range of 4.50% to 4.75%. Yet, during that same period, Defendants barely increased the rates paid under the ABD Program. Even worse, rates in the ABD Program *have not been adjusted since February 2023*, even though the Federal Reserve increased the federal funds target range three additional times, culminating at a target range of 5.25% to 5.50%, a 20-year high.

45.    The following chart depicts the rates paid under the ABD Program and the average monthly federal funds effective rate from January 2022 through May 2025:

---

[39]  R.W. Baird, *Cash Sweep Program Disclosure* (June 2025), https://www.rwbaird.com/ globalassets/pdfs/help/cash-sweep-program-disclosure.pdf.

[40]  Fidelity, *Fidelity Cash Management Account FDIC-Insured Deposit Sweep Program Disclosure*, https://www.fidelity.com/bin-public/060_www_fidelity_com/documents/ fcma_disc.pdf (last visited June 5, 2025).



46.    As depicted above, the sharp increase in the federal funds effective rate in 2022 and 2023 produced little to no increases to the rates paid under the ABD Program.

47.    By comparison, short-term interest rates for other federal financial instruments, including Treasury bills, experienced steep rate increases in 2022 and 2023, as the Federal Reserve hiked the federal funds rate.  For purposes of illustration, the following charts depict the one-year and three-month Treasury bill rates between 2017 and today:

*One-Year Treasury Bill Rates (2017 to Present)*



*Three-Month Treasury Bill Rates (2017 to Present)*



48.     The overnight interest rate at which the Federal Reserve repurchases securities from private banks (the "repo" rate), currently at 4.33%, similarly increased together with the federal funds rate beginning in 2022. For purposes of illustration, the following graph depicts the repo rates between 2017 and today:

*Overnight Repo Rates (2017 to Present)*



49.     As depicted above, like other short-term interest rate benchmarks, the repo rate increased alongside the federal funds rate beginning in 2022.

**B.    Rates Paid by Competitors' Interest-Bearing Deposit Accounts**

50.    The rates paid under the ABD Program have also been significantly lower than rates paid by interest-bearing deposit accounts at other institutions.

51.    Rates on interest-bearing deposit accounts at other institutions are an appropriate comparator for determining a reasonable sweep-program interest rate because deposit accounts' rates typically conform to changing economic and business conditions (*e.g.*, changing federal benchmark rates) – the same conditions to which the rates paid under the ABD Program purportedly adhere.

52.    Informa Research Services ("Informa"), which compiles data on interest rates paid by U.S. banks on various deposit accounts, has published data showing that the interest rates for 50 of the largest FDIC-insured banks in the United States correlate with the federal funds rate, unlike the cash sweep rates paid under the ABD Program.

53.    Significantly, Informa's data shows that interest rates for online money market deposit accounts ("MMDAs") from 2022 to the present have been substantially higher than the rates Defendants paid to Plaintiff and Class Members. According to this data, unlike the rates paid by Defendants under the ABD Program, the rates paid by online banks reflected changes in the federal funds rate.

54.    The following is a summary of the data made available by Informa for the period January 2022 through May 2025 for deposits in excess of $50,000 for all national banks, the top 50 national banks, and 74 prominent online banks:

| Date | All Nat'l Avg. APY | Top 50 Avg. APY | Internet Avg. APY | Fed. Funds Rate |
|---|---|---|---|---|
| 07-Jan-22 | 0.07 | 0.08 | 0.24 | 0.08 |
| 04-Feb-22 | 0.07 | 0.08 | 0.25 | 0.08 |
| 04-Mar-22 | 0.07 | 0.08 | 0.26 | 0.20 |
| 01-Apr-22 | 0.07 | 0.08 | 0.26 | 0.33 |

| | | | |
|---|---|---|---|
| 06-May-22 | 0.08 | 0.09 | 0.28 | 0.77 |
| 03-Jun-22 | 0.08 | 0.10 | 0.34 | 1.21 |
| 01-Jul-22 | 0.10 | 0.15 | 0.45 | 1.68 |
| 05-Aug-22 | 0.12 | 0.22 | 0.62 | 2.33 |
| 02-Sep-22 | 0.14 | 0.26 | 0.72 | 2.56 |
| 07-Oct-22 | 0.20 | 0.38 | 0.89 | 3.08 |
| 04-Nov-22 | 0.24 | 0.44 | 1.06 | 3.78 |
| 02-Dec-22 | 0.31 | 0.59 | 1.26 | 4.10 |
| 06-Jan-23 | 0.37 | 0.73 | 1.43 | 4.33 |
| 03-Feb-23 | 0.39 | 0.78 | 1.55 | 4.57 |
| 03-Mar-23 | 0.43 | 0.78 | 1.61 | 4.65 |
| 07-Apr-23 | 0.46 | 0.83 | 1.68 | 4.83 |
| 05-May-23 | 0.49 | 0.86 | 1.72 | 5.06 |
| 02-Jun-23 | 0.51 | 0.93 | 1.79 | 5.08 |
| 07-Jul-23 | 0.53 | 0.95 | 1.83 | 5.12 |
| 04-Aug-23 | 0.55 | 0.99 | 1.88 | 5.33 |
| 01-Sep-23 | 0.56 | 1.00 | 1.92 | 5.33 |
| 06-Oct-23 | 0.58 | 1.01 | 1.99 | 5.33 |
| 03-Nov-23 | 0.59 | 1.04 | 1.95 | 5.33 |
| 01-Dec-23 | 0.59 | 1.07 | 1.95 | 5.33 |
| 05-Jan-24 | 0.59 | 1.04 | 2.05 | 5.33 |
| 02-Feb-24 | 0.60 | 0.95 | 2.05 | 5.33 |
| 01-Mar-24 | 0.57 | 0.92 | 2.01 | 5.33 |
| 05-Apr-24 | 0.58 | 0.90 | 2.00 | 5.33 |
| 03-May-24 | 0.58 | 0.89 | 2.10 | 5.33 |
| 07-Jun-24 | 0.59 | 0.89 | 2.10 | 5.33 |
| 05-Jul-24 | 0.59 | 0.89 | 2.14 | 5.33 |
| 02-Aug-24 | 0.59 | 0.88 | 2.14 | 5.33 |
| 06-Sep-24 | 0.57 | 0.87 | 2.14 | 5.13 |
| 04-Oct-24 | 0.55 | 0.80 | 2.03 | 4.83 |
| 01-Nov-24 | 0.55 | 0.80 | 2.07 | 4.64 |
| 06-Dec-24 | 0.54 | 0.77 | 2.05 | 4.48 |
| 03-Jan-25 | 0.53 | 0.73 | 1.99 | 4.33 |
| 07-Feb-25 | 0.52 | 0.72 | 1.98 | 4.33 |
| 07-Mar-25 | 0.52 | 0.73 | 2.01 | 4.33 |
| 04-Apr-25 | 0.53 | 0.72 | 2.01 | 4.33 |
| 02-May-25 | 0.53 | 0.73 | 1.99 | 4.33 |

