UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
┌─────────────────────────────────────────┐
│ LIBERTY CAPITAL GROUP, individually     │
│ and on behalf of all others similarly   │
│ situated,                               │
│                                         │
│           Plaintiff,                    │
│                                         │
│    -v-                                  │
│                                         │
│ OPPENHEIMER HOLDINGS INC. et al.,       │
│                                         │
│           Defendants.                   │
└─────────────────────────────────────────┘
```

25-cv-4822 (JSR)

OPINION & ORDER

JED S. RAKOFF, U.S.D.J.:

On October 1, 2025, the Court entered a "bottom-line" Order granting in part and denying in part the motion of defendants Oppenheimer Holdings Inc., Oppenheimer & Co. Inc., and Oppenheimer Asset Management Inc. to dismiss the putative Class Action Complaint ("CAC") that plaintiff Liberty Capital Group ("Liberty") filed in this matter. See ECF No. 43. On October 3, 2025, the Court amended that "bottom-line" Order to dismiss Liberty's Fifth Cause of Action, for negligent misrepresentations and omissions, in addition to Liberty's Fourth and Seventh Causes of Action. See ECF No. 46. This Opinion sets forth the reasons for the Court's Order, as so modified.

I.   Background

Liberty, a New York limited liability company, held a "standard brokerage account" with Oppenheimer & Co. Inc. at all times relevant to the CAC. See ECF No. 1 ("CAC") ¶ 7. Liberty does not allege that it held any other type of account pertinent to the CAC's allegations,

nor does it allege that it held any accounts with Oppenheimer Asset Management Inc. See ECF No. 31 ("MTD") at 25.

Liberty commenced this putative class action to recover alleged damages arising out of defendants' supposedly wrongful management of their "Advantage Bank Deposit Program" ("ABD Program"). See CAC ¶ 1. Through the ABD Program, defendants allegedly invested, or "swept," the cash balances that their customers maintained in various types of accounts into interest-bearing accounts at certain deposit banks. See id. Liberty alleges that the ABD Program "functions and is operated in the same manner regardless of account type." Id. ¶ 16.

The gravamen of the CAC is that defendants paid ABD Program customers "unreasonable, below-market interest rates." See id. ¶¶ 2-3. Specifically, the CAC alleges that, even though ABD Program documents promised that applicable interest rates would "vary based on prevailing economic and business conditions," id. ¶ 18, the ABD Program actually paid "below-market interest rates," ranging from 0.01% to 0.60%, at a time when relevant interest rates paid by the Federal Reserve, other federal financial instruments, and defendants' competitors increased more than twenty-fold, see id. ¶¶ 37-62. Separately, the CAC alleges that defendants also charged ABD Program customers "unreasonable, unjustified, and arbitrary" fees. See id. ¶¶ 22-26.[1]

---

[1] While the CAC alleges that defendants represented that "[t]he fee payable to Oppenheimer may be as high as 5% of the household balances invested in the ABD Program," id. ¶ 21 (original emphasis), it does not allege what fees defendants actually charged. Nor does it allege

The CAC names three defendants. In addition to Oppenheimer & Co. Inc., the entity with which Liberty held a brokerage account, see id. ¶ 7, Liberty sues Oppenheimer Holdings Inc., the corporate parent of Oppenheimer & Co. Inc., along with Oppenheimer Asset Management Inc., a separate subsidiary of Oppenheimer Holdings Inc. that provides investment advisory services, see id. ¶¶ 8-10. Liberty alleges that Oppenheimer Holdings Inc. and Oppenheimer Asset Management Inc. "participate[d] in" the operation, control, or administration of the ABD Program. See id. It also alleges that Oppenheimer Asset Management Inc. operates as a fiduciary for its customers and, in that capacity, determines how much of a customer's cash is available for investment in the ABD Program at any given time. See id. ¶¶ 10, 24, 99. The CAC is otherwise devoid of non-conclusory allegations regarding either Oppenheimer Holdings Inc. or Oppenheimer Asset Management Inc.

Based on these and other allegations, the CAC asserts seven causes of action, all under New York law, against all three defendants: breach of contract (Count One), breach of the implied covenant of good faith and fair dealing (Count Two), breach of fiduciary duty (Count Three), negligence (Count Four), negligent misrepresentations and omissions (Count Five), violation of New York General Business Law § 349 (Count Six), and unjust enrichment (Count Seven).[2] Liberty seeks to represent "a Class consisting of all customers of Defendants who had cash

---

whether, or how, those fees varied from those charged by defendants' competitors.

[2] Federal jurisdiction is based on the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2) and (6). See CAC ¶ 4.

deposits or balances in the ABD Program," subject to certain exceptions not relevant here. See CAC ¶ 109.

Liberty filed the CAC on June 6, 2025. See generally CAC. Defendants moved to dismiss the CAC on August 8, 2025, and briefing on defendants' motion concluded on September 4, 2025. See ECF Nos. 30-33, 35-36. The Court held oral argument on September 25, 2025, and issued its original "bottom-line" Order on October 1, 2025, followed by the amended Order on October 3, 2025.

## II.  Legal Standards

To survive a motion to dismiss under Rule 12(b)(6), a pleading "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. (citing Twombly, 550 U.S. at 555). In addition, causes of action that sound in fraud or mistake must be supported by allegations stating "with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).

Because Rule 12(b)(6) "assesses the legal feasibility of the complaint, but does not weigh the evidence that might be offered to support it," Global Network Commc'ns, Inc. v. City of New York, 458 F.3d 150, 155 (2d Cir. 2006), courts assessing motions to dismiss may consider materials beyond the four corners of a pleading in only

limited circumstances.[3] A pleading is "deemed to include any written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are 'integral' to the complaint." Sierra Club v. Con-Strux, LLC, 911 F.3d 85, 88 (2d Cir. 2018).

