UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- X
LIBERTY CAPITAL GROUP,                          :
Individually and on Behalf of All Others         :
Similarly Situated,                                     :
                                                               :
      Plaintiffs,                                      :
                                                               :       No. 1:25-cv-04822-JSR
v.                                                            :
                                                               :
OPPENHEIMER & CO. INC.                         :
                                                               :
      Defendant.                                     :
                                                               :
------------------------------------------------------- X

## OPPENHEIMER & CO. INC.'S
## MEMORANDUM OF LAW IN OPPOSITION TO
## PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

MORGAN, LEWIS & BOCKIUS LLP
Bernard J. Garbutt III
Grant R. MacQueen
Melissa M. Coates (*pro hac vice*)
Michael T. Paslavsky
Joshua B. Moses
Amanda M. Outcalt (*pro hac vice*)
101 Park Avenue
New York, New York  10178-0060
Phone: 212.309.6000

*Counsel for Defendant Oppenheimer & Co. Inc.*

# TABLE OF CONTENTS

**Page**

FACTUAL BACKGROUND .................................................................................. 3

LEGAL STANDARD ........................................................................................... 4

ARGUMENT ....................................................................................................... 5

I.    LIBERTY HAS NOT MET ITS BURDEN TO PROVE THAT
COMMON ISSUES PREDOMINATE ............................................................ 5

    A.    Evaluating How ABDP Rates Varied For Each Class Member
Presents Overwhelmingly Individual Issues ................................................ 7

        1.    Liberty Cannot Demonstrate Breach Through Common
Proof On A Classwide Basis ........................................................ 8

        2.    Liberty Cannot Demonstrate Each Class Member's Injury
Through Common Proof On A Classwide Basis ......................... 10

        3.    Liberty Cannot Demonstrate Each Class Member's
Interpretations Of ABDP Terms Through Common Proof
On A Classwide Basis ................................................................. 12

    B.    Evaluating Class Member Decisions Raises Individual  Issues
Bearing On OpCo's Defenses To Liability And Damages ..................... 15

    C.    Liberty's Predominance Arguments Fail ................................................. 18

        1.    Liberty Has Not Presented A Classwide  Damages
Methodology Consistent With Its Liability Case ........................ 18

        2.    Form Contracts Do Not Establish Predominance Where
Individual Evidence Is Necessary To Determine Breach,
Injury, And Damages ................................................................. 20

II.    LIBERTY CANNOT FAIRLY AND ADEQUATELY PROTECT THE
INTERESTS OF CLASS MEMBERS, AND IS NOT TYPICAL ..................... 21

III.    THE FIDUCIARY DUTY CLAIM CANNOT BE CERTIFIED
BECAUSE LIBERTY WAS NOT OWED, AND WAS NOT INJURED
BY, A BREACH OF ANY FIDUCIARY DUTY ................................................. 24

CONCLUSION.................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Alpern v. Hurwitz,
    644 F.2d 943 (2d Cir. 1981)................................................................17

Amchem Prods. v. Windsor,
    521 U.S. 591 (1997).........................................................................21

APL Co. PTE v. Blue Water Shipping U.S. Inc.,
    592 F.3d 108 (2d Cir. 2010)..............................................................17

Axiom Inv. Advisors, LLC v. Deutsche Bank AG,
    2018 WL 4253152 (S.D.N.Y. Sept. 6, 2018)......................................12

In re Bally Total Fitness of Greater N.Y., Inc.,
    411 B.R. 142 (S.D.N.Y. 2009)(Rakoff, J.) .....................................6, 20

Bentley v. Verizon Bus. Global, LLC,
    2010 WL 1223575 (S.D.N.Y. Mar. 31, 2010) ....................................24

Bernstein v. JPMorgan Chase,
    775 F.Supp.3d 701 (S.D.N.Y. 2025)..................................................11

Blum v. Spaha Cap. Mgmt.,
    LLC, 44 F.Supp.3d 482 (S.D.N.Y. 2014) ...........................................16

In re Canon Cameras,
    237 F.R.D. 357 (S.D.N.Y. 2006)(Rakoff, J.) .............................6, 11, 17

Cassese v. Washington Mut., Inc.,
    262 F.R.D. 179 (E.D.N.Y. 2009) .......................................................24

Chambers v. Time Warner,
    2003 WL 749422 (S.D.N.Y. Mar. 5, 2003)(Rakoff, J.)...........6, 7, 10, 23

Comcast Corp. v. Behrend,
    569 U.S. 27 (2013)................................................................ *passim*

Cruz v. Leviev Fulton Club, LLC,
    711 F.Supp.2d 329 (S.D.N.Y. 2010).....................................................7

In re Currency Conversion Fee Antitrust Litig.,
    230 F.R.D. 303 (S.D.N.Y. 2004) .......................................................16

Dweck L. Firm, L.L.P. v. Mann,
    340 F.Supp.2d 353 (S.D.N.Y. 2004)....................................................................10

In re Ephedra Prods. Liab. Litig.,
    231 F.R.D. 167 (S.D.N.Y. 2005)(Rakoff, J.) ...................................................6, 11

Fernandez v. UBS AG,
    2018 WL 4440498 (S.D.N.Y. Sept. 17, 2018)...................................................18

In re Foreign Exch. Benchmark Rates Antitrust Litig.,
    407 F.Supp.3d 422 (S.D.N.Y. 2019).................................................................21

Gillian v. Starjem Rest. Corp.,
    2011 WL 4639842 (S.D.N.Y. Oct. 4, 2011)(Rakoff, J.)....................................21

Gordon v. Sonar Cap. Mgmt. LLC,
    92 F.Supp.3d 193 (S.D.N.Y. 2015)(Rakoff, J.) ...............................................23

Haley v. Teachers Ins. & Annuity Ass'n of Am.,
    54 F.4th 115 (2d Cir. 2022) .........................................................................5, 15

Hyland v. Navient Corp.,
    48 F.4th 110 (2d Cir. 2022) ............................................................................11

Keller v. AXA Equitable Life Ins. Co.,
    2013 WL 6506259 (S.D.N.Y. Dec. 12, 2013) ..................................................21

In re LIBOR-Based Fin. Instruments Antitrust Litig.,
    299 F.Supp.3d 430 (S.D.N.Y. 2018).................................................................18

LNC Invs., Inc. v. First Fid. Bank, N.A. N.J.,
    173 F.3d 454 (2d Cir. 1999)........................................................................13, 15

In re LPL Fin. Cash Sweep Litig.,
    2025 WL 2103545 (S.D. Cal. June 30, 2025)...................................................13

Marshall v. Hyundai Motor Am.,
    334 F.R.D. 36 (S.D.N.Y. 2019) ......................................................................17

Martinez v. Agway Energy Servs., LLC,
    88 F.4th 401 (2d Cir. 2023) ............................................................................20

Myers v. Hertz Corp.,
    624 F.3d 537 (2d Cir. 2010)............................................................................15

Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank,
    392 F.3d 520 (2d Cir. 2004)............................................................................16

NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.,
    693 F.3d 145 (2d Cir. 2012)............................................................................25

Nieves v. Just Energy New York Corp.,
   2020 WL 6803056 (W.D.N.Y. Nov. 19, 2020) .........................................................................20

Onaka v. Shiseido Americas Corp.,
   2023 WL 2663877 (S.D.N.Y. Mar. 28, 2023) .........................................................................25

Palmer Kane LLC v. Scholastic Corp.,
   2012 WL 2952898 (S.D.N.Y. July 16, 2012) .........................................................................21

Patterson v. Morgan Stanley,
   2019 WL 4934834 (S.D.N.Y. Oct. 7, 2019) .........................................................................25

Randolph v. Mondelez Glob. LLC,
   2022 WL 953301 (S.D.N.Y. Mar. 30, 2022)(Rakoff, J.) .........................................................12

RCN Telecom Servs. v. 202 Centre St. Realty,
   156 F.App'x 349 (2d Cir. 2005) .........................................................................10

Richards v. Direct Energy Servs., LLC,
   915 F.3d 88 (2d Cir. 2019) .........................................................................20

Rodriguez v. It's Just Lunch, Int'l,
   300 F.R.D. 125 (S.D.N.Y. 2014) .........................................................................18

