UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LIBERTY CAPITAL GROUP, individually and on behalf of all others similarly situated,<br><br>      Plaintiff,<br><br>  -v-<br><br>OPPENHEIMER & CO.,<br><br>      Defendant. | 25-cv-4822 (JSR)<br><br><u>OPINION & ORDER</u> |

JED S. RAKOFF, U.S.D.J.:

Before the Court is the motion of plaintiff Liberty Capital Group ("Liberty") to certify, under Federal Rule of Civil Procedure 23(b)(3), a class consisting of "[a]ll participants in the Advantage Bank Deposit Program from March 17, 2022[,] through the present," subject to certain exceptions. ECF No. 50 (motion) at 1; <u>see</u> ECF No. 51 ("Pl.'s Mem.") at 3 n.3.[1] Liberty's motion was fully briefed on November 18, 2025, and the Court held oral argument on November 24, 2025. <u>See</u> ECF Nos. 62, 65. Upon consideration of the parties' written submissions and the arguments of counsel, the Court hereby grants Liberty's motion in part and denies it in part. Accordingly, the Court hereby certifies the proposed class to the extent described herein.

---

[1] In all quotations, the Court omits citations, footnotes, emphases, internal quotation marks, brackets, and ellipses, unless otherwise indicated.

I.   Factual Background and Procedural History

The Court presumes familiarity with the allegations in Liberty's Class Action Complaint ("CAC"). See ECF No. 1. In short, Liberty brought this putative class action to recover damages arising out of the alleged misconduct of defendant Oppenheimer & Co., Inc. ("Oppenheimer") in operating its Advantage Bank Deposit Program ("ABD Program"). Through the ABD Program, Oppenheimer invested, or "swept," the cash balances that its customers maintained in various kinds of accounts into interest-bearing accounts at certain deposit banks. See id. ¶ 1. Liberty alleges that Oppenheimer paid ABD Program customers "unreasonable, below-market interest rates," on these accounts. See id. ¶¶ 2-3. Specifically, the CAC alleges that, even though ABD Program documents promised that the interest rates that Oppenheimer would pay would "vary based on prevailing economic and business conditions," id. ¶ 18, Oppenheimer actually paid ABD Program participants significantly lower, "below-market" interest rates, at least compared with relevant rates of interest paid by the Federal Reserve, other federal financial instruments, and Oppenheimer's competitors, see id. ¶¶ 37-62.

On October 6, 2025, the Court issued an Opinion and Order granting in part and denying in part defendants' motion to dismiss the CAC. ECF No. 47 ("MTD Opinion"). The Court dismissed from this action two defendants other than Oppenheimer, concluding that the CAC did not adequately state any claims against those defendants. Id. at 7-9. The Court also granted Oppenheimer's motion to dismiss Liberty's claims

for negligence (Count Four), negligent misrepresentations and omissions (Count Five), and unjust enrichment (Count Seven). Id. at 22-25, 28-29.[2] The Court otherwise denied the motion to dismiss, thereby allowing Liberty's claims for breach of contract (Count One), breach of the implied covenant of good faith and fair dealing (Count Two), breach of fiduciary duty (Count Three), and violation of New York General Business Law § 349 (Count Six) to proceed. See generally id. As to these claims, the Court recognized that Liberty had narrowed its theory of liability by focusing on Oppenheimer's alleged promise to pay interest rates that would "vary based on prevailing economic and business conditions," rather than on any obligation that Oppenheimer allegedly had to pay objectively reasonable rates. See id. at 12-19.

On October 21, 2025, Liberty filed the instant motion for class certification. ECF No. 50. In support of its motion, Liberty submitted the declaration of a damages-methodology expert, Dr. Adam Werner. ECF No. 52-23 ("Werner Report"). Oppenheimer opposed Liberty's motion on November 4, 2025, relying on the declarations of rebuttal experts Drs. Faten Sabry and Victor Stango. ECF No. 62 ("Opp'n"); see ECF No. 63-3 ("Sabry Report"); ECF No. 63-4 ("Stango Report"). Liberty filed its reply on November 18, 2025. ECF No. 65 ("Reply"). As noted, the Court held oral argument on November 24, 2025.

---

[2] The Court granted Liberty leave to replead these claims, see id. at 29-30, but Liberty elected not to amend the CAC.

## II.  Legal Standards

On a motion for class certification, a plaintiff bears the burden of showing, by a preponderance of the evidence, that the four express requirements of Federal Rule of Civil Procedure 23(a), the fifth implicit requirement of ascertainability, and the requirements of at least one of the sub-parts of Federal Rule of Civil Procedure 23(b), are met. Polvay v. VCTI, Inc., 713 F. Supp. 3d 1, 5 (S.D.N.Y. 2024). The four express requirements of Rule 23(a) are numerosity ("the class is so numerous that joinder of all members is impracticable"), commonality ("there are questions of law or fact common to the class"), typicality ("the claims or defenses of the representative parties are typical of the claims or defenses of the class"), and adequacy ("the representative parties will fairly and adequately protect the interests of the class"). Fed. R. Civ. P. 23(a). In addition, the Second Circuit has recognized an implied requirement of ascertainability, that is, a requirement that a class be "defined using objective criteria that establish a membership with definite boundaries." In re Petrobras Secs., 862 F.3d 250, 257 (2d Cir. 2017). Under Rule 23(b)(3), which Liberty here invokes, the Court must find that "the questions of law or fact common to class members predominate over any questions affecting only individual members," as well as that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