55.     As shown above, as the Federal Reserve increased the federal funds target range throughout 2022 and 2023, average rates offered for deposits in excess of $50,000 increased across the board.   Meanwhile, during the same period, the rates paid to customers changed only marginally: Tiers 1 and 2 ranged from 0.01% to 0.30%, and the rate paid to customers in Tiers 3-

5 ranged from 0.04% to 0.60% from at least as far back as July 2022 to December 2023. In fact, as the following chart shows, even the ABD Program rates for customers with total brokerage assets of more than $5,000,000 (Tier 5) came nowhere close to the average rates paid by internet banks for deposits in excess of $50,000:



56.    National averages for deposits in excess of $10,000 similarly exceeded rates offered under the ABD Program between July 2022 and November 2023. The following is a summary of the data made available by Informa for the period January 2022 through November 2023 for the average rate on deposits in excess of $10,000 for the same group of banks:

| Date | All Natl Avg. APY | Top 50 Avg. APY | Internet Avg. APY | Fed. Funds Rate |
|---|---|---|---|---|
| **7-Jan-22** | 0.07 | 0.07 | 0.22 | 0.08 |
| **4-Feb-22** | 0.07 | 0.07 | 0.22 | 0.08 |
| **4-Mar-22** | 0.07 | 0.07 | 0.23 | 0.08 |
| **1-Apr-22** | 0.07 | 0.08 | 0.24 | 0.33 |
| **6-May-22** | 0.08 | 0.08 | 0.26 | 0.83 |

| | | | |
|---|---|---|---|
| **3-Jun-22** | 0.08 | 0.10 | 0.32 | 0.83 |
| **1-Jul-22** | 0.10 | 0.15 | 0.41 | 1.58 |
| **5-Aug-22** | 0.12 | 0.21 | 0.56 | 2.33 |
| **2-Sep-22** | 0.14 | 0.25 | 0.66 | 2.33 |
| **7-Oct-22** | 0.20 | 0.35 | 0.77 | 3.08 |
| **4-Nov-22** | 0.24 | 0.41 | 0.94 | 3.83 |
| **2-Dec-22** | 0.31 | 0.53 | 1.07 | 3.83 |
| **6-Jan-23** | 0.37 | 0.61 | 1.21 | 4.33 |
| **3-Feb-23** | 0.39 | 0.66 | 1.27 | 4.58 |
| **3-Mar-23** | 0.43 | 0.67 | 1.35 | 4.57 |
| **7-Apr-23** | 0.46 | 0.72 | 1.40 | 4.83 |
| **5-May-23** | 0.49 | 0.74 | 1.43 | 5.08 |
| **2-Jun-23** | 0.51 | 0.78 | 1.49 | 5.08 |
| **7-Jul-23** | 0.53 | 0.80 | 1.52 | 5.08 |
| **4-Aug-23** | 0.55 | 0.85 | 1.56 | 5.33 |
| **01-Sep-23** | 0.56 | 0.86 | 1.59 | 5.33 |
| **06-Oct-23** | 0.58 | 0.91 | 1.60 | 5.33 |
| **03-Nov-23** | 0.59 | 0.92 | 1.59 | 5.33 |
| **01-Dec-23** | 0.59 | 0.95 | 1.62 | 5.33 |
| **05-Jan-24** | 0.59 | 0.95 | 1.69 | 5.33 |
| **02-Feb-24** | 0.60 | 0.86 | 1.69 | 5.33 |
| **01-Mar-24** | 0.57 | 0.83 | 1.65 | 5.33 |
| **05-Apr-24** | 0.58 | 0.83 | 1.64 | 5.33 |
| **03-May-24** | 0.58 | 0.82 | 1.75 | 5.33 |
| **07-Jun-24** | 0.59 | 0.82 | 1.75 | 5.33 |
| **05-Jul-24** | 0.59 | 0.81 | 1.79 | 5.33 |
| **02-Aug-24** | 0.59 | 0.81 | 1.80 | 5.33 |
| **06-Sep-24** | 0.57 | 0.80 | 1.82 | 5.13 |
| **04-Oct-24** | 0.55 | 0.73 | 1.76 | 4.83 |
| **01-Nov-24** | 0.55 | 0.76 | 1.82 | 4.64 |
| **06-Dec-24** | 0.54 | 0.72 | 1.81 | 4.48 |
| **03-Jan-25** | 0.53 | 0.69 | 1.75 | 4.33 |
| **07-Feb-25** | 0.52 | 0.68 | 1.75 | 4.33 |
| **07-Mar-25** | 0.52 | 0.67 | 1.80 | 4.33 |
| **04-Apr-25** | 0.53 | 0.66 | 1.80 | 4.33 |
| **02-May-25** | 0.53 | 0.67 | 1.77 | 4.33 |

57.    Like the average rates for deposits in excess of $50,000, these rates increased as the

Federal Reserve increased the federal funds rate.  Meanwhile, during the same period, the paltry

rates paid to ABD Program customers changed only marginally: Tiers 1 and 2 ranged from 0.01%

to 0.30%, and the rate paid to customers in Tiers 3-5 ranged from 0.04% to 0.60%.

### C.    Rates Paid by Competitors' Cash ABD Programs

58.    The rates paid under the ABD Program have also remained substantially lower than the rates paid by competitors' sweep programs.

59.    For example, Fidelity and R.W. Baird pay a substantially higher rate on swept cash to bank deposit accounts than Defendants. At year-end 2022, Fidelity paid 2.21% and R.W. Baird paid between 1.69% (on cash balances up to $1 million) and 3% (on cash balances above $5 million).  By August 2023, as the federal funds rate peaked at an effective yield of 5.33%, a 20-year high, Fidelity paid investors as much as 2.72% on swept cash, and R.W. Baird paid investors (as of September 8, 2023) 2.07% to 4.15% on swept cash, depending on cash balances.

60.    Other competitors who sweep cash to deposit accounts similarly offer far higher rates.  For example, during the relevant time period, Interactive Brokers LLC ("Interactive Brokers"), Webull Financial LLC ("Webull"), and Vanguard each swept cash to unaffiliated banks and offer substantially higher rates than Oppenheimer: Interactive Brokers paid up to 4.83%, Webull paid 5%, and Vanguard paid 3.7% on sweeps to FDIC-insured deposit accounts.

61.    Further demonstrating the unreasonableness of the sweep rates, the Program Banks participated as program banks in sweep programs offered by Oppenheimer's competitors and paid competitors' customers far higher rates of interest.  The Program Banks' willingness to pay far higher rates to customers of Oppenheimer's competitors than to Oppenheimer's own customers evinces the unreasonableness of the sweep rates.  For example, three of the Program Banks are program banks for Vanguard's cash sweep program, which currently pays 3.65% interest on customer cash deposits.[41] Likewise, five of the Program Banks are program banks for one of

---

[41]    The three Program Banks involved in the Vanguard cash sweep program are Citibank, N.A.; HSBC Bank USA, National Association; and NexBank.