"Where the dates in a complaint show that an action is barred by a statute of limitations, a defendant may raise th[at] affirmative defense in a pre-answer motion to dismiss" under Rule 12(b)(6). Ghartey v. St. John's Queens Hosp., 869 F.2d 160, 162 (2d Cir. 1989). But under Rule 12(b)(6), in deciding a motion to dismiss that includes a statute of limitations defense, the Court may not generally consider matters outside the pleadings. See id. (citing Gordon v. Nat'l Youth Work All., 675 F.2d 356, 360 & n.3 (D.C. Cir. 1982)).

Finally, where the Court grants a motion to dismiss under Rule 12(b)(6), "leave to amend the complaint should be refused only if there is no basis for concluding that plaintiff can state a claim and thus permitting an amendment would be futile." 5B Fed. Prac. & Proc. Civ. § 1357 (4th ed. 2025); see also, e.g., Porat v. Lincoln Towers Cmty. Ass'n, 464 F.3d 274, 276 (2d Cir. 2006); Cruz v. Gomez, 202 F.3d 593, 597-98 (2d Cir. 2000).

---

[3] In all other circumstances, a court must either exclude extrinsic materials from its consideration of a motion to dismiss or convert the motion into a motion for summary judgment and provide the parties an opportunity to conduct relevant discovery and submit supporting evidence. See Fed. R. Civ. P. 12(d).

III. Analysis

Defendants raise three threshold challenges to the CAC, arguing that Liberty lacks standing to assert certain claims, that the CAC does not state any claims against Oppenheimer Holdings Inc. or Oppenheimer Asset Management Inc., and that the statutes of limitations have run on all seven of Liberty's causes of action. The Court addresses each of these threshold issues before turning to other challenges to Liberty's claims.

A.    Standing

Defendants contend that, because Liberty held only a standard brokerage account with Oppenheimer & Co. Inc., Liberty lacks standing to raise claims based on other types of accounts or on laws and regulations that apply to such other accounts. See MTD at 24-25. According to defendants, Liberty's claims for breach of contract, breach of implied covenant, breach of fiduciary duty, negligent misrepresentations, and violation of General Business Law § 349 all fail, in whole or in part, for this reason. See id.

The parties agree that, for a named plaintiff to have standing to bring a claim on behalf of a putative class, that plaintiff must allege that (1) it "personally suffered some actual . . . injury as a result of the putatively illegal conduct of the defendant[s]" and (2) "such conduct implicates the same set of concerns as the conduct alleged to have caused injury to other members of the putative class by the same defendants." NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co., 693 F.3d 145, 161 (2d Cir. 2012). In contrast to the

usual rule that a court must assure itself of jurisdiction before considering the merits of a claim, issues of standing in putative class actions are usually decided <u>after</u> class certification except where a claim "will move forward regardless of how the Court decides the class certification issue." <u>In re Propranolol Antitrust Litig.</u>, 249 F. Supp. 3d 712, 726-27 (S.D.N.Y. 2017). As the Court discusses at greater length below, <u>see infra</u> Section III.D.3, that exception does not apply here. Moreover, defendants do not cite any documents properly before the Court that support the view that the ABD Program operated differently as to the types of accounts Liberty did not hold, in comparison to the type of account that it did hold. <u>See</u> ECF No. 35 ("Reply") at 10. Thus, at this stage, the Court takes as true the CAC's allegation that the "ABD Program functions and is operated in the same manner regardless of account type." <u>See</u> CAC ¶ 16; ECF No. 33 ("Opp'n") at 25. Accordingly, and without prejudice to the Court's further consideration of this issue at a later juncture, the Court assumes for now that Liberty has standing to bring its claims on behalf of the proposed class.

        B.    Oppenheimer Holdings Inc. & Oppenheimer Asset Management Inc.

        Next, defendants argue that the CAC does not adequately state any of its claims against either Oppenheimer Holdings Inc. or Oppenheimer Asset Management Inc. because the CAC alleges wrongdoing only by Oppenheimer & Co. Inc. and does not allege that Liberty had a relationship -- contractual or otherwise -- with either of the other defendants. <u>See</u> MTD at 23-24; Reply at 10. Moreover, defendants assert,

the CAC does not allege that either Oppenheimer Holdings Inc. or Oppenheimer Asset Management Inc. exercised "complete domination" over Oppenheimer & Co. Inc. "with respect to the transaction at issue." See MTD at 23-24; Reply at 10 (citing Thrift Drug, Inc. v. Universal Prescription Adm'rs, 131 F.3d 95, 97 (2d Cir. 1997)).

Liberty responds that because all three defendants "share a unified leadership structure," including a common board of directors, they "are centrally controlled at the highest level, including the ABD Program." See Opp'n at 23-24. Alternatively, Liberty contends, Oppenheimer & Co. Inc. and Oppenheimer Asset Management Inc. are "wholly owned subsidiaries and agents" of Oppenheimer Holdings Inc. that were "acting within the scope of their corporate principal-agent relationship" in reference to the CAC's allegations. See id.

These arguments fail because the CAC does not contain allegations sufficient to support them. Under New York law, plaintiffs intending to pierce the corporate veil between a parent corporation and its subsidiary must show that the parent "exercised complete domination over the [subsidiary] with respect to the transaction at issue; and . . . that such domination was used to commit a fraud or wrong that injured the party seeking to pierce the veil." Thrift Drug, Inc., 131 F.3d at 97 (original emphasis). The CAC, however, does not contain any non-conclusory allegations to either effect.[4] Moreover, to the

---

[4] Liberty's argument regarding the defendants' corporate relationships substantially relies on defendants' filings with the Securities and Exchange Commission. See Opp'n at 23-24. However, those filings are neither incorporated by reference into the CAC nor otherwise properly

extent that Liberty, in opposition, argues a theory of liability sounding in the doctrine of <u>respondeat superior</u>, the CAC is also devoid of non-conclusory allegations concerning the nature of any principal-agent relationships between any of the defendants.