Sacred Heart Health Sys., Inc. v. Humana Mil. Healthcare Servs., Inc.,
   601 F.3d 1159 (11th Cir. 2010) .........................................................................21

Sauer v. Xerox,
   5 F.App'x 52 (2d Cir. 2001) .........................................................................15

Scott v. Chipotle Mexican Grill, Inc.,
   954 F.3d 502 (2d Cir. 2020) .........................................................................6

Simon v. E. Ky. Welfare Rts. Org.,
   426 U.S. 26 (1976) .........................................................................11, 24

Slader v. Pearle Vision Inc.,
   2000 WL 1702026 (S.D.N.Y. Nov. 14, 2000)(Rakoff, J.) .........................................................21

Spagnola v. Chubb Corp.,
   264 F.R.D. 76 (S.D.N.Y. Jan. 7, 2010) .........................................................................20

Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier Inc.,
   546 F.3d 196 (2d Cir. 2008) .........................................................................4

Town of Chester v. Laroe Ests., Inc.,
   581 U.S. 433 (2017) .........................................................................11, 24

TransUnion LLC v. Ramirez,
   594 U.S. 413 (2021) .........................................................................11

<u>Vaccariello v. XM Satellite Radio</u>,
  295 F.R.D. 62 (S.D.N.Y. 2013) ...............................................................6, 17

<u>Valley Drug Co. v. Geneva Pharm., Inc.</u>,
  350 F.3d 1181 (11th Cir. 2003) ...................................................................21

<u>In re Veeco Instruments, Inc. Sec. Litig.</u>,
  235 F.R.D. 220 (S.D.N.Y. 2006) .................................................................24

<u>Wal-Mart Stores, Inc. v. Dukes</u>,
  564 U.S. 338 (2011).......................................................................... *passim*

<u>Washington v. Kellwood Co.</u>,
  2009 WL 855652 (S.D.N.Y. Mar. 24, 2009) ......................................16

<u>Weiss v. La Suisse, Societe D'Assurances Sur La Vie</u>,
  226 F.R.D. 446 (S.D.N.Y. 2005) .................................................................21

<u>Yukos Cap. S.A.R.L. v. Feldman</u>,
  977 F.3d 216 (2d Cir. 2020)..........................................................................11

**Rules**

Fed. R. Civ. P. 23 ...............................................................4, 5, 15, 19, 21

**Statutes**

28 U.S.C. § 2072(b) .....................................................................................11

**Other Authorities**

<u>American Heritage Dictionary</u> (5th ed. 2022) .............................................7

U.S. Const. art. III...............................................................................11, 24

Defendant Oppenheimer & Co., Inc. ("OpCo") submits this memorandum in opposition to the class certification motion, Dkt.# 50, of Plaintiff Liberty Capital Group, LLC ("Liberty").

Liberty challenges the interest rates paid under OpCo's Advantage Bank Deposit Program ("ABDP").[1]  Liberty's sole remaining liability theory is that ABDP rates over a nearly four-year period allegedly did not "vary based upon prevailing economic and business conditions."  Order, 12-16.[2]  For Liberty to carry its burden, it must show that it can prove on a classwide basis that each class member suffered an injury because its ABDP rates, during the period in which it participated in the ABDP program, did not "vary based upon [the] prevailing economic and business conditions" at the relevant time for each class member.  Id.

Liberty cannot make that showing because several critical elements of liability (and the basis for any damage calculation) can only be proven on an individual basis.  Liberty erroneously suggests that "prevailing economic and business conditions" equates to some (unspecified) benchmark perhaps associated with "short-term interest rates."  P-Memo, 2, 4-5, & 9.  But "prevailing economic and business conditions," as used in the ABDP documents, neither imposes a duty tied to a particular benchmark nor guarantees each class member a particular ABDP rate.  Rather, it discloses that each class member's ABDP rates will vary based on factors that include any number of conditions in the economy at large and OpCo's business prospects.  Liberty has not shown that **any** class member understood "prevailing economic and business

---

[1]    Unless stated otherwise, emphasis is added, and quotations, citations, and alterations are omitted.  "P-Memo" is Plaintiff's memorandum in support of its motion, Dkt.# 51.  "Order" is the "Opinion & Order," Dkt.# 47.  "T&C" refers to the ABDP "Terms and Conditions," M. Paslavsky Declaration ("MP-Decl."), Exhibit ("MP-Ex.") A.  For other documents pertaining to Liberty's account, see Dkt.## 32-1—32-7.  "Werner Rep.," is the report of Dr. Adam Werner ("Werner"), Dkt.# 52-23.  "Werner Tr." is the transcript of the deposition of Werner, MP-Ex. B.  "Sabry Rep." is the report of Dr. Faten Sabry ("Sabry"), MP-Ex. C.  "Stango Rep." is the report of Dr. Victor Stango ("Stango"), MP-Ex. D.

[2]    The "Proposed Class Period" is March 17, 2022 to the present.  P-Memo, 2-3.

conditions" to refer to a particular benchmark, much less that **all** class members had such a common understanding.  For Liberty to prove that **each** class member understood "prevailing economic and business conditions" to refer to a particular benchmark, much less to be limited to "short-term interest rates," would itself require individual showings that preclude certification.

But even assuming Liberty could demonstrate that the core phrase at issue could be shown to have been understood by all class members to link ABDP rates to some single published interest rate, the sole remaining liability theory would still present intractably individual issues that defeat predominance, commonality, and typicality.  The "will vary" language imposes at most an individual promise to each class member **at the particular time it entered the ABDP** that rates will vary **from that point forward** based upon "prevailing economic and business conditions."  Because the record confirms that ABDP rates and economic and business conditions **actually varied during the Proposed Class Period**, to establish liability as to a class member, Liberty would have to prove that as to that class member, there was a change in "prevailing economic and business conditions" that should have—but did not— result in some undefined variation to that class member's ABDP rates.  Proving breach, then, would require looking at the rates offered to each class member when they entered the ABDP, assessing "prevailing economic and business conditions" while that class member participated in the ABDP, and determining whether that class member's ABDP rates had to and/or did in fact vary based upon those conditions.  That is an inherently individual inquiry specific to the time of each class member's first participation in the ABDP.  Moreover, proving the fact of injury for each class member and the measure of such injury (if any) is similarly an individual exercise that requires findings about whether each class member's ABDP rates had to and/or did in fact vary over time and whether that class member was injured by the actual rates paid.

Rather than grapple with the individual issues plaguing its sole remaining liability theory,

Liberty **ignores** that theory and focuses instead on theories it **abandoned**.  The Court held that Liberty abandoned its theories that OpCo "limited customers to unreasonably low rates of interest under the ABD Program" or charged "unreasonable, unjustified, and arbitrary fees."  Order, 12.[3]  But Liberty seeks certification of those abandoned theories, claiming (incorrectly) that OpCo "injured each one of its customers in the same way" because OpCo failed to pay them "**reasonable, market-based rates** as it had promised" and that the "central liability question" is whether OpCo paid "**reasonable, market-based rates**."  P-Memo, 2, 14 & 15. **That is not Liberty's sole remaining liability theory; it is the theory Liberty abandoned.**  The damages methodology proposed by Liberty's expert Werner similarly focuses on the abandoned theory of a "reasonable, market-based rate," Werner Report, ¶ 17, and thus is inconsistent with the remaining liability theory and fails under <u>Comcast Corp. v. Behrend</u>, 569 U.S. 27 (2013).  Neither Liberty nor its expert does anything to show how the individual issues actually relevant to its sole remaining liability theory can be addressed on a common basis.

      Liberty's motion also fails because Liberty is not an adequate or typical class representative.  Section II.  And, because Liberty is not owed a fiduciary duty, it lacks standing to pursue a fiduciary duty claim on behalf of the proposed class.  Section III.

      For the reasons below, and in the Sabry and Stango Reports, certification must be denied.