As to both Rule 23(a) and Rule 23(b)(3), the Court may be required

to "resolv[e] factual disputes relevant to each Rule 23 requirement and find[] that whatever underlying facts are relevant to a particular Rule 23 requirement have been established." Teamsters Loc. 4455 Freight Div. Pension Fund v. Bombardier Inc., 546 F.3d 196, 202 (2d Cir. 2008). In doing so, the Court may consider "[m]erits questions . . . to the extent -- but only to the extent -- that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." Amgen Inc. v. Conn. Ret. Plans & Tr. Funds, 568 U.S. 455, 466 (2013); see Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350-51 (2011) (calling for "rigorous analysis" of each requirement at the class certification stage); Comcast Corp. v. Behrend, 569 U.S. 27, 33-34 (2013) (noting that such analysis may need to "probe behind the pleadings" and may "entail overlap with the merits of the plaintiff's underlying claim"). Nevertheless, at class certification, "the [ultimate] question before the Court is whether Plaintiffs meet Rule 23's requirements, not whether Plaintiffs will prevail on the merits." E.g., Pearlstein v. BlackBerry Ltd., 13 Civ. 7060, 2021 WL 253453, at *6 (S.D.N.Y. Jan. 26, 2021) (citing Amgen, 568 U.S. at 466).

## III. Analysis

The Court begins by addressing Oppenheimer's argument that Liberty lacks standing to represent the proposed class with respect to Count Three, the claim for breach of fiduciary duty. The Court concludes that Liberty lacks such standing under Article III of the U.S. Constitution but that this jurisdictional defect may be remedied

by the prompt amendment of the CAC to join at least one additional class representative. Then, turning to consider whether Liberty has satisfied the requirements of Rule 23(a) and Rule 23(b)(3) as to the CAC's remaining causes of action, the Court concludes that it has.

A.    Standing

As it did at the motion to dismiss stage, see ECF No. 31 at 24-25, Oppenheimer argues that Liberty lacks standing, under Article III, to assert a claim for breach of fiduciary duty because Liberty did not hold any account as to which Oppenheimer owed it a fiduciary duty. Opp'n at 24-25. Liberty responds that Oppenheimer has confused Article III standing with the distinct concept of class standing, that Liberty has Article III standing because it allegedly sustained injury from Oppenheimer's management of the ABD Program, and that it has class standing because its alleged injury implicates the same concerns as the conduct alleged to have injured customers to whom Oppenheimer did owe fiduciary duties. Pl.'s Mem. at 11-14, Reply at 9-10. The Court previously deferred consideration of the parties' arguments on standing, see MTD Opinion at 21 n.11, but reaches that issue now.

As the Second Circuit has observed, the doctrines of Article III standing and class standing have a "complicated relationship." E.g., Langan v. Johnson & Johnson Consumer Cos., Inc., 897 F.3d 88, 93 (2d Cir. 2018). To have Article III standing, "a plaintiff must demonstrate (1) a personal injury in fact (2) that the challenged conduct of the defendant caused and (3) which a favorable decision will likely

redress." Id. (quoting Mahon v. Ticor Title Ins. Co., 683 F.3d 59, 62 (2d Cir. 2012)). Standing is not "dispensed in gross," meaning that "a plaintiff must demonstrate standing for each claim [it] seeks to press and for each form of relief that is sought." Town of Chester, N.Y. v. Laroe Estates, Inc., 581 U.S. 433, 439 (2017) (quoting Davis v. Federal Election Comm'n, 554 U.S. 724, 734 (2008)).

"Class actions under Rule 23 of the Federal Rules of Civil Procedure are an exception to the general rule that one person cannot litigate injuries on behalf of another." Langan, 897 F.3d at 93. But Rule 23 does not alter the constitutional requirement that a class action plaintiff must have standing for each of its claims; the rule simply represents Congress' authorization for a plaintiff "to bring, under limited circumstances, a suit in federal court on behalf of, not just themselves, but others who were similarly injured." Id. (citing Dukes, 564 U.S. at 348-49).

In the Second Circuit, for a plaintiff to enjoy class standing, the plaintiff must plausibly allege (1) that it "personally has suffered some actual injury as a result of the putatively illegal conduct of the defendants, and (2) that such conduct implicates the same set of concerns as the conduct alleged to have caused injury to other members of the putative class by the same defendants." NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co., 693 F.3d 145, 162 (2d Cir. 2012). Thus, "non-identical injuries of the same general character can support [class] standing." Langan, 897 F.3d at 94. But that is not

identical to Article III standing.

Here, Liberty lacks Article III standing to assert Count Three, its claim for breach of fiduciary duty. As the Court has previously noted, the elements of such a claim under New York law are (1) the existence of a fiduciary relationship, (2) misconduct by the fiduciary, and (3) damages. MTD Opinion at 20. Because Liberty did not hold an account as to which Oppenheimer owed it any fiduciary duty during the proposed class period, Liberty cannot plead a personal injury-in-fact sufficient to confer standing to assert a claim for breach of fiduciary duty. See Town of Chester, 581 U.S. at 439 ("[A] plaintiff must demonstrate standing for each claim [it] seeks to press" (emphasis added)).

Liberty's arguments to the contrary are unavailing. Of course, Liberty is correct that Article III standing and class standing "are distinct concepts," governed by different legal standards. Reply at 10. But Liberty's moving papers almost exclusively discuss class standing, rather than Article III standing, and the cases on which Liberty relies mostly address disputes about class standing. See Pl.'s Mem. at 11-14 (collecting cases).