Fidelity's cash sweep programs, which currently pays 2.19% interest on customer cash deposits.[42] Additionally, three Program Banks are program banks for R.W. Baird's cash sweep program, which currently pays between 1.45% and 2.89% on customer cash deposits.[43] Meanwhile, the same Program Banks pay Defendants' own customers meager rates of interest as low as 0.25% under the ABD Programs.

62.    The disparity between these benchmarks, individually and collectively, and the rates paid under the ABD Program show that the rates were unreasonable.

**D.    Rates Paid by Sweep Programs Sweeping Cash to Money Market Funds**

63.    Though Oppenheimer currently offers MMFs as alternative solutions to the ABD Program, it does not offer MMFs as an automatic sweep investment option. Instead, for advisory clients, "the client or the client's Financial Advisor must request access to these funds . . . as all cash held in advisory accounts custodied at Oppenheimer is currently invested automatically in the ABD Program."[44] Similarly, for non-advisory clients Oppenheimer admits, "[t]he ABD Program is significantly more profitable to Oppenheimer than money market fund sweep vehicles which Oppenheimer does not offer (although the extent of profitability will fluctuate with interest

---

[42]    The five Program Banks involved in the Fidelity cash sweep program are Citibank, N.A.; Citizens Bank, National Association; First Horizon Bank; HSBC Bank USA, National Association; and Morgan Stanley Bank, N.A.

[43]    The three Program Banks involved in the R.W. Baird cash sweep program are Associated Bank, National Association; Citibank, N.A.; and HSBC Bank USA, National Association.

[44]    Oppenheimer, *Brokerage Advisory Brochure*, *supra* note 5 at 5; *see also* Oppenheimer, *Brokerage Wrap Fee Brochure*, *supra* note 6 at 4; OAM, *OAM Advisory Brochure*, *supra* note 8 at 4-5.

rates)."[45] On the other hand, brokerage firms like Fidelity and Vanguard offer MMFs as primary sweep options.

64.     SEC Rule 2a-7 "is the principal rule governing money market funds."[46] According to Rule 2a-7(a)(14), government MMFs are required to invest at least 99.5% of their total assets in cash, Treasury securities, or fully collateralized repurchase agreements (repos).  Moreover, MMFs are required to invest in short-term investments, which are defined as securities with maturities no greater than 397 days.  The SEC further requires the dollar-weighted average maturity of the securities owned by a MMF to not exceed 60 days.[47]

65.     Treasuries are backed by the full faith and credit of the U.S. government. Accordingly, Treasuries are risk-free investments that carry essentially no credit risk.  Moreover, portfolios with average maturities of 90 days or less are short-term and so subject to a negligible amount of interest rate risk.  Because government MMFs invest solely in short-term government securities or cash, government MMFs are essentially risk-free and have never lost money.  For these reasons, government MMFs have the same or better risk profile as FDIC-insured accounts with assets under the insurable limits set by the FDIC.[48]

---

[45]    Oppenheimer, *Brokerage Disclosure Guide*, *supra* note 3 at 5.

[46]    *See* U.S. Securities and Exchange Commission, *Fact Sheet, Money Market Fund Reforms*, https://www.sec.gov/files/rules/proposed/2021/ic-34441-fact-sheet.pdf (last visited June 5, 2025).

[47]    *See* 17 C.F.R. § 270.2a-7(c)(2).

[48]    As further evidence, *see* the article by SEC staff, Viktoria Baklanova, Isaac Kuznits, Trevor Tatum, *Money Market Funds in the Treasury Market* (Sept. 1, 2022), https://www.sec.gov/files/mmfs-treasury-market-090122.pdf (showing that "assets in government MMFs more than doubled in 2016 following implementation of the 2014 MMF reforms and increased considerably once again in the first half of 2020, when demand for government assets surged amidst the COVID-19 pandemic (Figure 1).").  This suggests that government MMFs, like bank deposits, have generally low default risk.

66.    An MMF is "income producing, low risk, liquid fund," and an appropriate capital preservation alternative for use in retirement accounts.    *See* 29 C.F.R. §2550.404c-1(b)(2)(ii)(C)(2)(ii).

67.    Academic literature further supports the equivalence of MMFs and FDIC-insured accounts. For example, Federal Reserve economists state that MMFs and bank deposits are "close substitutes from an investor's perspective."[49]

68.    Brokerages that sweep cash to MMFs pay substantially higher rates of interest than Oppenheimer and other brokerages that sweep cash to program banks.  For example, in 2022-23 Fidelity Investments swept cash into its Fidelity Government Money Market Fund (SPAXX) and Vanguard Investments swept investors cash into its Vanguard Federal Money Market Fund (VMFXX).  Both Fidelity and Vanguard government MMFs have minimal risk that is equivalent to FDIC-insured accounts.[50]

69.    An MMDA is a high-yield savings account that allows depository financial institutions to be competitive with MMFs, and it is often used as a sweep product by financial institutions, including Defendants.  There is no reason in fact why interest rates paid on MMFs should not be considered competitive with interest rates paid on MMDAs since banks are allowed (but not required to) invest in the same instruments as government MMFs.

70.    Rather, banks have more options to invest FDIC–insured sweep funds than issuers of government MMFs, which are required to invest in short-term government securities.

---

[49]    Gara Afonso, Marco Cipriani, et al., *Monetary Policy Transmission and the Size of the Money Market Fund Industry: An Update*, Fed. Rsrv. Bank of NY (Apr. 3, 2023), https://libertystreeteconomics.newyorkfed.org/2023/04/monetary-policy-transmission-and-the-size-of-the-money-market-fund-industry-an-update/.

[50]    *See* 17 C.F.R. §270.2a-7(a)(11).

Oppenheimer has full discretion to offer all customers the same alternatives.  In fact, SEC's
Investor Bulletin:  Bank Sweep Programs, dated June 5, 2014, explicitly refers to money market
mutual funds as acceptable sweep options:

> One option, a bank sweep program, typically involves the automatic transfer (or
> "sweep") of cash in the brokerage account into a deposit account at a bank that may
> or may not be affiliated with the broker-dealer.  Other options include leaving cash
> in the brokerage account, or sweeping cash to one or more money market mutual
> funds.[51]

71.    A 2016 bulletin from the Office of the Comptroller of the Currency also urged
banks to use government MMFs as sweep options:

> Banks that offer sweep arrangements between deposit accounts and
> MMFs [footnote omitted] should assess the respective processing characteristics,
> system requirements, compliance requirements, and liquidity characteristics of
> government, retail, and prime MMFs. Based on operational and liquidity
> considerations, most banks will likely conclude that once the SEC's MMF reforms
> are fully implemented, government funds are the only practical option for bank
> deposit to MMF sweep arrangements.[52]

72.    As noted earlier, many of Oppenheimer's competitors, including Fidelity and
Vanguard, use MMFs as their primary sweep option.[53] For example, the Fidelity Government
Money Market Fund (SPAXX), which Fidelity employs as a primary sweep account, has a
fundamental investment objective to "seek[ ] as high a level of current income as is consistent with

---

[51]   U.S. Securities and Exchange Commission, *Investor Bulletin: Bank Sweep Programs* (June 5,
2014), https://www.sec.gov/oiea/investor-alerts-bulletins/ib_banksweep.