Because the Court holds that Liberty has not stated any of its claims against either Oppenheimer Holdings Inc. or Oppenheimer Asset Management Inc., those defendants are dismissed from this action.[5]

C.    Statutes of Limitations

As a third threshold issue, Oppenheimer contends that all seven of Liberty's causes of action are time-barred. The limitations periods applicable to Liberty's claims range from three to six years.[6] Oppenheimer argues that each of these limitations periods should be

---

before the Court on defendants' motion to dismiss. <u>See</u> <u>Sierra Club</u>, 911 F.3d at 88.

[5] Accordingly, the balance of this Opinion addresses only Liberty's claims against Oppenheimer & Co. Inc., which, for convenience, the Court hereinafter refers to as simply "Oppenheimer."

[6] In New York, claims for breach of contract and breach of the implied covenant of good faith and fair dealing must be brought within six years of the alleged breach. <u>E.g.</u>, <u>Miller v. Metro. Life Ins. Co.</u>, 979 F.3d 118, 121-22 (2d Cir. 2020). A three-year limitations period applies to claims for breach of fiduciary duty. <u>E.g.</u>, <u>Raul v. Am. Stock Exch., Inc.</u>, No. 95 Civ. 3154, 1996 WL 381781, at *8 (S.D.N.Y. May 2, 1996). Claims for negligence must also be brought within three years of an alleged injury. <u>See</u> CPLR 214(4). Claims for negligent misrepresentations and omissions are subject, at most, to a six-year limitations period. <u>See</u> <u>Meyer v. Seidel</u>, 89 F.4th 117, 129 (2d Cir. 2023). Claims under General Business Law § 349 must be brought within three years of a plaintiff's alleged injury. <u>E.g.</u>, <u>Gaidon v. Guardian Life Ins. Co.</u>, 96 N.Y.2d 201, 209-10 (2001). Finally, the limitations period for unjust enrichment claims is maximally six years, and that period begins to run "upon the occurrence of the wrongful act giving rise to a duty of restitution." <u>Matana v. Merkin</u>, 957 F. Supp. 2d 473, 494 (S.D.N.Y. 2013).

reckoned from "no later than 2015," when Oppenheimer asserts that Liberty initially contracted with it and elected not to opt out of the ABD Program. See MTD at 22; Reply at 9. In support of that argument, an exhibit to Oppenheimer's motion contains a "Client Agreement" between Liberty and Oppenheimer that is dated March 17, 2015. See MTD, Ex. A at 6-8.

Liberty contends that its claims are all timely for two independent reasons: (1) the CAC does not allege any wrongdoing by Oppenheimer prior to 2022, and (2) Oppenheimer's allegedly wrongful conduct is ongoing. See Opp'n at 22-23.

The Court agrees with both of Liberty's arguments. First, Oppenheimer may only raise the statute of limitations as an affirmative defense "[w]here the dates in a complaint show that an action is barred." Ghartey, 869 F.2d at 162. Here, as Liberty's counsel stressed at oral argument, the CAC does not allege wrongful conduct by Oppenheimer prior to 2022. See Tr. of Oral Arg., Sept. 25, 2025 ("Tr.") at 30-31. While Liberty does not dispute that its relationship with Oppenheimer commenced in 2015,[7] that fact is immaterial for limitations purposes where the CAC lacks allegations of earlier wrongdoing. Second, by asserting that Oppenheimer has underpaid interest and overcharged fees from 2022 through the date of the CAC, see, e.g., CAC ¶¶ 45, 82,

_____

[7] The Court may properly consider the March 17, 2015, Client Agreement between Liberty and Oppenheimer because it is deemed incorporated into the CAC by virtue of being "integral to plaintiff's ability to pursue" the CAC's causes of action. L-7 Designs, Inc. v. Old Navy, LLC, 647 F.3d 419, 422 (2d Cir. 2011) (citation modified).

Liberty has alleged "continuing unlawful acts," as opposed to merely the "continuing effects of earlier unlawful conduct," see Miller, 979 F.3d at 122; CAC ¶¶ 37-62, 82-84. Under New York law, allegations of continuing violations effectively toll the running of limitations periods because "each breach may begin the running of the statute anew." Miller, 979 F.3d at 122.

D.   Individual Claims

This putative class action is the latest in a series of lawsuits, brought in this District and elsewhere, concerning alleged misconduct by financial institutions in connection with so-called "cash sweep programs" like the ABD Program. See MTD at 2 n.2; Opp'n at 1-2. The Court finds the opinions of other courts addressing such cases to be helpful, though not dispositive, in assessing the merits of Liberty's claims here. See Vallely v. Merrill Lynch, Pierce, Fenner & Smith Inc., 464 F. Supp. 3d 634 (S.D.N.Y. 2020); DeBlasio v. Merrill Lynch & Co., Inc., No. 07 Civ. 318, 2009 WL 2242605 (S.D.N.Y. July 27, 2009); Welch v. TD Ameritrade Holding Corp., No. 07 Civ. 6904, 2009 WL 2356131 (S.D.N.Y. July 27, 2009); Dey v. Robinhood Markets, Inc., 780 F. Supp. 3d 882 (N.D. Cal. 2025); In re Wells Fargo Cash Sweep Litigation, No. 24 Civ. 4616, 2025 WL 1785315 (N.D. Cal. June 27, 2025); In re LPL Fin. Cash Sweep Litig., --- F. Supp. 3d ---, 2025 WL 2103545 (S.D. Cal. June 30, 2025); Mehlman v. Ameriprise Fin., Inc., No. 24 Civ. 3018, 2025 WL 2403252 (D. Minn. Aug. 19, 2025).