## FACTUAL BACKGROUND

      The Court's familiarity with Liberty's claims (CAC, Dkt.# 1; Dkt.# 31), OpCo's defenses

---

[3]    <u>See also</u> Order, 12 n.8 ("Because Liberty's contract claim now turns solely on [OpCo's] promise to vary interest rates with economic and business conditions, cases involving cash sweep programs in which customers were promised reasonable interest rates are inapposite"), 13 n.9 ("Liberty no longer presses the theory that [OpCo] breached its contract by not paying reasonable rates of interest"), 19 ("Liberty has not adequately alleged breach of the implied covenant … on the basis that the interest rates [OpCo] paid were unreasonable"), & 30 (denying OpCo's motion "but subject to the limitations set forth above").

(Dkt.## 31, 32, 35, & 49), and this case's background (Order, 1-4) is assumed.

Liberty claims that OpCo breached a promise that ABDP rates "will vary based upon prevailing economic and business conditions," and that ABDP rates "remained essentially static" and varied "only to reflect the amount of funds held in the" ABDP.  P-Memo, 5 & 2.  The record refutes those assertions.  ABDP rates **did vary** over time.  MP-Decl., ¶¶ 6-7, & MP-Ex. E, at 3; Appendix A; Stango Rep., ¶¶ 46 & 48, n. 82; Sabry Rep., ¶¶ 45-47.  These variances are fatal to Liberty's sole, remaining liability theory, which Liberty and its expert ignore.

## LEGAL STANDARD

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only."  <u>Comcast</u>, 569 U.S. at 33.  "[A] party seeking to maintain a class action must affirmatively demonstrate his compliance with Rule 23."  <u>Id.</u>  This Court must conduct a "rigorous analysis" to determine whether a party seeking to certify a class has met its burden to "satisfy through evidentiary proof"—not pleadings or speculation—both Rule 23(a) and at least one of the provisions of Rule 23(b).  <u>Comcast</u>, 569 U.S. at 33.[4]

Rule 23(a) requires Liberty to show: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." And, Rule 23(b)(3), which Liberty invokes, requires it to demonstrate that common questions "predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

---

[4]    <u>Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier Inc.</u>, 546 F.3d 196, 202 (2d Cir. 2008) (requiring district courts to "assess all of the relevant evidence admitted at the class certification stage," to resolve all "factual disputes relevant to each Rule 23 requirement," and to find "that whatever underlying facts are relevant to" Rule 23 "have been established").

In applying Rule 23, this Court must consider the evidence Liberty would offer at trial to establish all the elements of each class member's claims and OpCo's due process entitlement to litigate its defenses to individual claims.  Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 367 (2011).  It also must resolve factual disputes related to Rule 23 requirements, including expert-related disputes that "frequently" overlap with merits issues.  Comcast, 569 U.S. at 33-34.

## ARGUMENT

As this Court held in resolving the motion to dismiss:

> Liberty will likely need to demonstrate **with greater specificity** *how* [OpCo] should have performed its promise to vary ABD Program interest rates and *how* Liberty and those similarly situated to it were damaged by [OpCo's] failure to perform. … [T]he promise [OpCo] made **could be read** not simply to vary interest rates in line with the market **but also to do so in light of considerations related to its own business interests**, and **this possible construction** remains alive at this early stage of the proceedings. … [I]t is uncertain whether Liberty will be able to establish all the elements of its claim for breach of contract because [it] may not be able to show **in what precise manner Oppenheimer should have performed** or to **what precise extent customers were damaged**.

Order, 16 & 17-18 (italicized emphasis in original).  Liberty cannot demonstrate the foregoing, especially on a classwide basis, for the reasons established below.

## I. LIBERTY HAS NOT MET ITS BURDEN TO PROVE THAT COMMON ISSUES PREDOMINATE

Rule 23(b)(3) requires this Court to take a "'close look' at whether common questions predominate over individual ones." Comcast, 569 U.S. at 34.  A question is "common" if evidence of "its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke," for "[w]hat matters to class certification" is "the capacity of a class-wide proceeding to generate common answers apt to drive the resolution of the litigation." Dukes, 564 U.S. at 350.  Whether "common" questions "predominate" under Rule 23(b)(3) is an "even more demanding" inquiry, Comcast, 569 U.S. at 34, that entails 'careful scrutiny' of the nature and significance of a case's common and individual issues." Haley v. Teachers Ins. &

Annuity Ass'n of Am., 54 F.4th 115, 121 (2d Cir. 2022).

The Court must assess:  (1) "the elements of the claims and defenses to be litigated;" (2) "whether generalized evidence could be offered to prove those elements on a class-wide basis or whether individualized proof will be needed to establish each class member's entitlement to relief;" and (3) "whether the common issues can profitably be tried on a class[-]wide basis, or whether they will be overwhelmed by individual issues."  Scott v. Chipotle Mexican Grill, Inc., 954 F.3d 502, 512 (2d Cir. 2020).  This Court routinely denies class certification where claims or defenses raise individual questions and/or require individualized/different proof.[5]

Initially, Liberty has not proven predominance because it fails to identify the "elements of the claims and defenses to be litigated" and to explain if "generalized" or "individual" evidence is needed to prove them.  Scott, 954 F.3d at 512.  That is "sufficient grounds for denying" certification.  Vaccariello v. XM Satellite Radio, 295 F.R.D. 62, 73 (S.D.N.Y. 2013).

Liberty does not prove common issues that predominate because:  (1) evaluating how ABDP rates varied on a going forward basis for each class member presents overwhelming individual liability issues relating to breach, the fact of injury, and class member expectations and preferences regarding ABDP rates; (2) evaluating the effect of class member decisions on liability and damages presents overwhelming individual issues; and (3) Liberty has not presented a damages methodology consistent with its sole remaining liability theory.

---

[5]    In re Bally Total Fitness of Greater N.Y., Inc., 411 B.R. 142, 146-47 (S.D.N.Y. 2009)(Rakoff, J.)(denying class certification because individual issues predominated even where the claims were based on the defendant's uniform practices/policies); In re Canon Cameras, 237 F.R.D. 357, 358-59 (S.D.N.Y. 2006)(Rakoff, J.); In re Ephedra Prods. Liab. Litig., 231 F.R.D. 167, 170-71 (S.D.N.Y. 2005)(Rakoff, J.); Chambers v. Time Warner, 2003 WL 749422, *6-7 (S.D.N.Y. Mar. 5, 2003)(Rakoff, J.).

### A.    Evaluating How ABDP Rates Varied For Each Class Member Presents Overwhelmingly Individual Issues

Liberty's liability theory is whether OpCo "failed **to vary ABD Program interest rates** with changes in economic and business conditions." Order, 12.[6]  A consequence of this theory is that class members cannot prove liability based upon the **initial** ABDP rates available to them at the outset of their participation.  There is no basis for any class member to claim that they were misled as to, or otherwise promised, a different set of ABDP rates at the time they began to participate in the ABDP, as it is undisputed that the ABDP rates that were publicly posted were the same rates that were paid.  CAC, ¶ 2.  The statement on which Liberty's claims are based— that ABDP rates "**will vary** based upon prevailing economic and business conditions"—is at most a statement concerning how ABDP rates would **change over time in the future**.[7]

Liberty mischaracterizes the "will vary" phrase as a promise that ABDP rates "would reflect changes in short-term interest rates."  P-Memo, 4-5.  That is simply not what the plain language of the ABDP T&C says, MP-Ex. A, and Liberty ascribes a meaning that cannot be fairly drawn from the T&C itself.  Even if "prevailing economic and business conditions" were interpreted to include (or worse yet mean only) "short-term interest rates," the T&C cannot be construed to promise that ABDP rates would be based solely on those rates.  The plain meaning of the word "vary" is "[to] undergo or show change."  American Heritage Dictionary (5th ed. 2022).  Liberty has not shown that **any** class member interpreted the T&C to mean that ABDP

---

[6]    The alleged failure to vary ABDP rates is what Liberty claims "breached the express terms of OpCo's contract with Liberty and other ABD Program participants" (Order, 12), "was a breach of the implied covenant" of good faith and fair dealing (id., 19), rendered statements about the ABDP "misleading or deceptive" in violation of GBL § 349 (id., 28), and breached fiduciary duties allegedly owed to advisory account customers.  Id., 20-21.