To the extent that Liberty's cases do discuss Article III standing, those cases generally arise in the context of either a plaintiff's standing to bring claims related to products or services other than the products or services that the plaintiff purchased, see, e.g., Goetz v. Ainsworth Pet Nutrition, LLC, 768 F. Supp. 3d 645, 658-

59 (S.D.N.Y. 2025), or a plaintiff's standing to bring claims under the consumer protection laws of states other than the state in which the plaintiff purchased the products at issue, see, e.g., Langan, 897 F.3d at 95. In both these factual scenarios, there is no dispute that a plaintiff has allegedly suffered the "same general character" of injury-in-fact as the injuries allegedly suffered by other class members. See Langan, 897 F.3d at 94. Here, in contrast, Liberty has not alleged that it suffered a breach of fiduciary duty -- that is, a breach of a specific, heightened form of trust. In fact, because Liberty admits that, at all times relevant to the CAC, it held only a "standard brokerage account" with Oppenheimer, it cannot allege that Oppenheimer even owed it a fiduciary duty, as opposed to the ordinary duties that any New York business owes its customers. See CAC ¶ 7; see also MTD Opinion at 21 & n.11.

Liberty cites no authority holding that a plaintiff that has Article III standing to bring contract claims also has Article III standing to bring a claim for breach of a fiduciary duty not owed to that plaintiff. The Court is skeptical that such authority exists because, as the Second Circuit has repeatedly held, a plaintiff "must always have suffered a distinct and palpable injury to [itself]" not just generally, but "with respect to each asserted claim." Langan, 897 F.3d at 94 (quoting Mahon, 683 F.3d at 64).

Although Liberty lacks Article III standing to assert Count Three, Oppenheimer's advisory services customers who are members of the

proposed class almost certainly have such standing. The CAC alleges that Oppenheimer represented to its advisory services customers that it had "an obligation to act as a fiduciary in the way that [Oppenheimer] provide[s] advisory services" and that it was required to act in such customers' "best interests" and place such interests ahead of Oppenheimer's own. See CAC ¶ 99. Oppenheimer does not dispute the existence of these duties. See Opp'n at 24-25. The CAC further alleges that Oppenheimer breached its duties by failing to abide by its promises concerning the interest rates that customers enrolled in the ABD Program would earn. See id. ¶¶ 100, 105, 130. And the CAC alleges that advisory services customers were damaged as a result of that breach. Id. ¶ 133. Therefore, advisory services customers who are members of the proposed class almost certainly have Article III standing to assert Count Three because they could allege a personal injury resulting from Oppenheimer's conduct that could be redressed by a favorable decision.[3] See Langan, 897 F.3d at 93.

Because Liberty lacks Article III standing as to Count Three, the Court concludes that it may not reach the merits of Liberty's motion for class certification as to that count until such time as a named plaintiff with standing has been joined. The Court accordingly denies

---

[3] Such advisory services customers would also almost certainly have class standing in relation to Count Three because they would have "personally suffered" an actual injury because of Oppenheimer's alleged breach, and Oppenheimer's alleged conduct as to any one of its advisory services customers "implicates the same set of concerns" as its conduct to all such customers. See NECA-IBEW, 693 F.3d at 162.

without prejudice Liberty's motion as to Count Three.

However, the Court grants Liberty leave to amend the CAC, no later than December 22, 2025, by joining as a named plaintiff at least one class member with standing to assert Count Three. Such an amendment would plainly be in the interest of justice, see Fed. R. Civ. P. 15(a)(2), and would be unlikely to prejudice Oppenheimer by requiring it "to expend significant additional resources to conduct discovery and prepare for trial or significantly delay the resolution of the dispute," see, e.g., Oliver v. Am. Express Co., 19 Civ. 566, 2023 WL 4471937, at *9 (E.D.N.Y. July 11, 2023).[4]

B.    Rule 23(a) Requirements

As to the CAC's remaining counts, Oppenheimer does not dispute that the proposed class satisfies Rule 23(a)'s numerosity and commonality requirements. See Opp'n at 21-24. It contends, however, that Liberty fails to meet the Rule's typicality and adequacy requirements. For the following reasons, the Court finds that Liberty has satisfied all four of the express requirements of Rule 23(a), plus the implied fifth requirement of ascertainability.

1.    Numerosity and Ascertainability

"Numerosity is presumed at a level of 40 members." Staley v. FSR Int'l Hotel Inc., No. 22 Civ. 6781, 2024 WL 3534450, at *2 (S.D.N.Y.

---

[4] Whether the addition of such a plaintiff would also require the creation of two subclasses, each represented by the respective plaintiffs, is an issue the Court need not address.

July 25, 2024) (quoting Consol. Rail Corp. v. Town of Hyde Park, 47 F.3d 473, 483 (2d Cir. 1995)). The parties agree that, during the proposed class period, there have been "well over 100,000 customers in the ABD Program." See Pl.'s Mem. at 7-8. Because the number of ABD Program customers so clearly exceeds the number of class members that triggers the presumption of numerosity, Liberty "need not provide a precise quantification of [its] class," and the Court "may make 'common sense assumptions' to support a finding of numerosity." See Kalkstein v. Collecto, Inc., 304 F.R.D. 114, 119 (E.D.N.Y. 2015). The Court concludes that the proposed class is so numerous that the joinder of all members is impracticable. See Fed. R. Civ. P. 23(a)(1).

Additionally, because Liberty has defined the proposed class "using objective criteria that establish a membership with definite boundaries," i.e., whether an individual or entity was an ABD Program participant during a period beginning on a date certain and running through the present, it also satisfies the Second Circuit's requirement of ascertainability. See In re Petrobras Secs., 862 F.3d at 264-65. And, as with numerosity, Oppenheimer does not challenge the ascertainability of the proposed class. See generally Opp'n.