[52]   Office of the Comptroller of the Currency, *OCC Bulletin 2016-17: Money Market Funds:
Compliance with SEC Money Market Fund Rules by Bank Fiduciaries, Deposit Sweep
Arrangements, and Bank Investments* (May 19, 2016), https://perma.cc/W9Z7-UXXY.

[53]   David Armstrong, *Fidelity Highlights Benefits of Default Cash Options for Retail Accounts*,
Wealth Management (Aug. 7, 2019), https://www.wealthmanagement.com/investment/fidelity-
highlights-benefits-default-cash-options-retail-accounts;  Daren Fonda,  *Fidelity is Giving
Customers Higher Rates on Cash. Here's Why.*, Barron's (Aug. 9, 2019), at 3,
https://www.barrons.com/articles/fidelity-sweep-accounts-cash-rates-federal-reserve-schwab-
merrill-lynch-vanguard-etrade-51565291732.

preservation of capital and liquidity."[54]  The Fidelity MMF is managed by an investment advisor, and is supervised by a Board of Trustees, each with an obligation to ensure that the fund is operated in a manner intended to achieve its fundamental investment objective.

73.     A list of MMFs that were offered as sweep options by other broker-dealers are listed in the below table entitled, "Money Market Funds with Automatic Sweep Option."  Each of these MMFs has a prospectus filed with the SEC, has a fundamental investment objective only changeable by shareholder vote, has a professional investment advisor responsible for investments, and a Board of Trustees responsible for supervising the advisor.  These are significant protections to ensure that investors be paid a reasonable rate.

### Money Market Funds with Automatic Sweep Option

|     | Company | Product | Ticker |
| --- | --- | --- | --- |
| [A] | Fidelity | Fidelity Govt Cash Reserves | FDRXX |
| [B] | Fidelity | Fidelity Treasury Fund | FZFXX |
| [C] | Fidelity | Fidelity Govt Money Market | SPAXX |
| [D] | Morgan Stanley | MS Active Assets Govt Trust | AISXX |
| [E] | Morgan Stanley | MS U.S. Govt MM Trust | DWGXX |
| [F] | Morgan Stanley | MS Inst Liq Govt Sec Part | MGPXX |
| [G] | Schwab | Schwab Treasury Oblig MF SwpCl | SNTXX |
| [H] | Schwab | Schwab Govt Money Market SwpCl | SWGXX |
| [I] | UBS | UBS RMA Govt MMF | RMGXX |
| [J] | Vanguard | Vanguard Federal Money Market Fund | VMFXX |
| [K] | Vanguard | Vanguard Treasury Money Market Fund | VUSXX |
| [L] | Wells Fargo | Allspring Government Money Market Fund | WFFXX |

74.     SPAXX (Fidelity) and VMFXX (Vanguard) paid, respectively, highs of 4.99% (regardless of account balances) and 5.30% in 2023 (based on initial deposits exceeding $3,000).

---

[54]  Fidelity, *Fidelity® Government Money Market Fund /SPAXX, Summary Prospectus* (June 29, 2023), https://perma.cc/QA98-QP96.

75.     In its Final Regulations with respect to prime money market reforms,[55] the SEC noted that as of March 2023, 78% of all MMFs were invested in government or Treasury MMFs, comprising over 4.4 trillion in assets.

76.     The SEC emphasized the stability of government and Treasury MMFs:

> Government money market funds . . . tend to have counter-cyclical flows. Specifically, during times of market turmoil and volatility, investors – particularly institutional investors – tend to shift their investments to government money market funds. [Footnote omitted.] These money market funds offer investments with high credit quality and liquidity, as well as an explicit guarantee for certain government securities (*e.g.*, Treasuries) and a perceived implicit guarantee for others (*e.g.*, Federal Home Loan Bank securities). As shown below, these funds experienced inflows during the global financial crisis of 2008, Euro debt crisis of 2011, Covid-19 pandemic of 2020 and the bank crisis in 2023.[56]

77.     The SEC has also previously recognized that MMFs are frequently used as sweep products.[57]

78.     Moreover, pressure from the SEC has also prompted other financial institutions to consider money market yields in setting sweep rates. For example, Wells Fargo & Company, responding to pressure from an SEC investigation into its managed accounts, raised certain sweep

---

[55]   U.S. Securities and Exchange Commission, *Money Market Fund Reforms; Form PF Reporting Requirements for Large Liquidity Fund Advisers; Technical Amendments to Form N-CSR and Form N-1A*, 17 C.F.R. Parts 270, 274, and 279 (Oct. 2, 2023), https://www.sec.gov/files/rules/final/2023/33-11211.pdf.

[56]   *Id.* at 182.

[57]   *See, e.g.*, *In re Cowen Prime Advisors LLC*, Investment Advisers Act of 1940, SEC Release No. 5874 (SEC Sept. 27, 2021), https://www.sec.gov/files/litigation/admin/2021/ia-5874.pdf ("Money market funds generally invest in short term, highly liquid securities with limited credit risk, and are frequently used in Sweep Accounts as cash sweep vehicles.").

rates in order to make them, in its words, "better align[ed] with rates paid in money market funds."[58]

79.     The substantially higher yields offered by government MMFs as sweep options is strong evidence that Oppenheimer's rates are not reasonable.

**Defendants Breached Their Contractual Obligations Related to the ABD Program**

80.     Defendants breached several express and implied contractual obligations through the payment of unreasonably low rates of interest.

**A.     Oppenheimer's Obligation to Pay and Secure Rates Determined Based on Economic and Business Conditions**

81.     For all customers in the ABD Program, Oppenheimer promised the interest rates "will vary based upon prevailing economic and business conditions."[59]   By making this representation, Oppenheimer promised the rates would reflect changes in the short-term interest-rate marketplace.   Indeed, Oppenheimer additionally represented that rates under the ABD Program "are subject to market fluctuations" and "may change daily."[60]

82.     Through the ABD, however, the rates paid have barely changed, if at all, even while short-term interest rate conditions improved drastically.  For example, between January 2022 and August 2023, the Federal Reserve increased the federal funds target range 11 times.  Though all other short-term interest rates increased after each rate hike, the rates paid under the ABD Program only changed approximately twice, and only marginally increased from: 0.01% to 0.25% for

---

[58]   *WFC Faces Lawsuit Over Interest Rates on Cash Sweep Accounts*, Zacks Equity Research (Sept. 27, 2024), https://perma.cc/7F2C-QGYN.