1.  Breach of Contract

The gravamen of the CAC is that Oppenheimer breached the express terms of its contract with Liberty and other ABD Program participants. The CAC sets forth three largely independent theories of this claim: (1) that Oppenheimer "limited customers to unreasonably low rates of interest under the ABD Program," see CAC ¶¶ 26, 37, 80, 85-96, 119-120; (2) that Oppenheimer failed to vary ABD Program interest rates with changes in economic and business conditions, see id. ¶¶ 37, 46, 57, 81-84, 120-121; and (3) that Oppenheimer charged "unreasonable, unjustified, and arbitrary fees," id. ¶¶ 87-88, 100, 120. But, in opposing Oppenheimer's motion to dismiss, Liberty abandons the first and third of these theories and now contends only that Oppenheimer breached its promise to pay rates that vary with economic and business conditions. See Opp'n at 3-7 (addressing only relationship between rates and market conditions); see also Tr. at 29-30 ("[W]e are not claiming that there is some unique extra reasonableness duty, it is just a market-based requirement that the rates paid as part of the sweep program vary as market conditions changed"). Narrowed in this fashion, the Court concludes that the CAC states a claim for breach of contract.[8]

---

[8] Because Liberty's contract claim now turns solely on Oppenheimer's promise to vary interest rates with economic and business conditions, cases involving cash sweep programs in which customers were promised reasonable interest rates are inapposite. See Vallely, 464 F. Supp. 3d at 644-45; Wells Fargo, 2025 WL 1785315, at *2. Likewise, cases involving the fees charged by institutions in connection with the administration of cash sweep programs are inapposite as well. See, e.g., LPL Fin., 2025 WL 2103545, at *13.

12

In New York, a claim for breach of contract lies where a plaintiff alleges (1) the existence of a contract; (2) plaintiff's performance under the contract; (3) defendant's breach of the contract; and (4) damages. <u>See, e.g.</u>, <u>Berman v. Sugo LLC</u>, 580 F. Supp. 2d 191, 202 (S.D.N.Y. 2008). Here, the parties agree that the first and second elements are satisfied. Nor does Oppenheimer seriously challenge Liberty's premise that, had Oppenheimer breached the contract, Liberty would have suffered damages. <u>See</u> MTD at 2-6; Reply at 1-3. Thus, only the third element of Liberty's claim is meaningfully contested at this stage.

Oppenheimer contends that Liberty has not plausibly alleged the element of breach. As pertinent to Liberty's narrowed theory of its claim, Oppenheimer argues that (1) it did not breach its promise to pay interest at the rates it disclosed to ABD Program participants and (2) the statement in the ABD Program documents that interest rates "will vary based upon prevailing economic and business conditions" is not an enforceable promise. <u>See</u> MTD at 3-6; Reply at 1-3.[9] Each of Oppenheimer's arguments fails.

<u>First</u>, Liberty does not contend that Oppenheimer failed to pay the rates that it disclosed. Liberty's claim, instead, is that the

_____

[9] Oppenheimer's moving papers include several other arguments, including that the ABD Program documents did not obligate Oppenheimer to pay reasonable rates of interest and that the interest rates Oppenheimer paid satisfy Liberty's standard for reasonableness. <u>See</u> MTD at 4-6; Reply at 2-3. Because Liberty no longer presses the theory that Oppenheimer breached its contract by not paying reasonable rates of interest, the Court need not (and does not) address those arguments.

interest rates that Oppenheimer disclosed (and paid) were inconsistent with Oppenheimer's promise to pay interest rates that would "vary based upon prevailing economic and business conditions." See Opp'n at 4. In concluding that Oppenheimer has thus misapprehended the thrust of Liberty's claim, the Court finds it instructive that the court in Ameriprise Financial, which involved a financial institution's similar promise to take "economic, market and business conditions" into account in setting cash sweep program interest rates, held that such a promise could support a breach of contract claim because the defendant's "disclosures do not obviate any alleged contractual obligation [that the defendant] had to secure for and pay clients rates of interest that considered economic and business conditions." See 2025 WL 2403252, at *7.

Second, Oppenheimer's arguments that its promise to vary interest rates with market conditions is unenforceable contravene the plain language of the ABD Program documents, which are incorporated into the CAC by reference. See CAC ¶ 15 (identifying relevant documents). Indeed, a document called the "Terms and Conditions of the Advantage Bank Deposit Program" expressly provides that "[a]s discussed herein, interest rates on the Deposit Accounts will . . . vary based upon prevailing economic and business conditions." MTD, Ex. B at 3. Oppenheimer contends that the placement of this language in the "Introduction" section of the "Terms and Conditions" means that the language somehow deserves less weight. See MTD at 4. But while Oppenheimer correctly states the general rule that "specific terms and

exact terms are given greater weight than general language," id.
(quoting Aramony v. United Way of Am., 254 F.3d 403, 413 (2d Cir.
2001)), Oppenheimer identifies no "specific" or "exact" terms in any
later section of the "Terms and Conditions" that contradict the promise
plainly contained in the "Introduction." Nor do any contrary terms
appear in the separate "Client Agreement" that Oppenheimer and Liberty
executed. See MTD, Ex. A.

Alternatively, Oppenheimer contends that, even if the Court were
to give effect to the language promising that rates would vary with
economic and business conditions, the function of that language is
merely to disclose that Oppenheimer or the deposit banks had the right
to vary the rates paid. See MTD at 5. But Oppenheimer's proposed
interpretation reads the key language out of the "Terms and
Conditions." That document does not simply disclose that rates may
vary; it specifically states that rates "will" vary and that the
variance will be "based upon prevailing economic and business
conditions." MTD, Ex. B at 3.

Thus, the Court concludes that Liberty has adequately alleged
that Oppenheimer promised to pay interest to ABD Program participants
at rates that would vary based on economic and business conditions.