[7]    "Will," American Heritage Dictionary (5th ed. 2022)("Used to indicate simple futurity"); Cruz v. Leviev Fulton Club, LLC, 711 F.Supp.2d 329, 337 (S.D.N.Y. 2010)(will is used as verb "to construct the future tense ... without any sense of the verb constituting a command.").

rates would be based solely on short-term interest rates, much less that such a peculiar interpretation was actually or reasonably held by **<u>every</u>** class member.

The only plausible reading of the T&C consistent with Liberty's sole, remaining liability theory is at most an **<u>individual</u>** promise by OpCo to each class member at the time it began participating in the ABDP that the class member's ABDP rates would vary **<u>going forward</u>** based upon "prevailing economic and business conditions."  To establish liability as to any <u>particular</u> class member, Liberty would have to prove that, as to <u>that</u> class member, a change in "prevailing economic and business conditions" should have resulted—but did not result—in a corresponding variation in <u>that</u> class member's ABDP rates.  Liberty does not even address its remaining liability theory.  Regardless, as demonstrated below, this raises intractable individual issues on central liability questions related to breach, injury, and consumer expectations.

>    **1.    Liberty Cannot Demonstrate Breach**
>    <u>**Through Common Proof On A Classwide Basis**</u>

Three of the five purportedly common issues identified in Liberty's motion focus on the question of breach.  P-Memo, 8.  Even if Liberty were correct that the "will vary" language required ABDP rates to vary with a particular benchmark (such as unspecified "short-term interest rates"), and it is not, determining breach as to <u>each</u> class member would require an individual inquiry of whether and how the ABDP rate varied going forward for <u>that</u> class member relative to the rate in effect when <u>that</u> class member first participated in the ABDP.

The ABDP is entirely voluntary; customers could begin or end their participation in the ABDP at any time.  MP-Ex. A, at 1-2.  Because class members started participating at different times and accepted different rates by participating, analyzing the question of breach as to each class member under Liberty's sole remaining liability theory would involve a distinct starting point for each class member (when its participation in the ABDP began), evaluating changes in that class member's rates based upon "prevailing economic and business conditions" at various

points thereafter, and then determining <u>how</u> ABDP rates from that starting point going forward should have varied based upon those economic and business conditions. This timeframe-specific breach analysis will thus vary for each class member depending upon the rates in effect when the class member first participated in the ABDP, how long the class member participated in the ABDP, and what happened to "prevailing economic and business conditions" during that participation. Sabry Rep., ¶¶ 28-30 (individual issues inherent in timeframe-specific analysis).

Even under the erroneous view that "prevailing economic and business conditions" equates to short-term interest rates, the same changes to ABDP rates could yield materially different breach and fact-of-injury analyses for different class members based on the unique periods in which they participated, as explained as follows. For example, for a period when ABDP rates remained steady, one participant could claim breach if he opened his account earlier and claims his ABDP rates should have risen higher before they stabilized, while a second participant who opened his account after rates stabilized could not. Sabry Rep., ¶¶ 37-44 (describing class members who, based on dates of ABDP participation, were uninjured). "[H]ow [OpCo] should have performed its promise," Order, 16, is an individual question that does not generate "common answers apt to drive the resolution of the litigation." <u>Dukes</u>, 564 U.S. at 350.

The same individual questions must be answered for each class member, whether they participated in the ABDP for ten days or ten years. They are not even limited to the Proposed Class Period because many class members first participated in the ABDP earlier in time. Liberty, for example, participated in the ABDP as early as 2015 and has continued its participation until the present. For Liberty to prove liability, then, it would have to trace all changes in its ABDP rates since it first participated in the ABDP, **<u>years before the Proposed Class Period</u>**. For other class members to prove liability, a similar exercise would have to be

done across different time periods and based upon different starting rates.[8]

Class members who participated in the ABDP during different/more limited timeframes present radically different liability inquiries. For example:

- From <u>January 2022 to August 2023</u>, the Federal Funds Rate ("FFR")[9] generally increased month-over-month, and ABDP rates also increased three to five times, depending on the tier. MP-Ex. E, at 3;
- From <u>August 2023 to August 2024</u> and from <u>January 2025 to August 2025</u>, the FFR Rate remained steady, and ABDP rates remained steady. <u>Id</u>; and
- From <u>August 2024 to January 2025</u>, ABDP rates benefitted customers by remaining steady when the FFR decreased. <u>Id.</u>

<u>See</u> <u>also</u> Appendix A. For class members whose ABDP participation aligned with these periods of changes in short-term interest rates (without conceding that is the appropriate measure), determining breach requires individual inquiries of fact and law; for those whose participation did **<u>not</u>** align with these periods, even more complex individual inquiries are required. Such a "fact-finding quagmire" is not suited to class certification. <u>Chambers</u>, 2003 WL 749422, *7.

## 2. Liberty Cannot Demonstrate Each Class Member's <u>Injury Through Common Proof On A Classwide Basis</u>

To establish liability, Liberty must demonstrate "<u>how</u> Liberty and those similarly situated to it were damaged" by OpCo's purported failure to vary ABDP rates. Order, 16. The fact of injury is an element of each claim Liberty asserts.[10] Where the fact of injury is an element of a

---

[8]      To the extent Liberty and its expert suggest ABDP rates should be analyzed the same for all class members and only from the start of the class period forward, <u>see</u> P-Memo, 5; Werner Report, ¶¶ 17-18, they mischaracterize the "will vary" language as a freestanding promise to the entire class rather than a promise made to each class member when that class member first agreed to the T&C. As Liberty participated in the ABDP as early as 2015, tracing the interest ABDP rates Liberty should have been paid under its theory of the case requires analysis reaching back to the beginning of its participation rather than the beginning of the class period.

[9]      Liberty has not identified which "short-term interest rates" supply Liberty's supposed benchmark for ABDP rates, but its pleadings have mentioned the FFR repeatedly. <u>See</u>, <u>e.g.</u>, CAC, ¶¶ 37, 41-44, 47. Accordingly, OpCo uses the FFR to illustrate the individual issues that defeat class certification, but does not concede it is an apt benchmark.

[10]      <u>RCN Telecom Servs. v. 202 Centre St. Realty</u>, 156 F.App'x 349, 350-51 (2d Cir. 2005) (contract); <u>Dweck L. Firm, L.L.P. v. Mann</u>, 340 F.Supp.2d 353, 358 (S.D.N.Y. 2004)(implied

class claim and requires individual analysis, class certification must be denied.  In re Ephedra, 231 F.R.D. at 170.  Common issues do not predominate when the Court must conduct individualized, fact-specific inquiries to determine which class members were actually harmed. See Comcast, 569 U.S. at 34-35; Dukes, 564 U.S. at 350-51.

Even under an erroneous theory equating "prevailing economic and business conditions" with short-term interest rates, the fact of injury is an individual issue that defeats predominance. Class members who participated in the ABDP only during periods when short-term interest rates remained steady (e.g., from August 2023 to August 2024 or from January 2025 to August 2025) or only during periods when short-term interest rates declined (e.g., from August 2024 to January 2025) were not injured because the record demonstrates that ABDP rates remained steady during those periods.  MP-Decl., ¶¶ 6-7 & MP-Ex. E, at 3; Appendix A; Sabry Rep., ¶¶ 39-44.  And none of those class members were injured "in the same way" as others for whom ABDP rates supposedly remained "static" even as short-term interest rates "soared."  P-Memo, 2 & 5.

Because granting the motion risks certifying a class of uninjured plaintiffs, or a class of plaintiffs who were not injured in the same way, certification must be denied.  In re Canon Cameras, 237 F.R.D. at 360 (denying certification where class "likely consists in overwhelming measure of owners of cameras that did not malfunction at all").  The Rules Enabling Act, Article III, and Supreme Court precedent bar certification of a class with uninjured class members.[11]

---

covenant); Bernstein v. JPMorgan Chase, 775 F.Supp.3d 701, 718 (S.D.N.Y. 2025)(GBL 349); Yukos Cap. S.A.R.L. v. Feldman, 977 F.3d 216, 241 (2d Cir. 2020)(fiduciary duty).