### 2. Commonality

The commonality requirement tests whether "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Notwithstanding issues regarding commonality raised in other kinds of class actions, see, e.g., Dukes, 564 U.S. at 349-60, in cases like the

instant case, commonality is still "generally considered a low hurdle easily surmounted," and "[a] single common question of fact or law suffices." Sjunde AP-Fonden v. Goldman Sachs Grp., Inc., --- F. Supp. 3d ---, 2025 WL 2554474, at *23 (S.D.N.Y. Sept. 4, 2025). This Rule 23(a) requirement is related to, but distinct from, Rule 23(b)(3)'s requirement that common questions must predominate over questions affecting individual class members. While Oppenheimer does not dispute that Liberty satisfies Rule 23(a)'s commonality requirement, it vigorously disputes whether common issues predominate. See infra Section III.C(1).

This action presents a host of issues of fact and law that are common to the proposed class, including whether Oppenheimer breached its contracts with class members; whether Oppenheimer breached the implied covenant of good faith and fair dealing in administering the ABD Program; whether Oppenheimer's practices were deceptive, in violation of New York consumer protection law; what interest rates Oppenheimer should have paid to ABD Program participants; and to what extent class members were damaged. See Pl.'s Mem at 8. Many of these common questions are capable of resolution with classwide proof. See id. at 8-9. Moreover, Oppenheimer's relevant promises appear in a single set of documents -- the ABD Program's terms and conditions -- making Liberty's claims distinctively susceptible to classwide resolution. See, e.g., Hanks v. Lincoln Life & Annuity Co. of N.Y., 330 F.R.D. 374, 380 (S.D.N.Y. 2019) (concluding that claims arising

from form contracts "appear to present the classic case for treatment as a class action"); Dover v. British Airways PLC (UK), 321 F.R.D. 49, 54 (E.D.N.Y. 2017) (similar). Hence, the Court finds that this action concerns questions of law and fact that are common to the proposed class. See Fed. R. Civ. P. 23(a)(2).

   3.  Typicality

   Rule 23(a)'s typicality requirement tests whether a representative plaintiff's "claims or defenses . . . are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). To satisfy this requirement, a plaintiff "must show that each class member's claim arises from the same course of events and [that] each class member makes similar legal arguments to prove the defendant's liability." In re Flag Telecom Holdings, Ltd. Sec. Litig., 574 F.3d 29, 35 (2d Cir. 2009). However, typicality does not require identity between a class representative's claims and those of the class at large. That is, "the mere existence of individualized factual questions with respect to the class representative's claim will not bar class certification." Baffa v. Donaldson, Lufkin & Jenrette Secs. Corp., 222 F.3d 52, 59 (2d Cir. 2000).

   Here, Liberty argues that its claims are typical of the proposed class because all class members' claims arise from a single course of conduct: Oppenheimer's administration of the ABD Program. Pl.'s Mem. at 9-10. Oppenheimer responds that Liberty's claims are not typical because Liberty is subject to unique defenses. Opp'n at 23-24.

According to Oppenheimer, Liberty is a sophisticated and professional investor, unlike other class members, and therefore affirmative defenses such as "causation, waiver, ratification, and mitigation" will "play differently" as to Liberty. Id. For instance, Oppenheimer asserts that Liberty is likely to have known that it had a claim (and, thus, had a duty to take reasonable steps to mitigate its damages) far earlier than the typical class member. Id.

Liberty has the better of these arguments. As the Court discusses at greater length in Section III.C(1) infra, neither Liberty's claims nor the bulk of Oppenheimer's anticipated affirmative defenses depend on the subjective expectations of individual class members. To take the same example, a plaintiff in a breach of contract action under New York law "has a duty to mitigate" such damages "that the plaintiff could have avoided with reasonable effort and without undue risk, burden, or expense." Impax Lab'ys, Inc. v. Turing Pharms. AG, No. 16 Civ. 3241, 2017 WL 4357893, at *19 (S.D.N.Y. Sept. 29, 2017) (quoting U.S. Bank Nat'l Ass'n v. Ables & Hall Builders, 696 F. Supp. 2d 428, 440-41 (S.D.N.Y. 2010)). This is an "objective standard," and courts in this District have rejected "attempts to convert the mitigation test into a subjective one." Id. Likewise, courts have routinely held that the potential presence of mitigation defenses does not render a representative plaintiff atypical for purposes of class certification. E.g., Poddar v. State Bank of India, 235 F.R.D. 592, 596 (S.D.N.Y. 2006) (holding that mitigation relates at most to the determination

of individual damages, "not to the central, disputed question of whether defendant is liable" to the class); cf. B & R Supermarket, Inc. v. Visa, Inc., 746 F. Supp. 3d 84, 94 (E.D.N.Y. 2024) (rejecting argument that supposedly "unique" mitigation defenses available against certain plaintiffs render representative plaintiffs atypical). And any individual defenses that Oppenheimer may have against Liberty are unlikely to become "the focus of the litigation," which will undoubtedly concern Oppenheimer's overall alleged mismanagement of the ABD Program. See Gordon v. Sonar Cap. Mgmt. LLC, 92 F. Supp. 3d 193, 201 (S.D.N.Y. 2015).[5]

Accordingly, the Court finds that Liberty's claims and Oppenheimer's defenses are typical of the claims of the proposed class and of the defenses that Oppenheimer may have to class members' claims. See Fed. R. Civ. P. 23(a)(3).