[59]   Oppenheimer, *Sweep Agreement*, *supra* note 2 at 3.

[60]   *Id.* at 2, 6.

customers in Tier 1; 0.01% to 0.30% for customers in Tier 2; 0.04% to 0.35% for customers in Tier 3; 0.04% to 0.50% for customers in Tier 4.  Even for customers in Tier 5 (*i.e.*, customers with total household ABD Program deposits of more than $5 million), the sweep rate only increased from 0.04% to 0.60%.  Worse still, rates have not changed at all since February 16, 2023, despite the fact that the Federal Reserve subsequently hiked rates three times and that all other short-term rates continued to improve.

83.    Like Oppenheimer, both R.W. Baird and Fidelity promised customers that sweep rates would reflect economic and business conditions.  R.W. Baird's sweep agreement states that its sweep rates "are subject to change based on prevailing economic and business conditions."[61] And Fidelity's sweep agreement similarly states that "[t]he interest rate for each tier is based on a number of factors, including general economic and business conditions."[62]  Despite making the same promise regarding "economic and business conditions," however, Oppenheimer paid rates under the ABD that had very little to no correlation with the federal funds rate, a key driver of the market for short-term interest rates.[63]

84.    This decision was driven not by economic and business conditions, as Defendants promised, but instead by Defendants' desire to maximize profit at the expense of their customers.  Accordingly, Defendants breached their promise to pay rates determined based on economic and business conditions.

---

[61]    R.W. Baird, *Cash Sweep Program Disclosure*, *supra* note 39 at 5.

[62]    Fidelity, *Fidelity Cash Management Account FDIC-Insured Deposit Sweep Program Disclosure*, *supra* note 40.

[63]    Oppenheimer, *Sweep Agreement*, *supra* note 2 at 3.

**B.** **Oppenheimer's Obligations to Pay Reasonable Rates to All ABD Program Customers**

85.     In addition, the Program Documents obligated Oppenheimer to pay reasonable rates to all customers under the ABD Program.

86.     Oppenheimer was the agent of customers in the ABD Program under the terms of the Program Documents discussed above.[64]  As agent, Oppenheimer exercised full discretion and control over cash deposited by customers in the ABD Program, including selecting the Program Banks that received the cash, coordinating with the Program Banks to set interest rates on the cash, sweeping the cash into the Program Banks, and unilaterally deciding the fees it wanted to extract from the interest accrued on the Deposit Accounts.

87.     Oppenheimer, as agent under the Program Documents, was contractually obligated to act in its customers' best interests in paying customers reasonable interest rates under the ABD Program and extracting reasonable fees from the interest accrued on the Deposit Accounts   In other words, reasonableness was implicit in the Program Documents and governed the sweep interest rates and fees paid under the ABD Program.  Defendants violated these contractual duties by failing to pay reasonable sweep interest rates to customers and extracting unreasonable fees for themselves out of interest accrued on customers' Deposit Accounts.

88.     Oppenheimer also owed all customers in the ABD Program contractual duties under the implied covenant of good faith and fair dealing, which precluded Oppenheimer from frustrating and unfairly interfering with its customers' right to receive the benefits of the contract. Oppenheimer violated these duties when it acted in bad faith and abused its discretion by paying customers unreasonable sweep interest rates that were well below several objective benchmarks,

---

[64]   Oppenheimer, *Sweep Agreement*, *supra* note 2 at 3-6.

including the federal funds rate (which rose dramatically as the sweep interest rates essentially remained the same) and competitors' rates, and were not reflective of prevailing economic and business conditions, and by extracting unreasonable, unjustified, and arbitrary fees from the sweep interest accrued on customers' Deposit Accounts.

### C.    Oppenheimer's Obligation to Pay Reasonable Rates to Retirement Customers

89.    Retirement account customers participating in the ABD Program were governed by the same Program Documents as outlined above. However, retirement accounts were further subject to an additional statutory requirement to be provided reasonable rates of interest (discussed below). With respect to retirement customers, Oppenheimer's contractual duty under the implied covenant of good faith and fair dealing also obligated Oppenheimer to pay reasonable rates of interest in order to preserve the core purpose of the retirement accounts: their tax-deferred and tax-exempt status.

90.    Defendants violated their contractual duties to provide reasonable rates of return on ABD Program customers' retirement account balances pursuant to the Internal Revenue Code ("IRC") and Employee Retirement Income Security Act of 1974 ("ERISA"), which were incorporated into the Program Documents.  For example, the Program Documents stated:

> When we provide investment advice to you regarding your retirement plan account or individual retirement account, we are fiduciaries within the meaning of Title I of the Employee Retirement Income Security Act and/or the Internal Revenue Code, as applicable, which are laws governing retirement accounts. The way we make money creates some conflicts with your interests, so we operate under a special rule that requires us to act in your best interest and not put our interest ahead of yours.[65]

---

[65]    Oppenheimer, *Brokerage Advisory Brochure*, *supra* note 5 at 5; Oppenheimer, *Brokerage Wrap Fee Brochure*, *supra* note 6 at 5; OAM, *OAM Advisory Brochure*, *supra* note 8 at 4; OAM, *OAM Wrap Fee Brochure*, *supra* note 9 at 5.

91.     The Program Documents also stated what Defendants were required to do as fiduciaries pursuant to the "special rule" referenced above, including:

- Meet a professional standard of care when making investment recommendations (give prudent advice);

- Never put our financial interests ahead of yours when making recommendations (give loyal advice);

- Avoid misleading statements about conflicts of interest, fees, and investments;

- Follow policies and procedures designed to ensure that we give advice that is in your best interest;

- Charge no more than is reasonable for our services; and

- Give you basic information about conflicts of interest.[66]

92.     Section 4975 of the IRC states that "prohibited transaction[s]" involving a retirement plan include any direct or indirect "transfer to, or use by or for the benefit of, a disqualified person of the income or assets of a plan"; "act by a disqualified person who is a fiduciary whereby he deals with the income or assets of a plan in his own interest or for his own account"; or "receipt of any consideration for his own personal account by any disqualified person who is a fiduciary from any party dealing with the plan in connection with a transaction involving the income or assets of the plan·"[67] A "disqualified person" under Section 4975 of the IRC includes a "fiduciary" and "a person providing services to the [retirement] plan."[68]

93.     Therefore, Oppenheimer was a "disqualified person" under Section 4975 of the IRC because it was a fiduciary and service provider of retirement account customers in connection with

---

[66]  *Id.*

[67]  26 U.S.C. §4975(c)(1)(D)-(F).

[68]  26 U.S.C. §4975(e)(2)(A)-(B).

the ABD Program.  Because it was a disqualified person, cash sweeps from retirement accounts to the Program Banks, for the benefit of Defendants and the Program Banks, were "prohibited transactions" under Section 4975 of the IRC.