Liberty has also adequately alleged that Oppenheimer breached that
promise. Specifically, the CAC alleges that interest rates available
under the ABD Program ranged from 0.01% to 0.60% from 2022 to 2023,
as well as that such rates remained unchanged from February 2023
onward. See CAC ¶ 37; see also id. ¶ 38 (presenting table of interest

rates). In contrast, the CAC alleges that other relevant interest rates skyrocketed during that same period. From January 2022 through May 2025, for instance, the Federal Reserve System raised the federal funds target rate from 0% to a high of 5.5%, including three increases between February and November 2023. See id. ¶¶ 44-45. Other short-term interest rates rose similarly, see id. ¶¶ 47-49, as did the rates of interest that banks offered on deposits, see id. ¶¶ 51-57, and the rates of interest that Oppenheimer's competitors offered to customers in their cash sweep programs, see id. ¶¶ 58-61. Because the ABD Program's rates allegedly remained constant during this period, the CAC plausibly alleges breach.

For these reasons, the Court concludes that Liberty has stated a claim for breach of contract. The Court stresses, however, the limits of its holding. At the motion to dismiss stage, Liberty need only allege facts stating a "plausible" claim to relief. See Ashcroft, 556 U.S. at 678. To prevail at subsequent stages of this litigation, Liberty will likely need to demonstrate with greater specificity how Oppenheimer should have performed its promise to vary ABD Program interest rates and how Liberty and those similarly situated to it were damaged by Oppenheimer's failure to perform. As Oppenheimer contended at oral argument, see Tr. at 33-34, the promise it made could be read not simply to vary interest rates in line with the market but also to do so in light of considerations related to its own business interests, and this possible construction remains alive at this early stage of the proceedings.

2.    Implied Covenant of Good Faith and Fair Dealing

In New York, "persons invoking the aid of contracts are under implied obligation to exercise good faith not to frustrate the contracts into which they have entered." Pitcairn Props., Inc. v. LJL 33rd St. Assocs., LLC, No. 11 Civ. 7318, 2012 WL 6082398, at *5 (S.D.N.Y. Nov. 20, 2012) (quoting Novick v. AXA Network, LLC, 642 F.3d 304, 312 (2d Cir. 2011)) (cleaned up). To state a claim for breach of the implied covenant of good faith and fair dealing, a plaintiff must "allege facts which tend to show that the defendant sought to prevent performance of the contract or to withhold its benefits from the plaintiff." Dweck Law Firm, L.L.P. v. Mann, 340 F. Supp. 2d 353, 358 (S.D.N.Y. 2004). However, a plaintiff may not invoke the implied covenant "to create terms that do not exist in the writing," Vanlex Stores, Inc. v. BFP 300 Madison II, LLC, 66 A.D.3d 580, 581 (1st Dep't 2009), or to assert that the terms of a contract are simply unfair, Pitcairn Props., 2012 WL 6082398, at *5.

As to Liberty's implied covenant claim, Oppenheimer first contends that it is impermissibly duplicative of Liberty's claim for breach of contract. See MTD at 7; Reply at 3. To be sure, a plaintiff may not recover on both a contract claim and an implied covenant claim where they are "premised on the same conduct" and "intrinsically tied to the damages allegedly resulting from a breach of the contract." Miller v. Mercuria Energy Trading, Inc., 291 F. Supp. 3d 509, 520 (S.D.N.Y. 2018) (quoting MBIA Ins. Corp. v. Merrill Lynch, 81 A.D.3d 419, 419-20 (1st Dep't 2011)). However, at this stage, it is uncertain

whether Liberty will be able to establish all the elements of its claim for breach of contract because, as discussed above, Liberty may not be able to show in what precise manner Oppenheimer should have performed or to what precise extent customers were damaged. Accordingly, "where, as here, there is a dispute over the meaning of the contract's express terms, there is no reason to bar a plaintiff from pursuing both types of claims in the alternative." Spinelli v. Nat'l Football League, 903 F.3d 185, 206 (2d Cir. 2008); see also Wells Fargo, 2025 WL 1785315, at *3.

Oppenheimer next argues that Liberty's implied covenant claim fails because it is based on obligations that were not contained in the parties' contract. See MTD at 9; Reply at 4. But, as the Court also discussed above, the ABD Program documents include an express promise to pay interest rates that vary with economic and business conditions. Hence, the CAC states an implied covenant claim based on alleged misconduct by Oppenheimer that frustrated Liberty from obtaining the benefits of that promise. Cf. Dey, 780 F. Supp. 3d at 893-95 (defendant "plausibly breached the implied covenant by exercising its discretion . . . in a manner that frustrated those provisions of the contract and ran contrary to customers' reasonable expectations"); Ameriprise Fin., 2025 WL 2403252, at *10 (similar). Specifically, Liberty has plausibly alleged that it reasonably expected that Oppenheimer would pay rates of interest higher than those that Oppenheimer actually paid and that Oppenheimer's conduct in administering the ABD Program thereby deprived Liberty of the

benefit of its bargain. See CAC ¶ 125 (alleging Oppenheimer's failure to pay "fair . . . sweep interest rates," including rates "well below several objective benchmarks").

It is important to keep in mind, however, that Liberty's abandonment of two of the theories of breach of contract set forth in the CAC also implicates its breach of implied covenant claim. Oppenheimer is correct that Liberty has not adequately alleged breach of the implied covenant either on the basis that the interest rates Oppenheimer paid were unreasonable or on the basis that the fees Oppenheimer charged were excessive. See MTD at 9-10; Reply at 4-5; CAC ¶ 125. Again, however, Liberty has plausibly alleged that the failure of Oppenheimer to vary its rates with economic and business conditions, even if not strictly a breach of contract, was a breach of the implied covenant.

Contrary to Oppenheimer's assertions, see Reply at 5 n.8, other courts to have considered such claims in the context of cash sweep programs have agreed. See Ameriprise Fin., 2025 WL 2403252, at *9-10 (analyzing provision promising that interest rates would "vary based upon prevailing economic and business conditions"); Dey, 780 F. Supp. 3d at 894 (similar); LPL Fin., 2025 WL 2103545, at *18 (denying motion to dismiss implied covenant claim where plaintiffs had "reasonable understanding" that cash-sweep interest rates would increase "as the market improved and interest rates rose generally").