[11]    28 U.S.C. § 2072(b); TransUnion LLC v. Ramirez, 594 U.S. 413, 431 (2021)("Article III does not give federal courts the power to order relief to any uninjured plaintiff, class action or not."); Town of Chester v. Laroe Ests., Inc., 581 U.S. 433, 439-40 (2017); Simon v. E. Ky. Welfare Rts. Org., 426 U.S. 26, 40 n.20 (1976); but see Hyland v. Navient Corp., 48 F.4th 110, 117 (2d Cir. 2022).  Werner testified it is "possible" there are "class members who were not harmed."  Werner Tr., at 91:6-14.

**3.      Liberty Cannot Demonstrate Each Class Member's Interpretations Of ABDP Terms Through Common Proof On A Classwide Basis**

Class member understandings concerning the statement that ABDP rates "will vary based upon prevailing economic and business conditions" are relevant to any question of contractual interpretation pressed by Liberty that goes beyond the plain language of the documents.  To the extent the Court determines that the "will vary" or "economic and business conditions" phrases are ambiguous and/or too broad and encompassing to lend themselves to a universal understanding at all points in time[12] (or, are to be interpreted at the discretion of OpCo), extrinsic evidence bearing on each class member's individual understanding of those phrases would be relevant to that class member's contract claim.  Axiom Inv. Advisors, LLC v. Deutsche Bank AG, 2018 WL 4253152, *9, 6 (S.D.N.Y. Sept. 6, 2018)(denying class certification where agreements were "ambiguous as to the central issue of [the] case" and "any available extrinsic evidence" would be considered "to ascertain the meaning intended by the parties during the formation of the contract").  Werner testified that **"**economic conditions" and "business" "conditions" are "extremely broad" terms, and that he does not know what factors fall within "economic" or "business" conditions.  Werner Tr., 44:21-46:2.  Werner also acknowledged that class members' expectations may go to liability.  Id., 71:3-10.

Class members' expectations and understandings concerning the statement that ABDP rates "will vary based upon prevailing economic and business conditions" are also relevant to the implied covenant and GBL § 349 claims.  Order, 18-19; Randolph v. Mondelez Glob. LLC, 2022 WL 953301, *2 (S.D.N.Y. Mar. 30, 2022)(Rakoff, J.)(whether a statement is "materially misleading" under GBL § 349 may turn on a consumer's "reasonable expectations").

---

[12]      Order, 16 ("will vary with prevailing economic and business conditions" "could be read" in different ways, and "this possible construction remains alive") & 18 ("there is a dispute over the meaning of the contract's express terms").

Class member's understandings and expectations, as well as preferences, present intractably individual questions.  **First**, understandings and expectations may differ depending on when each class member first chose to participate in the ABDP.  Class members who participated in the ABDP for years before the Proposed Class Period would have different experiences with variations in ABDP rates informing their expectations as to how those rates should or would vary over time in relation to prevailing economic and business conditions.  See In re LPL Fin. Cash Sweep Litig., 2025 WL 2103545, *19 n.10 (S.D. Cal. June 30, 2025)(timing is "significant in evaluating [customers'] reasonable expectations for purposes of class certification").  Even under the erroneous view that "prevailing economic and business conditions" equate with short-term interest rates, a class member whose participation began in December 2022 (after months of increases in short-term interest rates) would understandably have different expectations than one who began participating in March 2022 (before those increases).  Whereas it would be "unlikely" for the former to "reasonably have expected a greater share of interest," the same might not be true of the latter.  In re LPL, 2025 WL 2103545, *19 n.10.[13]  Indeed, based on when proposed class members first participated in the ABDP, there were "diverse observable relationships between ABDP Program rates, other published rates, and prevailing economic and business conditions for different" class members.  Stango Rep., ¶ 44. The differences in spread between ABDP rates and the FFR, for example, could "provide different foundations for how consumers generally might expect ABD Program rates to vary in the future."  Id., ¶ 46.  Thus, such diverse experiences could further amplify diverse expectations about ABDP rates.  Id., ¶ 44-51.[14]

---

[13]    Werner did not consider whether or how a class member's initial ABDP rate could influence its expectations of how rates will vary going forward.  Werner Tr., at 50:9-19.

[14]    Not only could the timing of participation create diverse experiences, but there is a "wide range of experiences that consumers have with consumer interest rates across a wide variety of

Proving each class member's understandings and expectations—and whether those understandings and expectations affect the interpretation of contract provisions (for the contract claim), were frustrated (for the implied covenant claim), or were the product of some harm or deception (for the GBL § 349 claim)—presents individual questions that defeat predominance.

**Second**, preferences about the importance of varying ABDP rates as compared to other features of proposed class members' accounts could differ depending upon each class member's reasons for participating in the ABDP and their assessment of the ABDP's value relative to other features of their brokerage account. Sweep programs like the ABDP enable customers to earn a return on cash that would otherwise be idle, while also ensuring that the cash enjoys FDIC protection and remains liquid so the customer can quickly execute trades without the hassle of transferring funds from another account into a brokerage account, which can take multiple days. Sabry Rep., ¶¶ 17-20; Stango Rep., ¶ 20.[15] In exchange for those features, the ABDP generally pays lower interest rates, Sabry Rep., ¶ 18, which was disclosed to class members. MP-Ex. A, at 2, 6. Customers not only have different reasons for opening brokerage accounts and different financial circumstances, but they could also value sweep programs differently.[16]

---

products," (Stango Rep., ¶ 36), which supports the view that generally consumers would apply those experiences to their expectations regarding ABDP rates. Id., ¶¶ 37-43. Likewise, putative class members could also have diverse expectations of the T&C, which could generate additional diversity in expectations for how ABDP rates "will vary based upon prevailing economic and business conditions." Id., ¶¶ 52-57.

[15] The ABDP is not a "standalone product," and is offered as part of a "bundle" package to OpCo customers, which includes "many complementary" products, such as "cash- and credit-management tools, proprietary research, access to certain specialized or less-liquid investment products, etc." Stango Rep., ¶ 24.

[16] Stango Rep., ¶¶ 60-66. Customers "could place different values on their sweep program rates relative to the other bundled features" in their brokerage accounts. Id., ¶¶ 68 & 69. Some class members may have **chosen** to forego higher interest rates on other products in exchange for the ABDP features they found beneficial. Stango Rep., ¶ 69. Therefore, any assessment of alleged harm to putative class members from changes to ABDP rates requires individualized inquiries to understand how "a hypothetical alternative ABD Program rate might affect the availability and pricing of those other features." Id., ¶¶ 72-77.

The phrase "will vary based upon prevailing economic and business conditions" speaks in broad and general terms.  If Liberty argues the phrase must be read more specifically, it has to show that class members actually believed the reading it urges.  But Liberty presented no evidence as to what **<u>any</u>** class member understood that language to mean, let alone evidence that **<u>every</u>** class member shared that understanding.  That is insufficient.  See Dukes, 564 U.S. at 351.

### B.    Evaluating Class Member Decisions Raises Individual Issues Bearing On OpCo's Defenses To Liability And Damages

The predominance test requires the Court to evaluate the evidence OpCo will use to defend against the putative class claims.  See Myers v. Hertz Corp., 624 F.3d 537, 551 (2d Cir. 2010)("courts must consider potential defenses in assessing the predominance requirement").  OpCo does not lose its substantive, due-process, or constitutional rights to defend against any plaintiff's assertions just because claims are joined through Rule 23.  See Dukes, 564 U.S. at 367; see also Haley, 54 F.4th at 121 ("a complete assessment of predominance demands that a district court 'consider all factual or legal issues,'" including "defenses").

OpCo asserted a number of individual liability defenses, some based upon each class member's decisions with respect to the ABDP.  For example, for OpCo to prove its waiver defense (Dkt.# 49, p. 29, ¶ 17) as to a particular class member, it must show that the class member had "actual knowledge" of a breach yet "continue[d] to perform under and accept[] the benefits" of the contract.  Sauer v. Xerox, 5 F.App'x 52, 56 (2d Cir. 2001).  Similarly, for OpCo to prove its ratification defense (Dkt.# 49, p. 29, ¶ 23) as to a particular class member, it must show that the class member accepted the benefits of the ABDP with "full knowledge of all material facts relating to the transaction."  LNC Invs., Inc. v. First Fid. Bank, N.A. N.J., 173 F.3d 454, 463 (2d Cir. 1999).  Here, the record confirms that any class member may have had actual knowledge of material facts because the ABDP documents and rates were online.  Whether any given class member had actual knowledge of those facts or acted on it raises inherently

15

individual issues bearing on OpCo's liability defenses.