4.   Adequacy of Representation

Rule 23(a)'s adequacy requirement entails two inquiries: whether "plaintiff's interests are antagonistic to the interest of other members of the class" and whether "plaintiff's attorneys are qualified, experienced[,] and able to conduct the litigation." Flag Telecom, 574

---

[5] Moreover, the Court agrees with Liberty that Oppenheimer's arguments concerning typicality are in tension with its arguments concerning adequacy of representation. See Reply at 9. Under the former heading, Oppenheimer claims that Liberty is too sophisticated a trader to be typical; under the latter, it argues that Liberty did not trade enough. See Opp'n at 21-24. As the Court discusses here and in the following sub-section, neither of Oppenheimer's arguments is meritorious.

F.3d at 35 (quoting Baffa, 222 F.3d at 60).

Here, Oppenheimer does not dispute that Liberty has satisfied the second of these inquiries. Upon the Court's independent review of the qualifications of proposed class counsel, see ECF No. 52-24, the Court concurs with other courts in this Circuit that the law firm of Robbins Geller Rudman & Dowd LLP is "adequate and well-qualified for the purpose of litigating class action lawsuits." See, e.g., Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC, 310 F.R.D. 69, 100 & n.219 (S.D.N.Y. 2015) (collecting cases).

Nevertheless, Oppenheimer contends that Liberty cannot adequately represent the proposed class because (1) Liberty's theory of the case allegedly "create[s] fundamental intraclass conflicts" and (2) Liberty has effectively abandoned its account with Oppenheimer and lacks relevant documents concerning the ABD Program. See Opp'n at 21-23.

Oppenheimer's first argument is based on the view that it necessarily follows from Liberty's core allegation -- that Oppenheimer failed to vary ABD Program interest rates based on "prevailing economic and business conditions" as it promised -- that Oppenheimer must have paid some class members higher interest rates than they were due. Opp'n at 22. For instance, Oppenheimer reasons, class members who participated in the ABD Program during a period when ABD Program interest rates remained constant yet comparable interest rates decreased "would be worse off under Liberty's interpretation because their [interest] rates would need to be reduced." Id. (emphasis

omitted). Liberty replies that because Oppenheimer only ever paid "negligible interest rates" and because "there is not a single day when Oppenheimer paid" the rates it promised, every class member suffered damages. Reply at 2.

As the Court discusses at length below, Liberty has not yet set forth a methodology for determining precisely what interest rates Oppenheimer was obligated to pay to ABD Program participants on any given day (for purposes of Liberty's breach of contract claim) or precisely what interest rates participants could reasonably have expected to receive on any given day (for purposes of Liberty's implied covenant and General Business Law § 349 claims). See infra Section III.C(1). At oral argument, Liberty conceded that it has yet to propose such a methodology. Tr. of Oral Argument (Nov. 24, 2025) at 16. But while the Court expects that any methodology that Liberty does propose will be the subject of ongoing dispute between the parties, based on the current record, it appears highly unlikely that any such methodology would show that class members were allegedly overpaid, rather than underpaid. That is because Liberty's allegations are that the interest rates Oppenheimer paid were always substantially lower than -- and often a tiny fraction of -- interest rates paid by the Federal Reserve, other federal financial instruments, and Oppenheimer's competitors. See CAC ¶¶ 40-49. Although the Court expresses no view as to whether, or how, interest rates such as these are related to the rates Oppenheimer allegedly should have paid, it

agrees with Liberty that, on the current record, there is no meaningful prospect that a factfinder's adoption of Liberty's theory of the case would mean that class members were overpaid. See Reply at 8.

And once the proper rates that should have been paid are determined, the amount that any given member of the class should be paid (or, in Oppenheimer's hypothesis, not paid) becomes simply a matter of arithmetic that can be easily determined and applied.

Oppenheimer's second argument is that Liberty is not an adequate class representative because it lacks familiarity with Oppenheimer's alleged misconduct. See Opp'n at 22-23. This argument relies on evidence that Liberty last traded securities via Oppenheimer in 2019, three years before the beginning of the proposed class period, and last accessed its online account with Oppenheimer in 2006, many years before that. Id.; see also ECF No. 60 ¶¶ 25-30, ECF No. 60-2, ECF No. 60-3. Moreover, Oppenheimer contends that Liberty has represented in discovery that it lacks documents regarding the ABD Program as well as communications with Oppenheimer personnel about the ABD Program. Opp'n at 23.

The Court disagrees. Nothing about Liberty's claims depends on its having recently traded securities with Oppenheimer because the ABD Program specifically relates only to the management of cash that is not, at any given time, invested in securities. As to Liberty's alleged lack of relevant documents and communications, Liberty represented at oral argument that all materials concerning the ABD Program to which

it has access are hosted on Oppenheimer's own electronic systems. Tr. of Oral Argument at 37-38. Liberty's representation is confirmed by the fact that Oppenheimer has itself produced documents concerning the performance of Liberty's ABD Program funds. See, e.g., ECF Nos. 59 ¶ 12, 59-6, 59-7.

For these reasons, the Court concludes that Liberty has demonstrated that it and its counsel "will fairly and adequately protect the interests of the class." See Fed. R. Civ. P. 23(a)(4). Hence, the Court finds that all of Rule 23(a)'s express requirements, plus the implied requirement of ascertainability, are satisfied.

C.    Rule 23(b)(3) Requirements

Having concluded that Liberty satisfies Rule 23(a), the Court now turns to the requirements of Rule 23(b)(3), the specific provision under which Liberty seeks class certification. That rule requires Liberty to show "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The parties focus on the issue of predominance.