94.    The IRC provides limited "exemptions" to prohibited transactions under Section 4975, including "the investment of all or part of a plan's assets in deposits **which bear a reasonable interest rate** in a bank or similar financial institution."[69]  However, cash sweeps under the ABD Program were not exempt because the Program Banks did not pay reasonable sweep interest rates, as discussed above.

95.    Similarly, Section 408 of ERISA exempts interested party transactions involving the investment of retirement account assets in bank deposits only if they "bear a reasonable interest rate."[70]  This exemption did not apply because the Program Banks did not pay reasonable sweep interest rates.

96.    Thus, Defendants' cash sweeps from retirement accounts in the ABD Program violated the IRC, ERISA, and the contractual provisions of the Program Documents that incorporated the IRC and ERISA.

**Defendants Breached Their Fiduciary Duties Related to the ABD Program**

97.    In addition to violating their contractual obligations, Defendants breached their fiduciary duties related to the ABD Program.  Oppenheimer acted as an agent in connection with

---

[69]    26 U.S.C. §4975(d)(4).  U.S. Department of the Treasury regulations confirm that, under the IRC, investing retirement plan assets in deposits in a disqualified bank is exempted only if the deposits "bear[] a reasonable rate of interest" and, "in the case of a bank or similar financial institution that invests plan assets in deposits in itself or its affiliates under an authorization contained in a plan or trust instrument," the authorization must name the institution and "state that [it] . . . may make investments in deposits which bear a reasonable rate of interest in itself (or in an affiliate)."  26 C.F.R. §54.4975-6(b)(1), (3).

[70]    29 U.S.C. §1108(b)(4).

the ABD Program because it accepted special compensation in exchange for the exercise of managerial discretion over cash deposits in the ABD Program.  Oppenheimer exercised full managerial discretion over customer cash, including by unilaterally choosing the participating Program Banks, sweeping cash deposited by customers into the Deposit Accounts, setting interest rate tiers based on the amounts deposited and coordinating with the Program Banks to set the interest rates paid on customer deposits in the ABD Program, and extracting fees from the interest accrued on the Deposit Accounts.

98.    As its customers' agent in connection with the ABD Program, Oppenheimer owed fiduciary duties, including duties arising under common law and under Regulation Best Interest, 17 C.F.R. §240.15l-1, which individually and collectively required it to act in its retail customers' best interests and prohibited it from placing its own interests ahead of its retail customers' interests.[71]  Oppenheimer also had the obligation to consider reasonably available alternatives as part of determining whether recommending a given product to investors was appropriate.[72]

99.    Consistent with these fiduciary duties, Oppenheimer and OAM acknowledged in the Program Documents that "Oppenheimer [/OAM] has an obligation to act as a fiduciary in the way that we provide advisory services to you," meaning "[w]e need to act in your best interests" and "[w]e need to place your interests ahead of our own."[73]

---

[71]  *See* U.S. Securities and Exchange Commission, *Regulation Best Interest: The Broker-Dealer Standard of Conduct*, 84 Fed. Reg. 33318, 33320, 17 C.F.R. §240.15l-1 (July 12, 2019).

[72]  U.S. Securities and Exchange Commission*, Staff Bulletin:  Standards of Conduct for Broker-Dealers and Investment Advisers Care Obligations* (Apr. 30, 2023), https://www.sec.gov/about/divisions-offices/division-trading-markets/broker-dealers/staff-bulletin-standards-conduct-broker-dealers-investment-advisers-care-obligations.

[73]  Oppenheimer, *Brokerage Advisory Brochure*, *supra* note 5 at 5; Oppenheimer, *Brokerage Wrap Fee Brochure*, *supra* note 6 at 5; OAM, *OAM Advisory Brochure*, *supra* note 8 at 4; OAM, *OAM Wrap Fee Brochure*, *supra* note 9 at 5.

100.    However, as discussed above, Defendants violated these fiduciary duties by failing to act in their customers' best interests, and by placing their own interests ahead of their customers' interests, when they enriched themselves and their Program Banks by providing customers in the ABD Program with unreasonably low interest rates that were well below several objective benchmarks discussed above, and by paying themselves unreasonable fees extracted from the interest accrued on customers' Deposit Accounts.

**Defendants Made Material Misrepresentations and Omissions Regarding the ABD Program**

101.    In the Program Documents, Defendants made material omissions by failing to disclose that, as discussed above, Defendants established and used the ABD Program to enrich themselves and the Program Banks by extracting unreasonable, unjustified, and arbitrary fees and otherwise failing to negotiate, secure, and pass along reasonable sweep interest rates to customers in the ABD Program.

102.    Defendants also misleadingly stated in the Program Documents that they were "fiduciaries" and "operate[d] under a special rule that requires [them] to act in your best interest and not put [their] interest ahead of yours."[74]   These statements were misleading and omitted material facts because, as discussed above: (a) Defendants paid unreasonably low interest rates on cash that Defendants swept from retirement accounts and deposited into the Program Banks; and (b) such deposits were prohibited transactions that were not in compliance with Section 4975 of the IRC or Section 408 of ERISA. Defendants, therefore, did not act in their clients' best interests but rather profited at their expense.

---

[74]   Oppenheimer, *Brokerage Advisory Brochure*, *supra* note 5 at 5; Oppenheimer, *Brokerage Wrap Fee Brochure*, *supra* note 6 at 5; OAM, *OAM Advisory Brochure*, *supra* note 8 at 4; OAM, *OAM Wrap Fee Brochure*, *supra* note 9 at 5.

103.    Further, Defendants misleadingly stated:

- "Both the Interest Rates and APYs available through the [Sweep] Program **may be lower** than the rates available for other investment products, such as money market funds."[75]

- "The interest rates paid with respect to the Deposit Accounts at a Deposit Bank **may be higher or lower** than the interest rates available to depositors making deposits directly with the Deposit Bank or other depository institutions in comparable accounts, for investments in money market funds or other investments available through Oppenheimer."[76]

104.    The above statements were misleading because, in reality, the ABD Program interest rates paid to Oppenheimer customers were **always** less than the customers could obtain by making direct deposits themselves, **always** less than the customer could obtain by making deposits outside of the ABD Program, and **always** less than the prevailing market rates (*i.e.*, these were not mere possibilities that "may" occur).

105.    Moreover, Defendants' statements about potentially **lower** interest rates did not excuse their contractual and fiduciary obligations to pay **reasonable** interest rates, as described above.  These statements must be construed harmoniously with Defendants' contractual and fiduciary obligations.

106.    The Program Documents also misleadingly stated that interest rates were "subject to market fluctuations" and "will vary based upon prevailing economic and business conditions,"[77] and that the fee Oppenheimer earned from Program Banks was "subject to change based on market conditions."[78]  These statements were misleading and omitted material facts because, in reality,

---

[75]    Oppenheimer, *Sweep Agreement*, *supra* note 2 at 2; *see also Id.* at 6.