For all these reasons, the Court concludes that Liberty has stated a claim for breach of the implied covenant of good faith and fair

dealing in connection with Oppenheimer's promise to pay interest rates that would vary with economic and business conditions.

   3.   Breach of Fiduciary Duty

   Under New York law, a claim for breach of fiduciary duty has three elements: a plaintiff must allege (1) the existence of a fiduciary relationship, (2) misconduct by the fiduciary, and (3) resulting damages. Litvinoff v. Wright, 150 A.D.3d 714, 715 (2d Dep't 2017). Oppenheimer primarily contends that the CAC is deficient as to the first of these elements. See MTD at 10-15.

   Liberty, in response, maintains that Oppenheimer assumed two kinds of fiduciary duties pertinent to the CAC. First, for customers enrolled in Oppenheimer's advisory services programs, Liberty alleges that Oppenheimer expressly promised to "act as a fiduciary," including by acting in a customer's "best interests." CAC ¶ 99.[10] Second, for all other customers, Liberty alleges that Oppenheimer pledged to act as customers' agent in connection with the ABD Program. See id. ¶¶ 19, 86-87, 97-98, 128. While the first of these promises is sufficient to sustain a claim for breach of fiduciary duty, the second is not.

   Oppenheimer does not contest Liberty's allegation that it pledged to act as a fiduciary to its advisory services customers. See MTD at 11. Accordingly, and because Oppenheimer also does not contest that Liberty has alleged the remaining two elements of a claim for breach

_____

[10] Although the CAC at one point identifies now-dismissed defendant Oppenheimer Asset Management, Inc. as defendants' primary provider of investment advisory services, it also alleges that advisory services were performed by Oppenheimer itself. See CAC ¶¶ 10, 99 & n.73.

of fiduciary duty, see id. at 11-15, the Court denies Oppenheimer's motion to dismiss this claim as to advisory services customers.[11]

As to its non-advisory services customers, Oppenheimer contends that its "limited role as an 'agent'" in relation to the ABD Program is insufficient to create a fiduciary duty. See MTD at 12-13. The Court agrees. The ABD Program documents provide that Oppenheimer will act as an agent for the purpose of performing only limited tasks on a customer's behalf: opening one or more accounts at deposit banks, sweeping cash from brokerage accounts and depositing it with the deposit banks, and withdrawing cash from deposit bank accounts and returning it to brokerage accounts. See MTD, Ex. B at 3-5. None of these tasks is sufficient to create a fiduciary relationship. See Wells Fargo, 2025 WL 1785315, at *3 ("Unlike with the advisory clients, nothing in the contracts with non-advisory clients expressly establishes a fiduciary relationship."); LPL Fin., 2025 WL 2103545, at *17 (holding that scope of agency in connection with cash sweep

---

[11] As Oppenheimer points out, Liberty does not expressly allege that it held an advisory services account. See MTD at 11. Were the Court required at this juncture to decide whether Liberty has standing to press the claim for breach of fiduciary duty, this might well be a fatal flaw. However, as the Court has noted above, there is an exception to the rule that "an Article III court must ordinarily assure itself that it has jurisdiction before proceeding" to the merits in cases where "class certification issues are 'logically antecedent to Article III concerns.'" In re Propranolol, 249 F. Supp. 3d at 726. Accordingly, the Court defers until the class certification stage the question of whether Liberty has standing to represent the proposed class for this particular claim, as well as such other related questions as whether, if another plaintiff is available as to this claim, subclasses should be created, etc.

program "was exceedingly narrow").[12] Moreover, as Oppenheimer notes in passing, Liberty has not alleged that Oppenheimer engaged in misconduct as to those specific tasks, rather than as to the setting of interest rates and fees. See MTD at 13. Accordingly, the Court concludes that the CAC fails to state a claim for breach of fiduciary duty as to non-advisory services customers.

    4.   Negligence

The fourth count of the CAC asserts a claim for negligence, alleging that Oppenheimer owed Liberty a duty to act with reasonable care in administering the ABD Program and that Oppenheimer breached that duty by failing to pay fair and reasonable interest rates. See CAC ¶¶ 135-138. New York law plainly forecloses this claim because it impermissibly duplicates Liberty's contract and quasi-contract claims.

Oppenheimer asserts that this result is required by New York's so-called "economic loss doctrine," see MTD at 16; Reply at 7, but the New York Court of Appeals has recently cabined that doctrine to the context of products liability suits, IKB Int'l, S.A. v. Wells Fargo

---

[12] Liberty cites (and sometimes quotes selectively from) cases in which courts have held, under New York law, that certain kinds of agency relationships can give rise to fiduciary duties. See Opp'n at 10-11. But none of Liberty's cases concerns the non-discretionary duties that Oppenheimer promised to perform on behalf of non-advisory services customers. See Carlton Grp., Ltd. v. Mirabella SG SpA, No. 16 Civ. 6649, 2018 WL 3520494, at *9 (S.D.N.Y. July 19, 2018) (in discretionary broker relationship, "[a]n exclusive agency relationship gives rise to a fiduciary duty" (emphasis added)); Sokoloff v. Harriman Ests. Dev. Corp., 96 N.Y.2d 409, 416 (2001) (involving contractor hired in preparation for home construction); Cristallina S.A. v. Christie, Manson & Woods Int'l, Inc., 117 A.D.2d 284, 292 (1st Dep't 1986) (involving consignment of rare paintings).