      That class members were given a great deal of control over their accounts similarly raises individual issues bearing on liability questions (like causation[17]) and damages questions (like mitigation).  Each class member was responsible for its own decisions with respect to its own accounts.  The ABDP T&C advised customers that they could:  (1) elect not to participate in the ABDP at all (at account opening); (2) elect not to further participate in the ABDP at any time; (3) instruct OpCo how or where to otherwise invest available cash, including in other products of their choosing; and/or (4) withdraw all or a portion of their balance in the ABDP.  MP-Ex. A, at 1 & 3; CAC, ¶ 11 (describing the ABDP as an "option").  Each class member could have: (1) invested cash in one of OpCo's other products with a higher interest rate; (2) remained at OpCo, withdrawn the cash, and put it in another interest-bearing account; or (3) transferred their account to another institution that offered a higher sweep program interest rate than the ABDP. Stango Rep., ¶ 78.  A class member dissatisfied with the way ABDP rates varied may have closed its account with OpCo, limited participation in the ABDP as part of a larger financial strategy, or discontinued participation in the ABDP altogether.  Sabry Rep., ¶ 53; Stango Rep., ¶¶ 13.c., & 78-84.  Indeed, the percentage of customers that elected not to participate in the ABDP was ███████████████████████████████, demonstrating that many customers exercised their right not to participate in the ABDP.  LM-Aff., ¶ 31.

      Werner acknowledged that each class member's trading, balances, and cash inflows and outflows would have to be accounted for in determining damages.  Werner Tr., 102:14-103:11.

---

[17]    Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank, 392 F.3d 520, 525 (2d Cir. 2004)(contract); Washington v. Kellwood Co., 2009 WL 855652, *6 (S.D.N.Y. Mar. 24, 2009)(implied covenant); Blum v. Spaha Cap. Mgmt., LLC, 44 F.Supp.3d 482, 497 (S.D.N.Y. 2014)(fiduciary duty); In re Currency Conversion Fee Antitrust Litig., 230 F.R.D. 303, 310-11 (S.D.N.Y. 2004)(GBL § 349).

It would be reasonable for a class member satisfied with the liquidity provided by the ABDP on idle cash to respond differently to ABDP rate changes than a customer, such as Liberty, who ███████████████████████████████████████████. L. Molokie Aff. ("LM-Aff."), Exs. ("LM-Ex.") 1 & 2; MP-Ex. F.

As to causation (Dkt.# 49, pp. 28-29, ¶¶ 8 & 19), each class member's reasons for initially participating, and continuing to participate, in the ABDP present individual issues that preclude certification.[18] Class certification must be denied when, as here, "th[e] determination of the actual cause of a particular [harm] would require highly individualized fact-finding." In re Canon Cameras, 237 F.R.D. at 360; Vaccariello, 295 F.R.D. at 68 (denying certification of GBL § 349 claim for lack of predominance because of inability "to prove through common evidence which customers in fact wanted their subscriptions to be automatically renewed").

Similar considerations apply also to OpCo's failure to mitigate defense. Dkt.# 49, p. 29, ¶ 15. Under that defense, an injured plaintiff has a duty to make efforts to mitigate its damages. APL Co. PTE v. Blue Water Shipping U.S. Inc., 592 F.3d 108, 111 (2d Cir. 2010). That duty arises when a plaintiff actually knew, or reasonably should have known under the circumstances, that it had a claim against the defendant. Alpern v. Hurwitz, 644 F.2d 943, 946 (2d Cir. 1981). Individual analyses, as to each class member, are thus required to determine when the duty to mitigate arose and whether it was discharged. The duty could be triggered when each class member knew OpCo supposedly breached its promise, which would require an individual assessment of each class member's actual variances (or the lack thereof) in ABDP rates relative to "prevailing economic and business conditions." And once the duty is triggered, the steps each

---

[18]    Marshall v. Hyundai Motor Am., 334 F.R.D. 36, 59-60 (S.D.N.Y. 2019)(denying certification as to GBL§ 349 where, inter alia, questions of causation would require the court to conduct numerous mini-trials given the causation questions implicated many, unrelated issues).

class member took to mitigate and whether those steps were reasonable would require yet further individual inquiries, as the range of possible mitigation actions and their relative reasonableness could vary widely under different circumstances at different times.[19]  Such individualized questions of mitigation defeat predominance.  Fernandez v. UBS AG, 2018 WL 4440498, *21 (S.D.N.Y. Sept. 17, 2018)(denying certification because defendant's mitigation defense was subject to individualized proof); In re LIBOR-Based Fin. Instruments Antitrust Litig., 299 F.Supp.3d 430, 573-75 (S.D.N.Y. 2018)(denying certification where assessing mitigation would require plaintiff-specific inquiries, rendering damages individualized).

Liberty essentially ignores OpCo's defenses, asserting in conclusory fashion that OpCo's defenses "are susceptible to common proof."  P-Memo, 16.  It makes no showing as to the issue of causation, making a conclusory assertion that its alleged injury, was "caused by [OpCo], in the form of lower rates than [Liberty] was due" (id., p. 11) and that each class member's injuries "result from the same misconduct by the same defendant" (id., p. 13).  Those conclusory assertions are hardly the "rigorous analysis" required to demonstrate predominance.[20]

### C.    Liberty's Predominance Arguments Fail

#### 1.    Liberty Has Not Presented A Classwide Damages Methodology Consistent With Its Liability Case

Liberty argues Werner presents a damages methodology that supports a finding of predominance.  P-Memo, 16.  But the Werner Report does not, because it fails to present a

---

[19]    **Stango Rep., ¶ 80** (whether a customer did in fact value higher interest rates on uninvested cash "and how they might have sought to obtain them would require individualized inquires," such as whether they looked for other products, had other brokerage accounts that paid higher rates, decreased cash held in the account when rates changed, and their individual "experience and familiarity with transferring accounts").

[20]    Rodriguez v. It's Just Lunch, Int'l, 300 F.R.D. 125, 147 (S.D.N.Y. 2014), P-Memo, 16, is distinguishable because it involved common proof of reliance (based on record evidence of temporal proximity between the alleged misrepresentation and the alleged reliance).  300 F.R.D. at 140.  Here, there is no evidence that class members actually reviewed the T&C, much less when they did so relative to their decision to participate in the ABDP.

damages methodology "consistent with its liability case." <u>Comcast</u>, 569 U.S. at 35.

The Supreme Court has rejected the view that "at the class-certification stage <u>any</u> method of measur[ing damages] is acceptable so long as it can be applied classwide, no matter how arbitrary the measurement may be" because that "would reduce Rule 23(b)(3)'s predominance requirement to a nullity." <u>Comcast</u>, 569 U.S. at 36. Even Liberty concedes that a damages methodology that does not "actually measure damages that result from the class's asserted theory of injury" does not support class certification. P-Memo, 16.

Werner's proposed methodology is **<u>not</u>** consistent with Liberty's theory that OpCo "failed **<u>to vary ABD Program interest rates</u>** with changes in **<u>economic and business conditions</u>**." Order, 12; ; <u>see also</u> Sabry Rep., ¶¶ 25-27. Werner proposes to rely on a "**<u>reasonable, market-based interest rate</u>**" ("MIR"), to be provided from an as-yet undisclosed expert or source, that OpCo supposedly should have paid to class members "throughout the Relevant Period" and then measure the difference between what class members would have received under that MIR and what each class member actually received. Werner Report, ¶ 17; P-Memo, 16. That methodology appears to be the result of Werner's mistaken view that Liberty has not abandoned its theory that OpCo "promised to pay... **<u>reasonable, market-based rates</u>**." Werner Report, ¶¶ 14 & 18 ("It is my understanding that in the but-for world, the interest rate that ABD Program participants should have received should have reflected **<u>reasonable M.I.R.'s</u>** [sic] for each Tier of the ABD Program."). That is the theory that Liberty abandoned.