1.    Predominance

A legal or factual question is "common" if it is "of such a nature that it is capable of classwide resolution." Dukes, 564 U.S. at 350. Predominance is a "qualitative inquiry that entails careful scrutiny of the nature and significance of a case's common and individual

20

issues," including affirmative defenses. <u>Haley v. Teachers Ins. & Annuity Ass'n of Am.</u>, 54 F.4th 115, 121 (2d Cir. 2022).

Damages are among the issues as to which a class action plaintiff invoking Rule 23(b)(3) must show that common questions predominate. See <u>Comcast</u>, 569 U.S. at 34-36. A plaintiff must set forth a model showing that "damages are capable of measurement on a classwide basis." <u>Id.</u> at 34. Such a model "must measure only those damages attributable to" plaintiff's specific theory of damages. <u>Id.</u> at 35. At the class certification stage, a plaintiff need not precisely quantify the damages suffered by the class, but it must set forth evidence "sufficient to show that damages are measurable through the use of a common methodology." <u>E.g.</u>, <u>Dial Corp. v. News Corp.</u>, 314 F.R.D. 108, 119 (S.D.N.Y. 2015); <u>cf.</u> <u>Lytle v. Nutramax Lab'ys</u>, 114 F.4th 1011, 1019 (9th Cir. 2024) ("[T]here is no general requirement that an expert actually apply to the proposed class an otherwise reliable damages model in order to demonstrate that damages are susceptible to common proof at the class certification stage.").

As an initial matter, the Court observes that the parties' arguments about predominance turn on different views of Liberty's theory of liability. The parties agree that, as the Court held on Oppenheimer's motion to dismiss, Liberty's sole surviving theory is that "Oppenheimer breached its promise to pay rates that vary with economic and business conditions." See MTD Opinion at 12. But Oppenheimer contends that Liberty "ignores that theory and focuses

instead on theories it abandoned." Opp'n at 3. According to Oppenheimer, Liberty's motion for class certification attempts, sub silentio, to resurrect the theory that Oppenheimer was obligated to pay objectively reasonable interest rates. See id.

While Liberty's papers and the report of its expert, Dr. Werner, are not models of clarity in this respect, the Court concludes that Oppenheimer is laboring under a misunderstanding. To be sure, Liberty and its expert repeatedly use the phrases "reasonable, market-based rates" and "market-based interest rate ('M.I.R.')." E.g., Pl.'s Mem. at 15-16; Werner Report at 8-11; Reply at 2. But while these phrases might be read, in isolation, to refer to objectively reasonable rates, when considered in the context of Liberty's arguments they plainly refer to the rates that Oppenheimer promised that it would pay ABD Program participants -- that is, rates that would vary with economic and business conditions. See, e.g., Reply at 2 (referring to "the promised reasonable, market-based rates" and "the reasonable, market-based rate [Oppenheimer] promised"). The Court evaluates the parties' arguments regarding predominance in light of this understanding.

Liberty argues that common issues predominate because, among other things, the ABD Program is governed by a single set of terms and conditions (i.e., a form contract) that is equally applicable to every member of the proposed class; the actual interest rates paid by Oppenheimer were common to the proposed class; the interest rates that Liberty alleges Oppenheimer should have paid can be determined in a

manner common to the proposed class; many of Oppenheimer's affirmative defenses can be addressed on a classwide basis; and total damages can also be calculated classwide. Pl.'s Mem. at 15-17; Reply at 2-7.

The Court agrees with Liberty that common questions predominate because, as discussed further below, each of the central issues in this litigation appears to be "capable of classwide resolution." See Dukes, 564 U.S. at 350. Oppenheimer does not dispute that all potential class members participated in the ABD Program subject to the same terms and conditions, nor does it dispute that ABD Program participants were paid common interest rates that varied only by date and by the cash balances that participants maintained. See Opp'n at 20-21. Although Oppenheimer marshals a host of objections to Liberty's arguments concerning predominance, all of them fail.

First, Oppenheimer argues that Liberty will be unable to prove breach on a classwide basis. See Opp'n at 8-10. According to Oppenheimer, because class members began and ended their participation in the ABD Program on different dates, the factfinder would need to individually evaluate whether and how the interest rates paid to each class member should have varied. See id. But this objection misapprehends both Liberty's theory of liability and Dr. Werner's methodology for calculating damages. Liberty's theory entails that Oppenheimer should have paid interest at rates that would not have varied individually from class member to class member and that would have been far higher than the rates that Oppenheimer actually paid.

Hence, on Liberty's view, Oppenheimer breached its agreement with each ABD Program participant by not paying the promised, higher rates -- beginning on the first day that any participant joined the ABD Program. See Reply at 2-3. Dr. Werner's methodology is consistent with this theory. The methodology presupposes that the interest rates Oppenheimer should have paid can be identified on a classwide basis. The determination of what the rates should have been, of course, is a foundational merits issue in this case. But once those rates are determined, Dr. Werner's methodology can readily be used to calculate both the class's total damages and each class member's individual damages -- regardless of whether a class member participated in the ABD Program for a single day, a portion of the proposed class period, or the entire proposed class period.[6] For these reasons, therefore, whether Oppenheimer committed breach is a question capable of classwide resolution.[7]

---

[6] Oppenheimer argues that purportedly individual issues concerning breach would "not even [be] limited to the Proposed Class Period because many class members first participated in the [ABD Program] earlier in time." Opp'n at 9-10. The Court is perplexed by this argument for the same reasons given in this paragraph, but also because "the CAC does not allege any wrongdoing by Oppenheimer prior to 2022." See MTD Opinion at 10.