[76]    *Id.* at 6.

[77]    *Id.* at 2-3.

[78]    *Id.* at 4.

the ABD Program *always* paid below-market and unreasonably low interest rates rather than interest rates based on "prevailing economic and business conditions."[79]  Indeed, as discussed above, the sweep rates offered under the ABD Program largely remained the same, even as benchmark interest rates increased to their highest levels in nearly two decades, and always fell far below competitive rates.

107.    The conflict disclosures in the Program Documents also misleadingly state that "[t]he amount of the fee paid to Oppenheimer will affect the interest rate paid on Deposit Accounts. ***To the extent more of the fee paid is retained by Oppenheimer the interest rate paid to clients on Deposit Accounts will be less***"[80] and "*[t]he compensation received by Oppenheimer* and the service provider involved in operating the ABD Program ***will affect the interest rate paid by the Deposit Bank*** on your Deposit Accounts."[81]

108.    These conflict disclosures were misleading and omitted material facts because disclosing only a potential conflict that fees will affect interest rates omits the reality that Defendants exploited their customers for profit by retaining an unreasonable fee at their customers' expense.

## CLASS ACTION ALLEGATIONS

109.    Plaintiff brings this action as a class action against Defendants pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a Class consisting of all customers of Defendants who had cash deposits or balances in the ABD Program ("Class").  Excluded from the Class are Defendants, officers and directors of Defendants at all relevant times, members of their

---

[79]    *Id.* at 3.

[80]    Oppenheimer, *Brokerage Disclosure Guide*, *supra* note 3 at 5.

[81]    Oppenheimer, *Sweep Agreement*, *supra* note 2 at 4.

immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

110.    The Class members are so numerous that their individual joinder is impracticable. While the exact number of Class members can only be determined by appropriate discovery, Plaintiff believes that Class members number in the thousands, and are geographically dispersed, because OPY oversees nearly $49.4 billion in client assets across the United States.

111.    Plaintiff's claims are typical of Class members' claims because Plaintiff's cash deposits were subject to the ABD Program, and, therefore, Plaintiff's claims, and those of all other Class members, arose from the same wrongful conduct by Defendants alleged herein.

112.    Plaintiff will fairly and adequately protect the interests of the Class members and has retained counsel experienced and competent in complex class action litigation.  Plaintiff has no interests that are contrary to, or in conflict with, the members of the Class that Plaintiff seeks to represent.

113.    The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for the party opposing the Class or a risk of adjudications that, as a practical matter, would be dispositive of the interests of other Class members who were not parties to the adjudications or would substantially impair or impede the ability of such Class members to protect their interests.

114.    Because Defendants act or refuse to act on grounds that apply generally to the Class, final injunctive relief or corresponding declaratory relief is appropriate with respect to the Class as a whole.

115.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impossible for the members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

116.    Questions of law and fact common to the members of the Class predominate over any questions that may affect only individual members in that Defendants act on grounds generally applicable to the entire Class.  Among the questions of law and fact common to the Class are:

(a)    whether Defendants violated the laws as alleged herein;

(b)    whether Defendants owed fiduciary duties to Plaintiff and members of the Class in connection with the ABD Program;

(c)    whether Defendants breached their fiduciary duties to members of the Class in connection with the ABD Program;

(d)    whether Defendants breached their contractual obligations to members of the Class in connection with the ABD Program;

(e)    whether Defendants made material misrepresentations and/or omissions in connection with the ABD Program;

(f)    whether Defendants were unjustly enriched by their wrongful conduct;

(g)    whether the members of the Class sustained damages as a result of the alleged wrongful conduct by Defendants, and, if so, the appropriate measure of damages; and

(h)    whether the members of the Class are entitled to attorneys' fees and costs and, if so, the appropriate amount of attorneys' fees and costs.

## COUNT I

## BREACH OF CONTRACT
## AGAINST ALL DEFENDANTS

117.    Plaintiff incorporates paragraphs 1-116 as though fully set forth herein.

118.    Plaintiff and Class members were parties to the Program Documents with Defendants.  The Program Documents set forth the contractual terms and conditions of the ABD Program.  OPY owns and controls Oppenheimer and OAM and shares in the compensation earned from the ABD Program as disclosed in their public filings.

119.    Pursuant to the Program Documents, Defendants were contractually obligated to act as agents on behalf of Plaintiff and the Class, and, thus, were contractually obligated to act in Plaintiff's and the Class' best interests in seeking and negotiating reasonable sweep interest rates and extracting reasonable fees from the interest rates paid by the Program Bank under the ABD Program.

120.    Defendants breached their contractual obligations by (a) extracting unreasonable, unjustified, and arbitrary fees from the interest accrued on the Deposit Accounts; and (b) failing to provide Plaintiff and the Class with reasonable interest rates on their deposits in the ABD Program.  Rather, the sweep interest rates provided by Defendants were unreasonably low and well below several objective benchmarks including the federal funds rate, which increased dramatically during the Class Period while the interest rates paid to customers in the ABD Program largely remained flat.  As such, Defendants denied Plaintiff and the Class the full benefit of their bargain under the Program Documents.

121.    Defendants additionally promised that the sweep rates for all customers under the ABD Program "will vary based upon prevailing economic and business conditions."  However, the sweep rates provided by Defendants did not reflect the improving market conditions, including

the skyrocketing federal funds rate.  As such, the sweep rates were not determined based on economic and business conditions.  Instead, the sweep rates were determined based on Defendants' and the Program Banks' motivation to earn profits at the expense of their customers.

122.    As a direct and proximate result of Defendants' breaches of contract, Plaintiff and the Class sustained damages.

**COUNT II**

**BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
AGAINST ALL DEFENDANTS**

123.    Plaintiff incorporates paragraphs 1-116 as though fully set forth herein.

124.    Plaintiff and Class members were parties to the Program Documents with Defendants concerning the ABD Program.  The Program Documents set forth the contractual terms and conditions of the ABD Program.  OPY owns and controls Oppenheimer and OAM and shares in the compensation earned from the ABD Program as disclosed in their public filings.

125.    Implicit in the Program Documents were duties of good faith and fair dealing. Defendants breached their duties of good faith and fair dealing by (a) extracting unreasonable, unjustified, and arbitrary fees from the interest accrued on the Deposit Accounts; and (b) failing to provide Plaintiff and the Class with fair and reasonable sweep interest rates on their cash deposits in the ABD Program.  Rather, the sweep interest rates provided by Defendants were well below several objective benchmarks including the federal funds rate, which increased dramatically during the Class Period while the sweep interest rates largely remained flat.  As such, Defendants acted in bad faith and denied Plaintiff and the Class the full benefit of their bargain under the Program Documents.

126.    As a direct and proximate result of Defendants' breach of the implied covenant of good faith and fair dealing, Plaintiff and the Class sustained damages.