Bank, N.A., 40 N.Y.3d 277, 290 (2023). In doing so, moreover, the Court of Appeals reaffirmed New York's separate and longstanding "prohibition against duplicative contract and tort claims," under which an alleged breach of contract may not also give rise to tort liability "unless a legal duty independent of the contract itself has been violated." Id. Here, Liberty has alleged no such duties apart from those that pertain to its claim for breach of fiduciary duty. Accordingly, the Court dismisses Liberty's negligence claim.

### 5. Negligent Misrepresentations and Omissions

Under New York law, a claim for negligent misrepresentation or omission lies where (1) the defendant had a duty, as a result of a special relationship, to provide the plaintiff with correct information; (2) the defendant made a false representation that it should have known was incorrect; (3) the defendant knew that the plaintiff desired the information for a serious purpose; (4) the plaintiff intended to rely and act on the defendant's representation; and (5) the plaintiff reasonably relied on that representation to its detriment. Wargo v. Hillshire Brands Co., 599 F. Supp. 3d 164, 175 (S.D.N.Y. 2022). A "special relationship" is one that involves "a closer degree of trust between the parties than that of the ordinary buyer and seller." Izquierdo v. Mondelez Int'l, Inc., No. 16 Civ. 4697, 2016 WL 6459832, at *8 (S.D.N.Y. Oct. 26, 2016).

As an initial matter, Oppenheimer argues that this claim fails because Liberty has not pleaded the alleged misrepresentations with particularity. See MTD at 16-17; Fed. R. Civ. P. 9(b). Tellingly,

however, Oppenheimer abandons this argument on reply. See Reply at 7-8. And indeed, the CAC specifically alleges numerous statements that Liberty claims constitute misrepresentations or omissions, including statements regarding the relationship of ABD Program interest rates and market conditions. See CAC ¶¶ 101-108. Moreover, because Liberty's claim sounds in negligence, rather than fraud, Rule 9(b) does not apply. Cf. Rombach v. Chang, 355 F.3d 164, 178 (2d Cir. 2004) (holding that claims that "sound in negligence" are "not subject to the heightened pleading requirements of Rule 9(b)").

On the merits, Oppenheimer contends that Liberty's claim fails for numerous reasons. See MTD at 17-19; Reply at 7-8. The Court addresses only one, namely, Oppenheimer's argument that a promise that interest rates would vary based on economic and business conditions cannot support a claim for negligent misrepresentation because an "alleged misrepresentation must be factual in nature and not promissory or relating to future events." MTD at 19 (quoting Yellow Cab SLS Jet Mgmt. v. Schwartz, No. 13 Civ. 7575, 2014 WL 2111688, at *1-2 (S.D.N.Y. May 12, 2014)). Liberty responds to this argument only in a footnote, citing a case where a court observed -- in dicta -- that a financial institution's promise that cash sweep interest rates "will vary based on prevailing economic and business conditions" could properly be alleged to be a negligent misrepresentation. See Opp'n at 17 n.16 (citing Dey, 780 F. Supp. 3d at 891-92). But this case was decided under California law, see Dey, 780 F. Supp. 3d at 891, and New York law squarely forecloses Liberty's claim. Applying New York law, the

Second Circuit has repeatedly held that alleged misrepresentations "must be factual in nature and not promissory or relating to future events." Hydro Investors, Inc. v. Trafalgar Power Inc., 227 F.3d 8, 20-21 (2d Cir. 2000) (collecting cases). Because the misrepresentations on which Liberty's claim relies all concern the manner in which Oppenheimer intended to operate the ABD Program in the future, they are "[p]romises of future conduct" that are "not actionable as negligent misrepresentations." See, e.g., Murray v. Xerox Corp., 811 F.2d 118, 123 (2d Cir. 1987). In light of this fatal flaw in Liberty's claim, the Court need not (and does not) reach Oppenheimer's remaining arguments. Liberty's claim for negligent misrepresentations and omissions must be, and hereby is, dismissed.

> 6.    General Business Law § 349

Liberty's next claim is for Oppenheimer's alleged violation of section 349 of the New York General Business Law. In this claim, Liberty asserts that Oppenheimer misled and deceived ABD Program customers by, among other things, paying unreasonably low interest rates, charging unreasonable fees, abusing its discretion, breaching its fiduciary and other duties, and making false and misleading statements in the ABD Program documents. See CAC ¶ 146.

A claim under General Business Law § 349 consists of three elements: that (1) "the challenged act or practice was consumer-oriented"; (2) "it was misleading in a material way"; and (3) "the plaintiff suffered injury as a result of the deceptive act." Bernstein v. JPMorgan Chase Bank, N.A., 775 F. Supp. 3d 701, 718 (S.D.N.Y. 2025).

As to the third element, a plaintiff need not prove that it justifiably relied on the allegedly misleading act or practice, merely that it was damaged by it. Oswego Laborers' Loc. 214 Pension Fund v. Marine Midland Bank, N.A., 85 N.Y.2d 20, 26 (1995).

Oppenheimer argues that Liberty has not plausibly alleged the first or second elements of this claim. Both of Oppenheimer's arguments fail. As to the first element, Oppenheimer contends that Liberty is not a consumer within the meaning of the statute and that it has not alleged conduct affecting consumers at large. See MTD at 19-20; Reply at 8. Oppenheimer is incorrect because "[t]he test is not whether a plaintiff is an individual consumer," but, rather, "whether the acts or practices" alleged to be misleading "have a broader impact on consumers at large." See In re Libor-Based Fin. Instruments Antitrust Litig., No. 11 MDL 2262, 2015 WL 4634541, at *84 (S.D.N.Y. Aug. 4, 2015) (cleaned up). And indeed, the CAC amply alleges that Oppenheimer offered the ABD Program to "customers nationwide." CAC ¶ 11; see also id. ¶ 110 (asserting that putative class members "number in the thousands, and are geographically dispersed" throughout the United States).