Werner's assumption that ABDP rates were supposed to vary with "short-term interest rates," Werner Report, ¶ 14, means he fails to account for the "prevailing economic and business conditions" upon which ABDP rates actually "will vary." The phrase "prevailing economic and business conditions," which Werner acknowledges is extremely broad, encompasses far more than just "short-term interest rates," and includes all facets of the economy and OpCo's own

business concerns, including profit margins and expenses. Order, 16; Sabry Rep., ¶¶ 33-34 (identifying such facets).[21] Werner does nothing to substantiate his assumption that the meaning of this phrase can be determined on a classwide basis through common proof.

Nor does Werner offer any opinions suggesting that common proof can be used to resolve issues that are "central to the validity" of each class members' claim, including breach, fact of injury, or class member expectations. Dukes, 564 U.S. at 350. He also says nothing about resolving questions of mitigation on a classwide basis. Werner offers no methodology and performs no analysis to demonstrate that common proof could be used to determine "how [OpCo] should have performed its promise to vary ABD Program interest rates and how Liberty and those similarly situated to it were damaged by [OpCo's] failure to perform." Order, 16.

### 2. Form Contracts Do Not Establish Predominance Where Individual Evidence Is Necessary To Determine Breach, Injury, And Damages

Contrary to Liberty's arguments, the existence of some "evidence common to the Class," such as a "single form contract" or uniform ABDP rates, P-Memo, 15, is not enough to establish predominance. "[C]ourts have denied certification even in cases that involved form contracts where numerous individual inquiries were required to determine whether a breach of the contract could be found." Spagnola v. Chubb Corp., 264 F.R.D. 76, 98 (S.D.N.Y. Jan. 7, 2010); In re Bally, 411 B.R. at 146 (denying certification despite "uniform policies and practices," because

---

[21]    See Martinez v. Agway Energy Servs., LLC, 88 F.4th 401, 409-13 (2d Cir. 2023)(contract term stating that variable rate shall reflect "several named factors, including unspecified 'market-related factors'" permitted defendant to set variable rates based on "factors like its costs, expenses, and margins"); Richards v. Direct Energy Servs., LLC, 915 F.3d 88, 97, 99 (2d Cir. 2019)(contract term stating that variable rate "may be higher or lower each month based upon business and market conditions" allowed the defendant to set rates influenced by "ordinary business considerations" such as "a target profit margin"); Nieves v. Just Energy New York Corp., 2020 WL 6803056, *7 (W.D.N.Y. Nov. 19, 2020)(contract term allowing defendant to set variable rates "according to business and market conditions" meant that the defendant "could set its variable rates on any basis it chose").

claims "also require[d] individual analysis with respect to numerous legal and factual issues").[22]

Liberty's cases, P-Memo, 15, are distinguishable because, unlike here, those cases did not

present individual issues related to breach, fact of injury, causation, and damages.

Finally, because individual issues "would permeate any determination" on the central

liability issue, Liberty also cannot demonstrate that a class action is superior.[23]

## II.     LIBERTY CANNOT FAIRLY AND ADEQUATELY PROTECT THE INTERESTS OF CLASS MEMBERS, AND IS NOT TYPICAL

Aspects concerning Liberty itself defeat adequacy and typicality under Rule 23(a).  Rule

23(a)'s adequacy requirement is designed "to uncover conflicts of interest between named parties

and the class they seek to represent."  Amchem Prods. v. Windsor, 521 U.S. 591, 625 (1997).

A fundamental conflict precluding certification is when "the named plaintiffs seek relief

that may adversely affect some of the individuals they purport to represent."  Gillian v. Starjem

Rest. Corp., 2011 WL 4639842, *6-7 (S.D.N.Y. Oct. 4, 2011)(Rakoff, J.).  Adequacy is lacking

when named plaintiffs and class members have conflicting incentives that establishing liability

and maximizing recovery for one undermines liability and diminish recovery for the other.[24]

---

[22]    Palmer Kane LLC v. Scholastic Corp., 2012 WL 2952898, *8 (S.D.N.Y. July 16, 2012)(review of contracts "makes clear that generalized proof will not suffice and individual issues outweigh common ones"); Weiss v. La Suisse, Societe D'Assurances Sur La Vie, 226 F.R.D. 446, 454 (S.D.N.Y. 2005)(contract claims not suitable for certification; individual issues would "require the court to review the transactions of each plaintiff individually"); Sacred Heart Health Sys., Inc. v. Humana Mil. Healthcare Servs., Inc., 601 F.3d 1159, 1176-77 (11th Cir. 2010)("Even the most common of contractual questions—those arising, for example, from the alleged breach of a form contract—do not guarantee predominance if individualized extrinsic evidence bears heavily on the interpretation of the class members' agreements [and] a defendant raises substantial affirmative defenses to breach.").

[23]    Keller v. AXA Equitable Life Ins. Co., 2013 WL 6506259, *7 (S.D.N.Y. Dec. 12, 2013)(denying certification; individual issues relating to breach and injury defeated superiority).

[24]    Slader v. Pearle Vision Inc., 2000 WL 1702026, *1 (S.D.N.Y. Nov. 14, 2000)(Rakoff, J.)(denying certification; interests of the named plaintiffs were "quite likely in conflict with the interests" of unnamed class members and "comes close to denying the latter due process"); In re Foreign Exch. Benchmark Rates Antitrust Litig., 407 F.Supp.3d 422, 440 (S.D.N.Y. 2019); Valley Drug Co. v. Geneva Pharm., Inc., 350 F.3d 1181, 1189-90 (11th Cir. 2003)(adequacy

Even under an erroneous theory equating "prevailing economic and business conditions" with short-term interest rates, Liberty's claims create fundamental intraclass conflicts that defeat adequacy and preclude class certification. Liberty's motion suggests that the T&C would require ABDP rates to "vary" mechanically with certain (unspecified) "short-term interest rates," so that if "short-term interest rates" increase, then ABDP rates must increase. But an unavoidable consequence of Liberty's (incorrect) legal theory is if "short-term interest rates" decrease, then ABDP rates must also decrease. P-Memo, 2, 5-6, & 15-16. OpCo, by contrast, has maintained **steady** ABDP rates from August 2024 to the present, even as, purely for example, the FFR decreased. As a result, any class member who began participation in the ABDP between August 2023 and August 2024 would be **worse off** under Liberty's interpretation because their ABDP rates would need to have been reduced. Sabry Rep., ¶¶ 37-44.

Liberty argues that its "incentive is to maximize recovery by demonstrating that [OpCo] should have paid higher rates under the ABD Program than it actually did" does not conflict with class members' incentives. P-Memo, 11. But this ignores how the positions Liberty is and has been taking would result in diminished returns to many of the class members Liberty seeks to represent. This includes class members who began their participation in the ABDP when short-term interests rates were at their highest and whose ABDP rates remained steady even as short-term interests rates have fallen. And because the class period continues "to the present" and the Court's interpretation of the T&C could affect how OpCo administers the ABDP going forward, an interpretation of the "will vary" language that requires OpCo to lower ABDP rates in the future threatens to harm class members going forward.

Adequacy and typicality are also lacking because Liberty "possess[es] neither relevant

---

lacking when "some class members derive a net economic benefit from the very same conduct alleged to be wrongful by the named representatives of the class").

knowledge of [the defendant] nor familiarity with the alleged misconduct." Chambers, 2003 WL 749422, *6. Liberty last accessed its account online **in 2006**. LM-Ex. 3. Liberty's last trade occurred **in 2019**. LM-Ex. 2; MP-Ex. F. From March 31, 2022 through September 30, 2025, Liberty's ███████████████████████████. MP-Decl., ¶¶ 11-12, & MP-Exs. G & H. **Liberty basically abandoned its account**. Further, Liberty states it does not have **any** documents concerning: account statements; communications about the ABDP; the performance of Liberty's account; recommendations by OpCo to participate in the ABDP; deposits into the ABDP or any other cash sweep program; breaches or damages alleged in the Complaint; or Liberty's allegations in the Complaint. MP-Decl., ¶¶ 13-14, & MP-Ex. I. Liberty also states that it does not recall the identity of anyone: (1) at OpCo that Liberty spoke to, or that made any "recommendation," concerning the ABDP; or (2) with knowledge of the facts and circumstances in the Complaint. MP-Decl., ¶¶ 15-16, & MP-Ex. J. This lack of activity and knowledge render Liberty an inadequate and atypical class representative.