[7] Of course, the specific conduct that would constitute breach on Oppenheimer's part might vary slightly between Count One (where breach would consist of violating a contractual promise), Count Two (where breach would consist of preventing performance, or withholding the benefits, of a contract), and Count Three (where breach would consist of misconduct in relation to a fiduciary duty). While these standards are different, each may be addressed on a classwide basis.

Second, Oppenheimer contends that Liberty will also be unable to prove injury on a classwide basis. Opp'n at 10-11. This is because, Oppenheimer argues, some class members participated in the ABD Program only during periods of time when short-term interest rates remained steady or declined, yet ABD Program interest rates remained constant. See id. Hence, on Oppenheimer's view and that of one of its experts, numerous class members were uninjured, and the factfinder would need to engage in individualized inquiries about the existence and extent of each class member's injury. See id.; Sabry Report at 23-28.[8] But Oppenheimer neither presents any evidence as to how many class members were allegedly uninjured nor cites any authority holding that class certification must be denied unless every member of a proposed class has been injured. The proper test, as this Court has previously held, is that certification is only inappropriate where "the portion of the proposed class" that suffered relevant injuries "appears to be tiny" because certification in such circumstances would "render the class action device nothing more than a facade for conducting a small number

---

[8] Oppenheimer's argument appears to rest on the assumption that no injury could have occurred during periods when short-term interest rates either remained constant or declined, while ABD Program interest rates remained constant. See Opp'n at 11. However, as the Court has explained, see supra Section III.B(4), Liberty's theory is that the interest rates that Oppenheimer paid were consistently below the rates that it should have paid. Assuming, without deciding, that short-term interest rates are a relevant benchmark for determining the interest rates that Oppenheimer should have paid, class members could have been injured even when both short-term and ABD Program interest rates remained constant if Liberty is correct that ABD Program interest rates were always lower than they should have been.

of highly individualized cases." In re Canon Cameras, 237 F.R.D. 357, 360 (S.D.N.Y. 2006). There appears to be no such risk here. Hence, the Court concludes that injury, like breach, is a common question.

Third, Oppenheimer contends that class members had different interpretations of the ABD Program's terms and conditions, as well as different expectations concerning their participation in the ABD Program. See Opp'n at 12-15. These interpretations and expectations are relevant, Oppenheimer argues, because they constitute extrinsic evidence of the meaning of the terms and conditions, for purposes of Liberty's contract claim, and because they relate to essential elements of Liberty's implied covenant and General Business Law § 349 claims. Id. According to one of Oppenheimer's experts, class members' interpretations likely varied over time; they also likely varied based on the reasons that class members chose to participate in the ABD Program. See Stango Report at 15-45.

As Liberty points out on reply, however, the relevant legal standards are objective, not subjective. See Reply 4-5. Under New York law, commercial contracts are to be "interpreted according to common speech and consistent with the reasonable expectations of the average" customer. Universal Am. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa., 25 N.Y.3d 675, 680 (2015); see also N.Y. Civ. Pattern Jury Inst. § 4:1, comment 5 (2024) (recognizing "common speech" and the "reasonable expectation and purpose of the ordinary business person" as tools for interpreting business contracts). Liberty's

implied covenant and General Business Law § 349 claims are also governed by objective standards. See Cordero v. Transam. Annuity Serv. Corp., 39 N.Y.3d 399, 409-10 (2023) (holding that, for purposes of implied covenant claim, courts "infer that contracts include any promises which a reasonable person in the position of the promisee would be justified in understanding were included"); Randolph v. Mondeléz Glob. LLC, No. 21 Civ. 10858, 2022 WL 953301, at *2 (S.D.N.Y. Mar. 30, 2022) (holding that test for General Business Law § 349 claim is whether representations were "likely to mislead a reasonable consumer acting reasonably under the circumstances"). Accordingly, even assuming, arguendo, that Oppenheimer and its expert are correct that class members had different interpretations and expectations regarding the ABD Program, those interpretations and expectations do not present issues requiring individual rather than classwide resolution.

Fourth, Oppenheimer argues that its anticipated affirmative defenses, such as waiver, ratification, causation, and failure to mitigate, are not capable of being addressed on a classwide basis. Opp'n at 15-18. For instance, Oppenheimer's anticipated waiver defense would require it to prove that a particular class member had knowledge of Oppenheimer's breach yet continued to participate in the ABD Program. Id. at 15-16. Similarly, the defense of failure to mitigate would require Oppenheimer to show when a particular class member knew, or reasonably should have known, that it had a duty to mitigate its

damages from Oppenheimer's breach, as well as whether the class member took reasonable steps to mitigate those damages. Id. at 17-18. As to mitigation, one of Oppenheimer's experts enumerates the steps that class members could have taken to mitigate their damages and also discusses the possible reasons, such as valuing the total "bundle of services" they received from Oppenheimer, that class members may have chosen not to mitigate. See Stango Report at 45-50.

Several of Oppenheimer's anticipated affirmative defenses are likely to apply classwide. Take causation, for instance. To the extent that Oppenheimer intends to challenge whether its conduct caused class members' damages, Oppenheimer has not shown how class members could conceivably have been damaged by different causes. Of course, Oppenheimer is correct that "[e]ach class member was responsible for its own decisions with respect to its own accounts" and had the right to opt out of the ABD Program at any time, Opp'n at 16, but that does not mean that a class member who participated in the ABD Program for any portion of the proposed class period was damaged by some different cause than a class member who participated for some different period. Moreover, customers who opted out of the ABD Program entirely are, by definition, not members of the proposed class.