## COUNT III

## BREACH OF FIDUCIARY DUTY
## AGAINST ALL DEFENDANTS

127.    Plaintiff incorporates paragraphs 1-116 as though fully set forth herein.

128.    Oppenheimer and OAM were the agents of customers enrolled in the ABD Program, including Plaintiff and the Class.  OPY owns and controls Oppenheimer and OAM and shares in the compensation earned from the ABD Program as disclosed in their public filings.

129.    Defendants owed fiduciary duties to Plaintiff and the Class, including duties to act in the best interests of, and deal fairly and honestly with, Plaintiff and the Class.

130.    Defendants violated their duty to act in the best interests of Plaintiff and the Class by using the ABD Program to enrich themselves at the expense of customers by paying customers unreasonably low interest rates and extracting unreasonable fees from interest accrued on customers' Deposit Accounts, as described above.

131.    Defendants also violated their duty to deal fairly and honestly with Plaintiff and the Class by making material misrepresentations and omissions in the Program Documents, as described above.

132.    Further, Defendants violated their duty to act with reasonable care to verify the truthfulness of the information set forth in the ABD Program, which was materially misleading and omitted material facts for the reasons described above.

133.    As a direct and proximate result of Defendants' breach of their fiduciary duties, Plaintiff and the Class suffered damages and are entitled to recover such damages from Defendants.

**COUNT IV**

**NEGLIGENCE**
**AGAINST ALL DEFENDANTS**

134.    Plaintiff incorporates paragraphs 1-116 as though fully set forth herein.

135.    Defendants were the agents of customers enrolled in the ABD Program, including Plaintiff and the Class.  Defendants facilitated the ABD Program by, among other things, accepting deposits from customers through its online brokerage platform, which were swept into accounts with the Program Banks.  OPY owns and controls Oppenheimer and OAM and shares in the compensation earned from the ABD Program as disclosed in their public filings.

136.    Defendants owed Plaintiff and the Class a duty to act with reasonable care in connection with their cash sweep balances deposited and maintained in the ABD Program.

137.    Defendants' conduct with respect to the ABD Program, as described above, was negligent.  By failing to provide Plaintiff and the Class with fair and reasonable sweep interest rates on their cash deposits in the ABD Program, Defendants breached their duty to act with reasonable care.

138.    Defendants' negligence directly and proximately caused harm to Plaintiff and the Class.

**COUNT V**

**NEGLIGENT MISREPRESENTATIONS AND OMISSIONS**
**AGAINST ALL DEFENDANTS**

139.    Plaintiff incorporates paragraphs 1-116 as though fully set forth herein.

140.    Defendants were the agents of customers enrolled in the ABD Program, including Plaintiff and the Class.  OPY owns and controls Oppenheimer and OAM and shares in the compensation earned from the ABD Program as disclosed in their public filings.

141.    Defendants owed Plaintiff and the Class a duty to act with reasonable care in connection with their cash sweep balances deposited and maintained in the ABD Program.

142.    Defendants negligently made material misrepresentations and omissions in the Program Documents, as described above, which were posted on Defendants' public website.

143.    Plaintiff and the Class justifiably relied on Defendants' Program Documents and accordingly deposited and maintained cash balances in the ABD Program to their detriment.

144.    Defendants' material misrepresentations and omissions directly and proximately caused harm to Plaintiff and the members of the proposed Class.

### COUNT VI

### VIOLATION OF NEW YORK GENERAL BUSINESS LAW §349
### AGAINST ALL DEFENDANTS

145.    Plaintiff incorporates paragraphs 1-116 as though fully set forth herein.

146.    Defendants' acts and practices with respect to the ABD Program constitute unlawful, unfair, misleading, and deceptive business acts and practices in violation of §349 of New York's General Business Law ("GBL"). Defendants unlawfully and unfairly benefitted and enriched themselves and mislead and deceived customers in the ABD Program through, among other things:  (a) paying unreasonably low interest rates to customers; (b) extracting unreasonable fees from interest paid to customers; (c) abusing the managerial discretion provided under the ABD Program; (d) breaching the fiduciary, contractual, and other duties arising under the ABD Program; and (e) making false and misleading statements and omissions relating to such interest rates and duties in the Program Documents.

147.    Defendants' misleading and deceptive business acts and practices with respect to the ABD Program adversely impacted Plaintiff and the Class, and, therefore, constitute consumer-oriented conduct under GBL §349, which resulted in direct harm to Plaintiff and the Class.

- 46 -

148.    Accordingly, Plaintiff and the Class seek appropriate relief under GBL §349, including injunctive relief and damages.

## COUNT VII

### UNJUST ENRICHMENT
### AGAINST ALL DEFENDANTS

149.    Plaintiff incorporates paragraphs 1-116 as though fully set forth herein.

150.    Defendants financially benefitted from the unlawful acts alleged herein by paying Plaintiff and the Class unreasonably low and below-market interest payments under the ABD Program.  These unlawful acts caused Plaintiff and the Class to suffer injury and monetary loss.

151.    As a result of the unlawful acts alleged herein, Defendants were unjustly enriched at the expense of Plaintiff and the Class.

152.    Defendants have received, and are holding, funds belonging to Plaintiff and the Class, which in equity Defendants should not be permitted to keep but should be required to refund to Plaintiff and the Class.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on its own behalf and on behalf of the Class, prays for relief and judgment, as follows:

A.    Declaring that this action is a proper class action, certifying the Class, appointing Plaintiff as representative of the Class, and appointing Plaintiff's counsel as Class Counsel for the Class pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding compensatory damages in favor of Plaintiff and the Class for all damages sustained as a result of Defendants' wrongdoing, in amounts to be proven at trial, including interest thereon;

C.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in

this action, including attorneys' fees and expert fees; and

    **D.**    Such other and further relief as the Court deems appropriate.

**JURY TRIAL DEMAND**

Plaintiff hereby demands a trial by jury.

DATED:  June 6, 2025              ROBBINS GELLER RUDMAN
                                         & DOWD LLP
                                 STEPHEN R. ASTLEY
                                 ANDREW T. REES
                                 SCOTT I. DION
                                 ALEX KAPLAN
                                 RENE A. GONZALEZ

                                 *s/ Stephen R. Astley*
                                STEPHEN R. ASTLEY

                                 225 NE Mizner Boulevard, Suite 720
                                 Boca Raton, FL  33432
                                 Telephone:  561/750-3000
                                 sastley@rgrdlaw.com
                                 arees@rgrdlaw.com
                                 sdion@rgrdlaw.com
                                 akaplan@rgrdlaw.com
                                 rgonzalez@rgrdlaw.com

                                 ABRAHAM FRUCHTER & TWERSKY LLP
                                 JACK G. FRUCHTER
                                 450 7th Ave 38th Floor
                                 New York, NY  10123
                                 Telephone:  212/279-5050

                                 *Attorneys for Plaintiff*