Concerning this element, Oppenheimer also cites cases holding that General Business Law § 349 does not apply to the provision of certain brokerage services that are "ancillary to the purchase of securities." MTD at 19; Reply at 8. But Oppenheimer's cases concern activities that are inextricably bound up with transactions in securities, such as a financial institution's technological capacity

to engage in such transactions or an institution's provision of research regarding potential securities purchases. See Berger v. E*Trade Grp., Inc., Index No. 600721/99, 2000 WL 360092, at *4 (N.Y. Sup. Ct. Mar. 28, 2000); Gray v. Seaboard Securities, Inc., 14 A.D.3d 852, 852 (3d Dep't 2005). Oppenheimer makes no attempt to argue why its alleged conduct here, which concerns the management of its customers' cash during periods when that cash is specifically not being used for securities transactions, should be treated analogously. Courts have sustained General Business Law § 349 claims involving closer analogues to Oppenheimer's alleged conduct, including claims concerning savings accounts and commercial loans. See Libor-Based Fin. Instruments, 2015 WL 4634541, at *84.

As to the second element of Liberty's claim, Oppenheimer argues that Liberty has failed to allege material misrepresentations or omissions regarding the ABD Program because Oppenheimer "fully and truthfully disclosed all aspects" of the program. MTD at 20; Reply at 8. Oppenheimer is incorrect as to at least its statements concerning the fluctuations in the interest rates that it promised to pay to ABD Program customers. As the Court has discussed at length above, see supra Sections III.D.1-2, the ABD Program's "Terms and Conditions" promised that interest rates "will vary based upon prevailing economic and business conditions," see CAC ¶ 106. Because Liberty's claim is not based on whether Oppenheimer disclosed how it would administer the ABD Program but, rather, on whether Oppenheimer's disclosures were truthful, Oppenheimer's argument that its disclosures were sufficient

is unavailing. See, e.g., Volino v. Progressive Cas. Ins. Co., No. 21 Civ. 6243, 2022 WL 5242894, at *4 (S.D.N.Y. Oct. 6, 2022) ("[T]he Complaint sufficiently alleges that Defendants 'did not do what its policy said it would do,' and that this shortcoming would not be apparent from the face of any disclosure" (original emphasis)); cf. DeBlasio, 2009 WL 2242605, at *37 (dismissing General Business Law § 349 claim where plaintiff "failed to identify any materially misleading misstatements or omissions").

Separately, Oppenheimer contends that Liberty's claim under General Business Law § 349 is impermissibly duplicative of its contract claims. See MTD at 8. But, as Liberty points out, the thrust of its General Business Law § 349 claim is that provisions in its contract with Oppenheimer were misleading or deceptive, which is distinct from Liberty's claims that Oppenheimer breached the express and implicit provisions of the contract. See Opp'n at 21-22; McNeil v. Capital One Bank, N.A., No. 19 Civ. 473, 2020 WL 5802363, at *2-3 (E.D.N.Y. Sept. 29, 2020) (holding that allegations concerning misleading contractual terms are "separate from the breach of contract claim" and that, in any case, "Plaintiff may plead alternative causes of action").

For these reasons, the Court concludes that Liberty has adequately stated a claim for violation of General Business Law § 349.

### 7.   Unjust Enrichment

Liberty has not, however, stated a claim for unlawful enrichment. In New York, the elements of such a claim are that (1) the defendant benefited, (2) at the plaintiff's expense, and (3) equity and good

conscience require that restitution be made. E.g., Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc., 448 F.3d 573, 586 (2d Cir. 2006). "A plaintiff cannot maintain an unjust enrichment claim when there is a valid and enforceable contract between the parties covering the dispute at issue." Trustpilot Damages LLC v. Trustpilot, Inc., No. 21 Civ. 432, 2021 WL 2667029, at *9-10 (S.D.N.Y. June 29, 2021) (cleaned up).

Applying these principles, Liberty's claim fails because there is no dispute that Liberty and Oppenheimer were in contract with each other with respect to the ABD Program. See MTD at 20-22; Reply at 8-9. Although there is uncertainty at this stage of the litigation as to whether Liberty will ultimately succeed on its claims that Oppenheimer breached any express or implied promises under that contract, there is no question that "contractual provisions cover the same territory" as Liberty's unjust enrichment claim. Trustpilot, 2021 WL 2667029, at *10. Accordingly, Liberty's claim for unjust enrichment is dismissed.

E.    Leave to Replead

Where claims are dismissed under Rule 12(b)(6), "leave to amend the complaint should be refused only if there is no basis for concluding that plaintiff can state a claim." 5B Fed. Prac. & Proc. Civ. § 1357. Here, Oppenheimer does not contend that granting leave to amend would be futile; it argues only that leave to amend should be denied because the deadline for Liberty to amend the CAC without leave of the Court has passed. See MTD at 1. Accordingly, and because

it is conceivable that Liberty could amend the CAC to cure the defects in Counts Four, Five, and Seven, the Court grants leave to amend, provided any such amended complaint is filed no later than October 13, 2025 (so as not to unduly disrupt the prompt movement of this case).

IV.  Conclusion

For all the foregoing reasons, the Court grants in part and denies in part defendants' motion to dismiss the CAC. Oppenheimer Holdings Inc. and Oppenheimer Asset Management Inc. are dismissed from this litigation; Liberty's claims for negligence, negligent misrepresentations and omissions, and unjust enrichment are dismissed without prejudice and with leave to amend; and defendants' motion to dismiss is otherwise denied but subject to the limitations set forth above.

If Liberty files an amended complaint, further motion practice regarding the face of the complaint may be permitted, but discovery will still proceed. In any event, the parties should jointly call Chambers on October 15, 2025, at 12 noon to discuss further scheduling. In that regard, the Court will hold a hearing on class certification at 2:00 p.m. on November 21, 2025, in courtroom 14B of the United States Courthouse, 500 Pearl Street, New York, New York.

SO ORDERED.

New York, New York
October  6 , 2025                                JED S. RAKOFF, U.S.D.J.