Liberty is subject to unique defenses that would "threaten to become the focus of the litigation" and thus defeat adequacy/typicality.[25] Perhaps unlike other class members, Liberty is a "money manager," listing "Investments" as its "occupation," with 45 years of investment experience across multiple asset classes. LM-Ex 1. Liberty selected "speculation" as its investment objectives and risk tolerance (unlike most other customers, according to data, Stango Rep., ¶ 70), and stated it had liquid net worth of $2 million and $1 million of investable assets. LM-Ex 1. As of 2019, ███████████████████ to Liberty. Id. Thus, as a sophisticated, professional, ██████, investor, arguments/defenses regarding causation,

---

[25]    Gordon v. Sonar Cap. Mgmt. LLC, 92 F.Supp.3d 193, 201 (S.D.N.Y. 2015)(Rakoff, J.)(defendants need not show "the unique defense will prevail, only that it is meritorious enough to require the plaintiff to devote considerable time to rebut the unique defense").

waiver, ratification, and mitigation play differently; **when** Liberty knew it had a claim (giving rise to a duty to mitigate) and **what** mitigation efforts Liberty, in particular, could or should have taken, would be very different than for many other class members.  See Section I.B.

Finally, the lack of a fiduciary duty owed to Liberty (Section III) also presents insurmountable adequacy and typicality issues.  Certification is only appropriate when "class representatives have the incentive to prove all elements of the cause of action which would be presented by the individual members of the class were they initiating individualized actions."  In re Veeco Instruments, Inc. Sec. Litig., 235 F.R.D. 220, 238 (S.D.N.Y. 2006).  Here, Liberty lacks the incentive to prove a fiduciary duty claim it cannot assert.  Bentley v. Verizon Bus. Global, LLC, 2010 WL 1223575, *5 (S.D.N.Y. Mar. 31, 2010)(denying class certification because the named plaintiff could not seek the same relief as class members).  The lack of a fiduciary duty owed to Liberty is akin to a unique defense, and thus defeats typicality and adequacy.

## III.    THE FIDUCIARY DUTY CLAIM CANNOT BE CERTIFIED BECAUSE LIBERTY WAS NOT OWED, AND WAS <u>NOT INJURED BY, A BREACH OF ANY FIDUCIARY DUTY</u>

Liberty's "breach of fiduciary duty as to **non**-advisory services customers" claim failed.  Order, 20-22.  Liberty has not proven it "held an advisory services account," "a fatal flaw" showing that Liberty lacks standing to pursue a fiduciary duty claim.  Id., 21 n.11.[26]

Certification of the fiduciary duty claim is precluded because Liberty was not owed such duty, cannot prove injury from a breach of it, and, lacks standing to assert such claim.[27]  Without Article III standing, Liberty "cannot represent a class" asserting a fiduciary duty claim.  Cassese v. Washington Mut., Inc., 262 F.R.D. 179, 183 (E.D.N.Y. 2009).  "For **each claim** asserted in a class action, there must be at least one class representative … with standing to assert **that**

---

[26]    Liberty was not an OpCo advisory services customer.  LM-Ex. 1.

[27]    Town of Chester, 581 U.S. at 439; Simon, 426 U.S. at 40 n.20.

**claim**."  Onaka v. Shiseido Americas Corp., 2023 WL 2663877, *3 (S.D.N.Y. Mar. 28, 2023).

To have standing, Liberty must prove:  (1) that it "personally has suffered some actual ... injury **as a result of the putatively illegal conduct of the defendant**," and (2) that such conduct "implicates the **same set of concerns** as the conduct alleged to have caused injury to other members of the putative class by the same defendants."  NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co., 693 F.3d 145, 160 (2d Cir. 2012)("NECA").

Liberty lacks standing to represent class members to assert a fiduciary duty claim.  Liberty has not "personally" suffered any injury "**as a result of the putatively illegal conduct**"—the alleged breach of fiduciary duty—because Liberty was not owed a fiduciary duty.  Nor do Liberty's claims implicate the "same set of concerns" as the fiduciary duty claims of advisory services customers because Liberty has no such claim.[28]  Liberty would offer no proof as to a fiduciary duty it was not owed.  That disconnect defeats class standing.[29]

## CONCLUSION

For the foregoing reasons, class certification should be denied.

Dated:  New York, New York                     Respectfully submitted,
    November 4, 2025                         By: *Grant R. MacQueen*

---

[28]    NECA, at 162-63 (named plaintiff's injury may "flow from" the same source, but the respective injuries would not "implicate[] the same set of concerns" if they "turn on very different proof").  In NECA, of the 17 RMBS offerings, the plaintiff lacked standing to assert claims for 10 because they did not involve common warrantors that harmed plaintiff.  Id.

[29]    Patterson v. Morgan Stanley, 2019 WL 4934834, *6 (S.D.N.Y. Oct. 7, 2019).

**APPENDIX**

**ABD PROGRAM INTEREST RATES OVER TIME, BY INTEREST RATE TIER[30]**

| Period | $0.01 - $99,999.99 | $100,000 - $249,999.99 | $250,000 - $499,999.99 | $500,000 - $999,999.99 | $1,000,000 - $4,999,999.99 | $5,000,000 and greater |
|---|---|---|---|---|---|---|
| 01/01/19 - 07/31/19 | 0.1500% | 0.1700% | 0.4000% | 0.4000% | 0.5000% | 0.7500% |
| 08/01/19 - 09/18/19 | 0.1500% | 0.1500% | 0.2500% | 0.3500% | 0.3500% | 0.7500% |
| 09/19/19 - 10/15/19 | 0.1000% | 0.1000% | 0.1500% | 0.2500% | 0.3500% | 0.5000% |
| 10/16/19 - 10/30/19 | 0.1000% | 0.1000% | 0.1000% | 0.1000% | 0.3500% | 0.5000% |
| 10/31/19 - 11/04/19 | 0.0700% | 0.0700% | 0.0700% | 0.0700% | 0.2500% | 0.4500% |
| 11/05/19 - 12/04/19 | 0.0500% | 0.0500% | 0.0500% | 0.0500% | 0.2500% | 0.4500% |
| 12/05/19 - 03/03/20 | 0.0400% | 0.0400% | 0.0400% | 0.0500% | 0.1750% | 0.3750% |
| 03/04/20 - 03/15/20 | 0.0100% | 0.0100% | 0.0125% | 0.0175% | 0.0225% | 0.0250% |
| 03/16/20 - 03/19/20 | 0.0050% | 0.0050% | 0.0100% | 0.0100% | 0.0100% | 0.0200% |
| 03/20/20 - 05/03/20 | 0.0050% | 0.0050% | 0.0100% | 0.0100% | 0.0100% | 0.0150% |
| 05/04/20 - 07/26/22 | 0.0050% | 0.0050% | 0.0100% | 0.0100% | 0.0100% | 0.0100% |
| 07/27/22 - 08/15/22 | 0.0100% | 0.0100% | 0.0100% | 0.0400% | 0.0400% | 0.0400% |
| 08/16/22 - 09/26/22 | 0.0100% | 0.0100% | 0.0100% | 0.0500% | 0.1000% | 0.2000% |
| 09/27/22 - 11/15/22 | 0.0500% | 0.0500% | 0.0500% | 0.1000% | 0.1500% | 0.3000% |
| 11/16/22 - 01/04/23 | 0.1000% | 0.1000% | 0.1000% | 0.1200% | 0.2000% | 0.3500% |
| 01/05/23 - 02/15/23 | 0.1000% | 0.1000% | 0.1000% | 0.2000% | 0.3000% | 0.5000% |
| 02/16/23 - present | 0.2500% | 0.2500% | 0.3000% | 0.3500% | 0.5000% | 0.6000% |

Red text indicates ABD Program interest rate decreases from the prior period.
Green text indicates ABD Program interest rate increases from the prior period.

---

[30]    This chart was provided to Plaintiffs in "Defendant's Amended Objections and Responses to Plaintiff's First Set of Interrogatories to Defendants," dated October 20, 2025.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on November 4, 2025, a true and exact copy of the

foregoing document was submitted to the District Court via CM/ECF to all counsel of record.


*/s/ Grant R. MacQueen*