Another of Oppenheimer's anticipated affirmative defenses, waiver, would partially involve classwide considerations because one element of waiver is whether a plaintiff continued to perform under a contract. While certain elements of waiver, such as whether individual

class members knew of Oppenheimer's breach, are not susceptible of classwide resolution, much of the proof going to those elements would be objective because, under New York law, waiver requires a defendant to show a "clear manifestation of an intent by plaintiff to relinquish [its] known right." Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc., 448 F.3d 573, 585 (2d Cir. 2006).

More generally, even if other potential affirmative defenses, such as mitigation, might involve individualized considerations, courts have routinely held that the invocation of such affirmative defenses is insufficient to defeat class certification. See, e.g., In re Currency Conversion Fee Antitr. Litig., 264 F.R.D. 100, 116 (S.D.N.Y. 2010) ("[T]he need for individualized determinations of the putative class members' damages do[es] not, without more, preclude certification of a class under Rule 23(b)(3).").

Fifth, and finally, Oppenheimer contends that Liberty has not identified a classwide mechanism for measuring damages because Dr. Werner's proposed methodology is inconsistent with Liberty's theory of damages. Opp'n at 18-21. As the Court explained above, while Liberty's and Dr. Werner's language is not always precise, Liberty has not deviated from the theory of liability on which it settled at the motion to dismiss stage.

Consistent with that theory, Dr. Werner's report opines that classwide damages may be calculated by means of simple arithmetic. See generally Werner Report. Specifically, he proposes that classwide

damages can be determined by subtracting the total amount of interest that class members actually received from the total amount of interest that class members should have received had Oppenheimer paid interest at the rates that it promised. Id. at 8. Determining what total interest class members should have received, Dr. Werner indicates, is a further "mechanical exercise" that involves applying the interest rate that Oppenheimer should have paid "for any particular period (whether it be daily, monthly, years, or any other frequency) against the deposit balance" in the immediately prior period. Id. at 9. Based on these common-sense explanations, the Court concludes that Dr. Werner's methodology "actually measure[s] damages that result from [Liberty's] asserted theory of injury." Roach v. T.L. Cannon Corp., 778 F.3d 401, 407 (2d Cir. 2015).

Oppenheimer correctly points out that neither Dr. Werner nor Liberty has purported to identify what the proper interest rates should have been, when those rates will be calculated, or by whom. See Opp'n at 18-21; ECF No. 63-2 at 88 (Dr. Werner testifying at deposition that "someone," not himself, "will attempt to prove at trial . . . what an appropriate interest rate was"). Moreover, Liberty has not yet indicated how it intends to prove what interest rates Oppenheimer agreed to pay to ABD Program participants (for purposes of its breach of contract claim) or what reasonable expectations ABD Program participants should have had (for purposes of its implied covenant and General Business Law § 349 claims). But even though it remains to be

shown precisely how these and related showings will be determined, see MTD Opinion at 16, Liberty is right that "what rates Oppenheimer should have paid" is "the central merits question in this case," Reply at 7, rather than a question going to predominance under Rule 23(b)(3). Accordingly, whatever potential difficulties Liberty may face in proving these elements of its claims do not defeat class certification. It remains Liberty's burden, at summary judgment and/or at trial, to present evidence based on which a factfinder could determine the interest rates that Oppenheimer was obligated to pay or that ABD Program participants could have reasonably expected to receive.

For all these reasons, the Court concludes that common questions of law and fact predominate over individual questions. See Fed. R. Civ. P. 23(b)(3).

### 2. Superiority

In determining whether a class action "is superior to other available methods for fairly and efficiently adjudicating the controversy," id., the Court is to consider such matters as class members' interests in controlling separate actions, the existence of other pending litigation on the same subject, the desirability or otherwise of concentrating the litigation in a single forum, and the difficulties in managing a class action. See Fed. R. Civ. P. 23(b)(3)(A)-(D). Liberty argues that all these factors weigh in favor of certification, Pl.'s Mem. at 17, while Oppenheimer makes no independent argument regarding superiority, Opp'n at 21.

The Court agrees with Liberty that a class action is superior to other forms of adjudication. Most members of the proposed class appear to have claims too small in value to be worth litigating individually, the parties have pointed to no other pending litigation regarding Oppenheimer's ABD Program, and the parties have not identified any practical disadvantages to litigating this case as a class action.

Because Liberty has shown that common issues predominate and that a class action is superior to other methods for adjudicating this controversy, the Court concludes that Liberty has satisfied the requirements of Rule 23(b)(3).

IV.  Conclusion

For all the foregoing reasons, the Court finds that the proposed class satisfies Rule 23(a) and Rule 23(b)(3). Accordingly, the Court hereby grants Liberty's motion for class certification as to Counts One, Two, and Six. The Court hereby certifies the proposed class, appoints Liberty as class representative, and appoints Robbins Geller Rudman & Dowd LLP as class counsel.

As to Count Three, the Court denies Liberty's motion for class certification without prejudice to renewal of that motion if, no later than December 22, 2025, Liberty moves to amend the CAC by joining as a named plaintiff at least one class member with Article III standing to bring a claim for breach of fiduciary duty.

Additionally, the Court denies as moot Liberty's request that it exclude the reports of Oppenheimer's experts. See Reply at 4 n.2.

The Clerk of Court is respectfully directed to terminate the motion at docket number 50.

SO ORDERED.

New York, New York
December 8, 2025

JED S. RAKOFF, U.S.D.J.